1  **THOMPSON COBURN LLP**
   **MITCHELL N. REINIS, CSB 36131**
2  mreinis@thompsoncoburn.com
   **ROWENA G. SANTOS, CSB 210185**
3  rsantos@thompsoncoburn.com
   **2029 Century Park East, 19ᵗʰ Floor**
4  **Los Angeles, California 90067-3005**
   **Tel 310.282.2500 / Fax 310.282.2501**
5
   Attorneys for Plaintiffs
6  STATE OF CALIFORNIA, acting by and through
   the CALIFORNIA DEPARTMENT OF
7  TRANSPORTATION, and SACRAMENTO
   REGIONAL TRANSIT DISTRICT
8

9

10                **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF CALIFORNIA**

12                   **SACRAMENTO DIVISION**

13

14  STATE OF CALIFORNIA, acting by        CASE NO.
    and through the CALIFORNIA
15  DEPARTMENT OF                         **COMPLAINT FOR VIOLATION**
    TRANSPORTATION; and                   **OF THE ADMINISTRATIVE**
16  SACRAMENTO REGIONAL                   **PROCEDURE ACT;**
    TRANSIT DISTRICT,                     **VIOLATION OF THE**
17                                        **CONSTITUTION OF THE**
            Plaintiffs,                   **UNITED STATES;**
18                                        **DECLARATORY RELIEF**
        v.
19
    UNITED STATES DEPARTMENT
20  OF LABOR; and THOMAS E.
    PEREZ, in his capacity as
21  SECRETARY OF UNITED STATES
    DEPARTMENT OF LABOR,
22
            Defendants.
23

24

25

26

27

28

1

The State of California, acting by and through the California Department of Transportation ("Caltrans"), and Sacramento Regional Transit District ("SacRTD" and together with Caltrans, "Plaintiffs"), by and through counsel, allege as follows for their Complaint against the United States Department of Labor and Thomas E. Perez in his capacity as Secretary of the United States Department of Labor (together, the "Department"):

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to hear this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), 28 U.S.C. § 1331, and 28 U.S.C. § 2201.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## SUMMARY

3.     Before the Federal Transit Administration ("FTA") may issue grants to local transit agencies to improve or operate a transit system, federal law requires the Department to certify that fair and equitable labor protection is in place for transit employees. Here, the Department improperly declined to certify critical transit grants on the ground that California's landmark pension reform law, the California Public Employees' Pension Reform Act of 2013 ("PEPRA"), diminishes the collective bargaining rights of transit employees. In its determination letters, the Department takes the position that any change in state law affecting a mandatory subject of collective bargaining precludes grant certification, notwithstanding the continued ability of the transit agencies to bargain over pension and retirement issues.

4.     If allowed to stand, the practical effect of the Department's conclusion (that PEPRA abridges collective bargaining rights and that the only valid pension changes are those made at the bargaining table) would be to prevent state legislatures from amending any law that affects the employment terms of transit workers. The Department's decision violates federal law. It will result in the loss of

1  billions of dollars in federal funding to California transit providers and constitutes
2  an arbitrary, capricious, and unconstitutional effort to coerce California to alter a
3  pension reform law adopted for the benefit of California's citizens and public
4  employees. The Court should invalidate and overturn the Department's
5  determinations.

6  **NATURE OF THE ACTION**

7  5.      This action arises out of the Department's administration and
8  application of Section 13(c) of the Urban Mass Transportation Act of 1964
9  ("UMTA"), 49 U.S.C. § 1609(c) (1964) (now codified at 49 U.S.C. § 5333(b)
10 ("Section 13(c)").

11 6.      Most public employees in California, including employees of transit
12 agencies, have for decades been subject to California's pension laws. In 2012, the
13 California Legislature enacted, and Governor Edmund G. Brown Jr. signed into
14 law, PEPRA [AB 340 (Furutani), Stats. 2012, Chapter 296, codified at Calif. Gov't
15 Code § 7522, *et seq*.]. PEPRA was designed to reform California's public employee
16 pension systems and to bring the staggering cost of funding such systems under
17 fiscal control.

18 7.      PEPRA's primary effect was to amend California's pension laws as
19 they relate to "new" employees (those hired on or after the law's January 1, 2013
20 effective date). With respect to new employees, PEPRA precludes, among other
21 things, a public employer from offering a defined benefit pension plan to new
22 employees that would pose a greater cost or risk than the formula established by the
23 statute. PEPRA also requires new employees to contribute a specified percentage of
24 the annual cost of the defined benefit plan beginning after the expiration of any
25 existing pre-PEPRA collective bargaining agreement with inconsistent terms.

26 8.      In contrast, for existing (or classic) employees (those individuals who
27 were hired before January 1, 2013), PEPRA has only limited impact. It does not
28 require any change in the defined benefit plan formula or the employees' cost-

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

1    sharing contribution. In this respect, California followed the approach taken by the

2    federal government in 1986, when it reformed the federal pension program for new

3    federal employees, while leaving intact the pension rights of existing employees.

4         9.    PEPRA is intended to protect the fiscal stability of public employee

5    pensions in California and thereby enhance retirement security for public

6    employees. Importantly, PEPRA does not eliminate collective bargaining over

7    pension issues. Rather, it regulates certain aspects of pension benefits to protect

8    their viability while leaving a wide range of pension and retirement issues for

9    bargaining.

10        10.   On September 4, 2013, the Department issued its final determination

11   denying certification under 49 U.S.C. § 5333(b) (a "Section 13(c) certification") of

12   pending FTA grants for SacRTD. The Department's denial was based on its

13   conclusion that, "[u]nder PEPRA, SacRTD cannot comply with the requirements of

14   the [Transit] Act." Attached hereto as Exhibit A and incorporated by reference

15   herein is a true and accurate copy of the Department's September 4, 2013 final

16   determination regarding SacRTD grant numbers CA-03-0806-03 and 04.

17        11.   The Department issued a similar denial of Section 13(c) certification

18   of a separate grant for Caltrans on September 30, 2013. Attached hereto as Group

19   Exhibit B and incorporated by reference herein are true and accurate copies of (i)

20   the Department's September 30, 2013 final determination regarding Monterey-

21   Salinas Transit grant number CA-90-Z005-01 and Caltrans grant number CA-90-

22   Z117 and (ii) the Department's September 30, 2013 final determination regarding

23   Monterey-Salinas Transit grant number CA-03-0823.

24        12.   More than eighty California transit agencies, either directly or through

25   another entity, such as Caltrans, depend on federal funding to support their capital

26   projects and operational needs.

27        13.   On September 11, 2013, the California legislature passed Assembly

28   Bill No. 1222 (Bloom and Dickinson) ("AB 1222") which provides a temporary

5835284                                    4

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

1  exemption of transit workers' pension plans from PEPRA to allow critical work on

2  affected projects to continue pending judicial resolution of the lawfulness of the

3  Department's determinations denying Section 13(c) certification. The bill reached

4  the Governor's desk on September 30, 2013 and was signed into law on October 4,

5  2013.

6      14.    The exemption expires on the earlier of a judicial ruling that the

7  United States Secretary of Labor, or his or her designee, erred in determining that

8  the application of PEPRA precludes certification under 49 U.S.C. § 5333(b), or

9  January 1, 2015. The exemption becomes permanent upon a judicial ruling

10  upholding the determination of the United States Secretary of Labor, or his or her

11  designee, that the application of PEPRA precludes certification under 49 U.S.C. §

12  5333(b).

13      15.    With its denials of certification to SacRTD and Caltrans as precedent,

14  and in the absence of AB 1222, Plaintiffs are informed and believe that the

15  Department would have issued certification denials potentially affecting billions of

16  dollars of federal funding for California's transit agencies.

17      16.    The Department's current certification denials immediately and

18  directly impact Plaintiffs. SacRTD will not receive much-needed federal funding

19  for its South Sacramento Corridor Phase 2 Light Rail Extension Project. Some of

20  those funds lapsed permanently on October 1, 2013 at the beginning of Federal

21  Fiscal Year 2014, and SacRTD now is unable to obtain that funding from FTA.

22      17.    Caltrans likewise will not receive federal funding for Monterey-

23  Salinas Transit's Mobility Management Project. Monterey-Salinas Transit is the

24  only public transit bus operator in Monterey County.  It provides fixed-route,

25  demand response, and special seasonal transit service to a 280-square mile area of

26  Monterey County with connections to points in Santa Cruz County, San Luis

27  Obispo County, and Santa Clara County. Through the Mobility Management

28  Project, Monterey-Salinas Transit intends to continue brokering transportation

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

services, incorporate a new elderly and disabled taxi mobility program, and expand current travel training marketing and outreach. The funds sought by Caltrans lapsed permanently on October 1, 2013 at the beginning of Federal Fiscal Year 2014, and Caltrans now is unable to obtain that funding from FTA.

18.     As a result of the anticipated lapse of FTA grants to several grantees in the State, and to ensure uninterrupted service and avoid layoffs, California passed urgency legislation [AB 1222] to backstop a portion of the lapsed federal funding to California transit agencies with loans from the Public Transportation Account in the State Transportation Fund administered by Caltrans.

19.     The Department's denials of certification of California transit agency federal transportation grants, and FTA's resulting inability to provide those grants, will impact SacRTD's and other California transit systems' services to their riders (including the transit-dependent, disabled, elderly, and low-income individuals). It will materially and negatively impact essential public transportation services that those riders depend on for work, personal, and recreational use, as well as the ability of transit systems to make capital improvements. It thereby will damage California's economic health, transportation network, environmental quality, and attainment of required air quality standards in its urban areas.

20.     On information and belief, the Department based its denial of Section 13(c) certification for SacRTD's grants, in part, upon its arbitrary and capricious determination, made in excess of its statutory authority, that pension benefits under the existing SacRTD-Amalgamated Transit Union collective bargaining agreement extended to future employees and that PEPRA therefore reduced existing pension benefit levels for those new employees in violation of Section 13(c)(1). To conclude that PEPRA impermissibly reduced pension benefits of individuals who were not yet employed by transit agencies, the Department erroneously relied upon federal labor relations law that by its terms does not apply to state or federal public employees and ignored binding legal precedent that state law, not federal law,

1  governs the terms of a pension plan of public employees and the state's authority to
2  change those terms.

3      21.    On information and belief, the Department also based its certification
4  denial on the erroneous conclusion that PEPRA constrained the future collective
5  bargaining rights of California public transit employees over pension and retirement
6  issues in violation of Section 13(c)(2). In so doing, the Department acted in an
7  arbitrary and capricious manner, exceeded its statutory authority, and ignored
8  procedural and substantive requirements established by law.

9      22.    On information and belief, the Department based its denial of Section
10  13(c) certification for Caltrans's grant on the same grounds set forth in paragraphs
11  20 and 21 above.

12      23.    By its actions, the Department unconstitutionally impaired the fiscal
13  and legislative sovereignty of California.

14      24.    On September 30, 2013, the Department issued final determinations
15  denying certification of pending FTA grants for the Santa Clara Valley
16  Transportation Authority, Monterey-Salinas Transit, the Alameda-Contra Costa
17  Transit District, and the Golden Gate Bridge, Highway and Transportation District.
18  On information and belief, the Department's basis for denying certification to these
19  transit agencies is substantially similar to its basis for denying certification of the
20  SacRTD and Caltrans grants.

21                              **PARTIES**

22      25.    California is a sovereign state and constituent member of the United
23  States.

24      26.    Caltrans is an executive department within the State of California,
25  headquartered in Sacramento, California.

26      27.    SacRTD is a special regional transit district, authorized by California
27  Public Utilities Code § 102000, *et seq.* and located in Sacramento County,
28  California.

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

28. The United States Department of Labor is the federal government agency responsible for administering Section 13(c).

29. Thomas E. Perez is the Secretary of the United States Department of Labor.

## BACKGROUND

### The State of California

30. California has a sovereign interest and stake in implementing PEPRA for California public employees. The California Legislature passed, and Governor Brown signed, PEPRA to put into operation responsible, comprehensive pension reform for state and local public pension systems that reflects both the needs of public employees and the fiscal circumstances of the State and local governments, as well as California's public transit agencies.

31. California's public transit network and operations rely in great part on and would not be self-sustaining without federal funds. The health, safety, and well-being of California residents will be detrimentally affected by the loss of federal grant funds. Mass transit plays a vital role throughout California and affects both local economies and the State economy as a whole. Without federal grant funds, transit agencies will cut service and lay off employees, thereby restraining commerce in the State in a substantial way and affecting the well-being of a large portion of California's residents. If allowed to stand, the Department's determinations will unjustly exclude California and its residents from the benefits that flow from participation in the federal system.

32. California already has felt the effects of the Department's determinations. In anticipation of the loss of federal funding, California passed urgency legislation [AB 1222] temporarily exempting transit workers from PEPRA and authorizing cash flow loans from the Public Transportation Account in the State Transportation Fund to impacted local mass transit providers upon request.

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

**Caltrans**

33.   Pursuant to Cal. Gov't Code § 14030, Caltrans's powers and duties include coordinating and assisting local transit entities in strengthening the development and operation of balanced, integrated mass transportation and developing the full potential of all resources available to meet California's transportation needs, including maximizing the amount of federal funds available to California and increasing the efficiency by which such funds are utilized.

34.   Caltrans supports public transit in California in a number of ways, including through financial assistance to California's municipal transit agencies and preparation of the State Transportation Improvement Program, which allocates state transportation funds for interregional and regional capital improvement projects. Caltrans also ensures that funds are available for public transit projects by serving as a direct recipient of federal funds under a number of FTA funding programs. Caltrans determines eligible projects for federal funding through a competitive statewide call for projects from eligible local agencies and then submits grants to FTA for the selected projects.

35.   One project selected by Caltrans for FTA funding was Monterey-Salinas Transit's Mobility Management Project. The Department denied certification of the grant for this project on September 30, 2013 [Group Exhibit B].

**SacRTD**

36.   SacRTD serves a 418-square mile area in Sacramento County, California. SacRTD operates approximately 69 bus routes, 38.6 miles of light rail, 50 light rail stations, 33 bus and light rail transfer centers and 18 park-and-ride lots. SacRTD also serves approximately 3,140 bus stops throughout Sacramento County. SacRTD's annual ridership is 27,300,000. SacRTD relies heavily on federal funding from FTA for its capital expenditures, including 50 percent of the costs for the South Sacramento Corridor Phase 2 Project, which is estimated to cost a total of $270 million.

5835284

9

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

1    37.    SacRTD employs approximately 942 employees, of which 860 are
2    represented employees. The Amalgamated Transit Union, Local Division 256
3    represents 492 of SacRTD's employees in collective bargaining with SacRTD.

4    38.    SacRTD has the statutory authority under state law to establish an
5    independent retirement system for its employees. SacRTD also is authorized to
6    establish a pension trust and may make participation in the pension trust plan
7    compulsory for its officers and employees.

8    39.    Pursuant to its authority, and through collective bargaining, SacRTD
9    has established a retirement system (a pension plan) for its unionized employees.
10   The pension plan is a traditional defined benefit plan that provides an annual benefit
11   upon retirement, which is determined as a percentage of an employee's final
12   average compensation multiplied by the employee's years of service. SacRTD also
13   provides disability and survivor benefits under the plan. Currently, the plan is
14   funded exclusively through employer contributions and the earnings on plan assets.
15   The plan is qualified under Internal Revenue Code ("I.R.C.") § 401(a) and is a
16   governmental plan within the meaning of I.R.C. § 414(d) and § 3(32) of the
17   Employee Retirement Income Security Act of 1974 ("ERISA"). By the express
18   agreement of the parties, the plan is governed by California state law to the extent
19   not preempted by federal law.

20   40.    SacRTD relies heavily on federal funding, including federal
21   discretionary funds under the Section 5309 capital investment program and Section
22   5307 formula funds, to acquire capital assets, support its capital program, construct
23   rail projects, and fund preventive maintenance activities. SacRTD receives these
24   federal funds in the form of grants from FTA.

25                    **The Department's Denials of Section 13(c) Certification**

26   41.    Under Section 13(c), the Department must certify that the interests of a
27   transit agency's employees are protected under "fair and equitable" arrangements as
28   a condition to the receipt of FTA grants.

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

42.    Section 13(c) requires that these employee protective arrangements (generally termed "13(c) Agreements" or "13(c) Arrangements") include provisions that may be necessary for, among other things, "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements" and "the continuation of collective bargaining rights" [49 U.S.C. § 5333(b)].

43.    On November 15, 2012, SacRTD applied for a grant from FTA for funding for the South Sacramento Corridor Phase 2 Project (Extension of South Corridor LRT Service from Meadowview Road to Cosumnes River College). FTA assigned the grant reference number CA-03-0806-03. SacRTD planned to use the requested grant funds as reimbursement for capital expenditures made prior to January 1, 2013.

44.    On December 12, 2012, the Department's Office of Labor-Management Standards notified SacRTD and the labor organizations representing transit employees in the project's service area of the Department's intent to certify the pending grant on the basis of the existing 1977 13(c) Agreement, as amended, and the 2011 Unified Protective Arrangement, unless the Department received a written objection within 15 calendar days of the referral.

45.    In its December 12, 2012 referral letter, the Department included the following language in the header (bold emphasis in original):

> **The Department is aware that the newly enacted Public Employees' Pension Reform Act of 2013, AB 340 (Furutani), Stats. 2012, Chapter 296 (PEPRA) may affect the ability of California recipients to comply with 49 U.S.C. 5333(b)(2)(A) & (B), which require the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise and the continuation of collective bargaining rights. Grant recipients and unions party to this referral are requested to review the requirements of PEPRA, and if appropriate, utilize the objections procedures, explained on page 2 of this referral, to inform the Department, and each other, of any conflicts between PEPRA and 49 U.S.C. 5333(b)(2)(A) & (B) and/or their protective arrangements. The parties to this referral may respond to any objection(s)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**prior to the Department's determination of the sufficiency of the objection(s).**

The Department included this same boilerplate notice in a letter dated August 15, 2013 regarding the Department's referral of a pending FTA grant application for Los Angeles County Metropolitan Transportation Authority (grant number CA-95-X227). On information and belief, the Department included the same or substantially similar notice language in its referral letters concerning grants to other California entities.

46.     The Amalgamated Transit Union ("ATU") filed an objection to the Department's referral on December 20, 2012, on the grounds that the enactment of PEPRA removed or limited certain mandatory and/or traditional subjects of collective bargaining in violation of Section 13(c) requirements.

47.     SacRTD responded to ATU's objection on December 28, 2012. SacRTD opposed ATU's objection on the ground that PEPRA did not substantively impact existing collective bargaining agreements or future bargaining, or otherwise eliminate or remove pension issues from bargaining.

48.     By letter dated January 10, 2013, the Department determined that ATU raised sufficient objections to the Department's referral, stating: "The state law [PEPRA] appears to have removed mandatory and/or traditional subjects of collective bargaining from the consideration of the parties and may prevent [SacRTD] from continuing the collective bargaining rights of employees, as required by Section 13(c)(2) of the Federal Transit Act, codified as 49 U.S.C. 5333(b)(2)(B)."

49.     The Department directed SacRTD and ATU to engage in good faith negotiations and/or discussions to seek a mutually acceptable resolution of the issues concerning the continuation of collective bargaining.

50.     Also in the January 10, 2013 letter, the Department notified the parties that it did not anticipate issuing an interim certification within five (5) days of the

1   end of negotiations due to the "substantial possibility that the parties' failure to

2   negotiate a statutorily sufficient resolution to the issues in this matter may render

3   [SacRTD] ineligible for the receipt of Federal funds." This refusal was contrary to

4   the Department's standard practice regarding interim certifications, as set forth in

5   the Department's guidelines [29 C.F.R. Part 215].

6       51.   SacRTD and ATU were unable to reach a mutually acceptable

7   resolution of the issues presented in ATU's objection to the referral. Pursuant to the

8   Department's guidelines and the January 11, 2013 letter, SacRTD and ATU filed

9   their separate final proposals with the Department on February 12, 2013.

10      52.   In its proposal to ATU, SacRTD identified and offered to bargain over

11  a number of pension issues, including but not limited to the establishment of a new

12  or supplemental defined contribution plan, optional or supplemental retirement

13  benefits for existing and new employees, and addressing pensionable compensation

14  issues. ATU, on the other hand, refused to accept anything less than an agreement

15  that pension benefits would be the same for current and new employees and

16  SacRTD's support in seeking a prompt amendment to PEPRA exempting transit

17  workers' pension plans from PEPRA. In support of its final proposal to the

18  Department, ATU argued that "the DOL has already found that PEPRA presents

19  circumstances that are inconsistent with 49 U.S.C. § 5333(b), as it removes

20  mandatory and/or traditional subjects of bargaining."

21      53.   On April 18, 2013, as previewed in the January 10, 2013 letter, the

22  Department did not issue an interim certification for the pending grant.

23      54.   Also on April 18, 2013, the Department established a briefing schedule

24  and directed the parties to provide arguments on six enumerated issues.

25      55.   The parties filed their initial briefs on May 8, 2013, SacRTD timely

26  filed its reply brief on May 20, 2013, and ATU filed its reply brief on May 21,

27  2013.

28      56.   On September 4, 2013, the Department issued its final determination

1   [Exhibit A]. The Department concluded that PEPRA "makes significant changes to

2   pension benefits that are inconsistent with section 13(c)(1)'s mandate to preserve

3   pension benefits under existing collective bargaining agreements and section

4   13(c)(2)'s mandate to ensure continuation of collective bargaining rights " and

5   denied certification of SacRTD's pending grants.

6      57.   The Department found that any restriction of the right to bargain over

7   a mandatory subject of collective bargaining violates Section 13(c).

8      58.   The Department acknowledged that nothing in Section 13(c) or other

9   federal law restricts a state's enactment of law regulating the pensions of public

10   employees, but determined that a state must forego federal funding if a state law

11   alters the pension rights of public transit employees in any respect.

12      59.   The Department found, contrary to established congressional intent,

13   that federal labor law, rather than state labor law, defines the substantive meaning

14   of the collective bargaining rights that must be continued for purposes of Section

15   13(c) (contrary to federal case law precedent, contrary to the terms of the SacRTD

16   1977 13(c) Agreement, and contrary to the SacRTD pension plan agreement).

17      60.   Finally, the Department found that the effect of PEPRA on new

18   employees precluded SacRTD from preserving the pension benefits under existing

19   collective bargaining agreements and continuing collective bargaining rights as to

20   those new employees, based on decisions under the National Labor Relations Act

21   (which does not apply to public employees) holding that new or future employees

22   are entitled to the pension benefits set forth in collective bargaining agreements in

23   place prior to their obtaining employment. The Department also found that PEPRA

24   affects the rights of existing employees and prevents SacRTD from creating certain

25   new defined benefit plans for their benefit.

26      61.   The Department's conclusions are inconsistent with California law and

27   California's interpretation of PEPRA, and the Department's interpretations of state

28   law are due no deference. Under California law, PEPRA's enactment and its

1   application to employees hired after its effective date were a proper exercise of

2   California's power to regulate pensions and did not unlawfully impair the pension

3   benefits or bargaining rights of prospective employees. Similarly, the enactment

4   and implementation of the PEPRA provisions that affect existing employees were

5   lawful under California law.

6       62.   On September 30, 2013, the Department denied Section 13(c)

7   certification for Caltrans's grant application for funds to support Monterey-Salinas

8   Transit's Mobility Management Project (grant number CA-90-Z117) [Group

9   Exhibit B]. The Department referenced its separate September 30, 2013 final

10   determination denying certification for Monterey-Salinas Transit's grant application

11   for grant number CA-03-0823, and stated that "PEPRA presents identical obstacles

12   to the certification of the [Mobility Management Project] grants for the benefit of

13   [Monterey-Salinas Transit]." The final determination for grant number CA-03-0823

14   contained language and reasoning nearly identical to that in the Department's final

15   determination for SacRTD.

16       63.   On information and belief, in addition to the above described SacRTD

17   and Caltrans grants, the Department has, for over ten months, failed to certify a

18   majority of the grants to California transit agencies, resulting in a total amount of

19   funding withheld of over $1 billion.

20       64.   For the reasons set forth herein, the Department's determinations and

21   its application of Section 13(c) violated the Administrative Procedure Act and the

22   U.S. Constitution.

23                         **FIRST CLAIM**

24   **(Violation of the Administrative Procedure Act--Arbitrary and**
     **Capricious Agency Action and Agency Action not in Accordance**
25   **with Law)**

26

27       65.   Plaintiffs incorporate each and every allegation contained in

28   paragraphs 1-64, as if fully set forth herein.

66.     Section 13(c) requires that 13(c) Arrangements include provisions as may be necessary for the continuation of collective bargaining rights.

67.     Section 13(c) does not disturb the application of state labor law to the relationships between public transit employers and transit employees. It does not prohibit a state from enacting legislation that regulates certain elements of public sector pension benefits while retaining overall bargaining over pension and retirement issues.

68.     PEPRA does not remove or eliminate pension or retirement issues as a subject of collective bargaining.

69.     In its September 4, 2013 decision denying certification of the SacRTD grants [Exhibit A], the Department concluded that PEPRA "precludes the Union from negotiating many aspects of their pension plans, including the employee contribution rate, in subsequent agreements."

70.     The Department reached the same conclusion in its September 30, 2013 decision with respect to the Caltrans grant to support Monterey-Salinas Transit's Mobility Management Project [Group Exhibit B].

71.     In finding that PEPRA prevented SacRTD from continuing the collective bargaining rights of its union employees, the Department interpreted and applied Section 13(c) far beyond its statutory intent, in a manner fundamentally inconsistent with the section's legislative history, in conflict with precedential judicial and Department interpretations and application of Section 13(c), and inconsistent with the scope and effect of PEPRA.

72.     The Department interpreted PEPRA, a state statute, without giving proper deference to the opinions of California's Secretary of Labor and Workforce Development (supported by legal analysis by the agency's general counsel) regarding the effects of PEPRA, particularly that California transit agencies have a continued capacity to collectively bargain following PEPRA. By failing to consider and give controlling weight to the opinion of the state on the application and

interpretation of the state's own statute, the Department incorrectly substituted its judgment of state law for that of the state, failed to follow its own precedent of giving state opinions on state statutes controlling weight, and failed to give a reasoned explanation for its departure from prior precedent.

73.   Upon information and belief, the Department also was inconsistent and disparate in its certification determinations following the enactment of PEPRA, certifying certain agencies' grants simply because the involved union did not object to, or concurred in, the certification regardless of PEPRA's applicability to those agencies.

74.   For these reasons, the Department's issuance of the denials of certification was arbitrary and capricious.

75.   As a result of the Department's action, Plaintiffs face a substantial financial harm. Some of Plaintiffs' grant funds have lapsed, and Plaintiffs now are unable to obtain that funding from FTA. The Department's action prevents California from fully implementing PEPRA, threatening the financial soundness of the pension systems that provide benefits to public transit agency workers and negatively impacting California's economy. In addition, and in the absence of AB 1222, SacRTD, Caltrans, and other California transit agencies would have been denied transportation-related grant funds in the future in excess of $1 billion because of the Department's incorrect interpretation and application of Section 13(c) in light of PEPRA.

76.   Therefore, Plaintiffs are entitled to relief under 5 U.S.C. §§ 702 and 706(2)(A).

## SECOND CLAIM

### (Violation of the Administrative Procedure Act--Agency Action in Excess of Statutory Authority)

77.   Plaintiffs incorporate each and every allegation contained in paragraphs 1-64 and 67, as if fully set forth herein.

78.   Section 13(c) requires that 13(c) Arrangements include provisions as may be necessary for the preservation of rights, privileges, and benefits under existing collective bargaining agreements.

79.   California labor law applies to the relationship between California public transit employers and their employees. Pursuant to an explicit governing law provision, California law also controls the pension plan agreement covering employees of ATU Local 256.

80.   Under California labor law, prospective employees have no vested right to any benefits prior to accepting employment.

81.   In its September 4, 2013 decision denying 13(c) certification of the SacRTD grants [Exhibit A], the Department concluded that PEPRA "significantly reduces pension entitlements under the existing collective bargaining agreements for employees hired after January 1, 2013," the effective date of PEPRA.

82.   The Department reached the same conclusion in its September 30, 2013 decision with respect to the Caltrans grant to support Monterey-Salinas Transit's Mobility Management Project [Group Exhibit B].

83.   In finding that future SacRTD employees have pension rights under existing collective bargaining agreements that predate their employment, the Department ignored California labor law, the legislative history of Section 13(c) confirming that state labor law applies to 13(c) Agreements, established precedent regarding the states' control over public pensions, and the choice of law provision of the pension plan agreement between SacRTD and ATU.

84.   The Department relied instead on judicial precedent under the National Labor Relations Act, an Act that by its terms does not apply to public employers.

85.   In so doing, the Department acted in excess of its statutory authority in denying certification of the SacRTD and Caltrans grants.

86.   As a result of the Department's action, Plaintiffs face a substantial financial harm. Some of Plaintiffs' grant funds have lapsed, and Plaintiffs now are

1  unable to obtain that funding from FTA. The Department's action prevents

2  California from fully implementing PEPRA, threatening the financial soundness of

3  the pension systems that provide benefits to public transit agency workers and

4  negatively impacting California's economy. In addition, and in the absence of AB

5  1222, SacRTD, Caltrans, and other California transit agencies would have been

6  denied transportation-related grant funds in the future in excess of $1 billion

7  because of the Department's incorrect interpretation and application of Section

8  13(c) in light of PEPRA.

9      87.    Therefore, Plaintiffs are entitled to relief under 5 U.S.C. §§ 702 and

10  706(2)(C).

## THIRD CLAIM

### (Violation of the Constitution of the United States--Agency Action in Violation of the Spending Clause and the Tenth Amendment)

14      88.    Plaintiffs incorporate each and every allegation contained in

15  paragraphs 1-64, 67, and 79-80, as if fully set forth herein.

16      89.    The Spending Clause of the Constitution of the United States [U.S.

17  Const. art. I, § 8, cl. 1] provides Congress with the power to "pay the Debts and

18  provide for the … general Welfare of the United States." The Spending Clause does

19  not permit attaching conditions to federal grants where the conditions operate

20  primarily to coerce a state into changing its laws in a field Congress generally

21  leaves to state regulation and where the coerced legislative changes are not directly

22  related to the objectives behind the federal grants.

23      90.    The Tenth Amendment to the Constitution of the United States [U.S.

24  Const. amend. X] provides: "The powers not delegated to the United States by the

25  Constitution, nor prohibited by it to the States, are reserved to the States

26  respectively, or to the people."

27      91.    The Department's interpretation and application of Section 13(c) in the

28  wake of the passage and enactment of PEPRA has resulted in the withholding of

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

1     over $1 billion in federal grant funds.

2        92.    The Department's interpretation and application of Section 13(c), and

3 in particular its withholding of grant funds, operated primarily to coerce California

4 into changing a public pension reform enactment that California adopted for the

5 benefit of its citizens and public employees.

6        93.    The Congress has expressly indicated its intent that the regulation of

7 public pensions be the prerogative of the states.

8        94.    The Department presented California with a Hobson's choice--change

9 its pension reform legislation or forgo over $1 billion of federal transit funds. The

10 Department left California with no realistic option. By so doing, the Department

11 undermined the independent fiscal and legislative sovereignty of California and

12 interfered with California's exercise of its police powers and prerogative to legislate

13 for the benefit of its citizens in a field Congress has expressly left to state

14 regulation.

15        95.    The Department's interpretation and application of Section 13(c) is

16 inconsistent with established limitations on federal power under the Spending

17 Clause because it operates to condition the receipt of federal funds on ambiguous

18 requirements, and the conditions imposed do not directly relate to the objectives of

19 the federal grant program.

20        96.    The coercion to change state law regulating public pensions created by

21 the Department's interpretation and application of Section 13(c) exceeds the limits

22 of federal power to secure state compliance with federal conditions under the

23 Congress's spending power in Article I of the Constitution of the United States,

24 violates the Tenth Amendment to the Constitution of the United States, and is

25 contrary to the Constitution's principles of federalism.

26        97.    The Department's interpretation and application of Section 13(c) also

27 violates the basic principles of fiscal sovereignty and sovereign control over the

28 public purse. Only California elected officials may spend California's money.

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

Through Section 13(c), however, the Department improperly acted to force California to change its pension reform legislation and improperly interfered with California's control of transit agencies' spending on pensions.

98.    The Department's interpretation and application of Section 13(c) in violation of Article I of the Constitution of the United States and the Tenth Amendment to the Constitution of the United States is due no deference by this Court.

## FOURTH CLAIM

### (Violation of the Administrative Procedure Act--Agency Action with Pre-Judgment Bias and Without Necessary Due Process)

99.    Plaintiffs incorporate each and every allegation contained in paragraphs 1-64, 67, and 79-80, as if fully set forth herein.

100.    On information and belief, the Department determined at the outset of the Section 13(c) certification process, long before the parties briefed the underlying issues, that SacRTD could not meet its Section 13(c) obligations and also comply with PEPRA.

101.    The Department included bolded language in its referral letter to SacRTD and ATU, and on information and belief in other referral letters issued to California grant recipients, that PEPRA "may affect the ability of California recipients to comply with 49 U.S.C. 5333(b)(2)(A) & (B)."

102.    The Department stated in a January 10, 2013 letter to SacRTD and ATU that "state law appears to have removed mandatory and/or traditional subjects of collective bargaining from the consideration of the parties and may prevent [SacRTD] from continuing the collective bargaining rights of employees, as required by Section 13(c)(2) of the Federal Transit Act, codified as 49 U.S.C. 5333(b)(2)(B)."

103.    Also in the January 10, 2013 letter, the Department notified the parties that (contrary to its standard practices) it did not anticipate issuing an interim

1  certification within five (5) days of the end of negotiations due to the "substantial

2  possibility that the parties' failure to negotiate a statutorily sufficient resolution …

3  may render [SacRTD] ineligible for the receipt of Federal funds."

4      104.  In its presentation of the issues to the parties, the Department

5  instructed SacRTD to support a position that SacRTD did not advance in its

6  response to ATU's objection to the referral.

7      105.  On information and belief, the Department effectively determined that

8  PEPRA conflicted with Section 13(c)'s requirements before SacRTD and ATU

9  submitted the briefs requested by the Department in the subsequent adjudicatory

10  process.

11      106.  The Department's prejudgment of both the law and facts had an

12  equally prejudicial effect on the certification process for the Caltrans grant.

13      107.  The Department's bias is contrary to SacRTD's and Caltrans's

14  constitutional right to a fair adjudication of the complex facts and legal issues at

15  stake, and denied SacRTD and Caltrans the opportunity for meaningful review of

16  their positions.

17      108.  As a result of the Department's action, Plaintiffs face a substantial

18  financial harm. Some of Plaintiffs' grant funds have lapsed, and Plaintiffs now are

19  unable to obtain that funding from FTA. The Department's action prevents

20  California from fully implementing PEPRA, threatening the financial soundness of

21  the pension systems that provide benefits to public transit agency workers and

22  negatively impacting California's economy. In addition, and in the absence of AB

23  1222, SacRTD, Caltrans, and other California transit agencies would have been

24  denied transportation-related grant funds in the future in excess of $1 billion

25  because of the Department's incorrect interpretation and application of Section

26  13(c) in light of PEPRA.

27      109.  Therefore, Plaintiffs are entitled to relief under 5 U.S.C. §§ 702 and

28  706(2)(D).

## FIFTH CLAIM

### (Claim for Declaratory Judgment (28 U.S.C. § 2201))

110.  Plaintiffs incorporate each and every allegation contained in paragraphs 1-64, 66-75, 78-86, 89-97, and 100-108, as if fully set forth herein.

111.  There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of Plaintiffs and their legal relations with the Department to warrant relief under 28 U.S.C. § 2201.

112.  The harm to Plaintiffs as a direct result of the Department's actions is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.

**WHEREFORE,** Plaintiffs pray for an order and judgment:

A. Setting aside the Department's September 4, 2013 determination denying certification of SacRTD grant numbers CA-03-0806-03 and 04;

B. Setting aside the Department's September 30, 2013 determination denying certification of Caltrans grant number CA-90-Z117;

C. Declaring that PEPRA does not impair the ability of SacRTD, or any other California federal grant recipient or subrecipient, to meet its obligations under 49 U.S.C. § 5333(b) and/or to be eligible for federal grant funds;

D. Declaring that the Department erred in determining that PEPRA precludes certification under 49 U.S.C. § 5333(b);

E. Declaring the Department's interpretation and application of 49 U.S.C. § 5333(b) to be in violation of, and unsupported by the Congress's exercise of its powers under, Article I of the Constitution of the United States;

F. Declaring the Department's interpretation and application of 49 U.S.C. § 5333(b) to be in violation of the Tenth Amendment of the Constitution of the United States; and

G. Granting such other and further relief as is just and appropriate under the

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

1    circumstances.

2    October 4, 2013                              **THOMPSON COBURN LLP**

3

4                                    By:   _/s/ Mitchell N. Reinis_
                                          **MITCHELL N. REINIS**
5                                         Attorneys for Plaintiffs
                                          STATE OF CALIFORNIA, acting by
6                                         and through the CALIFORNIA
                                          DEPARTMENT OF
7                                         TRANSPORTATION, and
                                          SACRAMENTO REGIONAL
8                                         TRANSIT DISTRICT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: VIOLATION OF THE
CONSTITUTION OF THE UNITED STATES: DECLARATORY RELIEF

# Exhibit A

**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, D.C. 20210



September 4, 2013

Leslie Rogers, Regional Administrator
Federal Transit Administration, Region IX
201 Mission Street, Suite 2210
San Francisco, California 94105

Re:   FTA Application
      Sacramento Regional Transit District
      **FULL FUNDING GRANT AGREEMENT**
      South Sacramento Corridor Phase 2
      Project (Extension of South Corridor LRT
      Service from Meadowview Road to
      Cosumnes River College)
      **CA-03-0806-03 and CA-03-0806-04**

Dear Mr. Rogers:

This is in reply to the request from your office that we review the above-captioned application for a grant under section 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1609(c) (1964), now codified as part of the Federal Transit Act, 49 U.S.C. § 5333(b).

This is the Department of Labor's (Department or DOL) final determination of Sacramento Regional Transit District's (SacRTD) ability to preserve and continue, consistent with section 13(c), the pension benefits and collective bargaining rights of its employees represented by the Amalgamated Transit Union (ATU) Local 256 (ATU or Union).

Federal Transit law requires as a condition of financial assistance that the interests of employees affected by the assistance be protected under arrangements the Secretary of Labor certifies are fair and equitable, 49 U.S.C. § 5333(b)(1). The law specifically provides:

> Arrangements . . . shall include such provisions as may be necessary for

> (1)   the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;

> (2)   the continuation of collective bargaining rights;

000026

- 2 -

(3)   the protection of individual employees against a worsening of their positions with respect to their employment;

(4)   assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and

(5)   paid training or retraining programs.

49 U.S.C. § 5333(b)(2).[1] These arrangements are commonly referred to as section 13(c) agreements because the requirement for such arrangements originated in section 13(c) of the Urban Mass Transportation Act of 1964, 78 Stat. 307. Because the Secretary of Labor's certification is a "condition" for the award of a grant, the Secretary must certify the protective arrangements before the Department of Transportation can award funds to grantees. 73 Fed. Reg. 47,046, 47,047 (Aug. 13, 2008) (preamble to current DOL Guidelines).

In exercising the Department's discretion to ensure fair and equitable protective arrangements in compliance with section 13(c), the Department has reviewed California's Public Employee Pension Reform Act (PEPRA), Assembly Bill 340, (Furutani), Stats. 2012, Chapter 296, West's Ann.Cal.Gov.Code § 7522, et seq., in consultation with the State of California's Office of the Governor, and the State's Labor and Workforce Development Agency with respect to the precise contours of the statute.[2] The Department has also reviewed the relevant collective bargaining agreements, pension plans, and briefs and supporting materials provided by SacRTD and the Union to determine the effects of PEPRA on rights protected by section 13(c). We have concluded that PEPRA makes significant changes to pension benefits that are inconsistent with section 13(c)(1)'s mandate to preserve pension benefits under existing collective bargaining agreements and section 13(c)(2)'s mandate to ensure continuation of collective bargaining rights. Thus, PEPRA precludes the Department from providing the requisite certification to the Federal Transit Authority.[3]

## Background – State Law Change to Collective Bargaining Rights

On September 12, 2012, Governor Edmund G. Brown, Jr. signed into California law PEPRA and related pension reform changes. These statutory

---

[1] Note the text of the statute was codified from this earlier version in 1994 to separate the fourth assurance into two separate and lettered paragraphs.

[2] Along with the Department's independent review of PEPRA, attorneys from these California state government offices provided the Department with a useful summary of the PEPRA provisions, which the Department relied upon and supplied to the parties.

[3] This denial of certification is issued without prejudice to SacRTD's right to seek or obtain certification under changed circumstances.

provisions became effective on January 1, 2013. PEPRA applies to most
California transit systems.[4]  PEPRA's practical and legal effect on the
employees of transit agencies depends on each union's separately negotiated
collective bargaining agreement and the type of pension plan in which the
employees participate.[5]  In general, PEPRA is immediately effective for
employees hired on or after January 1, 2013.  These employees are termed
"new" employees or, when referring to their participation in any type of a public
retirement system or plan, "new" members. PEPRA Article 4, Section 7522.04(e)
and (f).  For the purpose of this determination, DOL adopts the term "classic,"
as used by the California Public Employee Retirement System, for all those
employees who do not meet the definition of "new."  PEPRA introduces a two-
tier pension benefit system for these two classes of employees.  *Id.*

PEPRA ultimately determines the pension contributions and every significant
aspect of the pension benefit calculation for "new" employees.  It controls the
benefit formula (i.e., percent multiplier of final compensation at various years
of service), the definition of compensation used to determine the pension
benefit ("pensionable compensation"), and the minimum age for receipt of a
pension; it imposes a cap on the amount of final compensation that can be
used in the pension benefit determination, and requires "new" employees to
pay 50 percent of normal pension costs.  Additionally, "new" employees are not
eligible to participate in supplemental defined benefit plans.  PEPRA Article 4,
Sections 7522.10, 7522.20, 7522.32, 7522.34(c), 7522.18(c).

PEPRA also affects the rights of "classic" employees.  As of January 1, 2018,
PEPRA authorizes employers to set "classic" employees' contribution level at 50
percent of the normal cost of pension benefits after bargaining to impasse,
restricted only by a cap set forth in Section 31631.5(a)(1).

Procedural Background – The Parties' Negotiations

The section 13(c) process begins when the DOL receives a copy of an
application for Federal assistance along with a request for certification of
employee protective arrangements from the Department of Transportation.
Upon receipt of an application involving employees represented by a labor
organization, DOL refers a copy of the application to that organization and

---

[4] Those operated by charter cities and charter counties not participating in the California Public
Employees Retirement System (CalPERS) or the 1937 Act County Requirement System and
those operated by the University of California are not affected.  In addition, transit systems that
use private contractors for the operation of all service and vehicle maintenance, as well as
other supporting functions, are not affected. PEPRA Article 4, Section 7522.02(a)(2).

[5] PEPRA's effect on employees of transit agencies also depends on whether the pension plan
falls under either CalPERS, the 1937 County Act Systems, or can be defined as an
"independent" plan, as is the case with the SacRTD-ATU Local 256 plan.

- 4 -

notifies the applicant of the referral. After referral and notice, DOL recommends the terms and conditions that are to serve as the basis for certification. The DOL's implementing Guidelines (Guidelines) reflect the practice that the previously certified protective arrangement is appropriate for application to the new grant. Therefore, DOL's referral will propose certification based on those terms and conditions. 29 C.F.R. § 215.3(b)(2).

Under DOL's implementing Guidelines, applicants and unions/employees may file "objections" to the terms of a proposed certification within fifteen days. DOL must then determine whether the objections are "sufficient," i.e., "raise[] material issues that may require alternative employee protections" or "concern[] changes in legal or factual circumstances that may materially affect the rights or interests of employees." 29 C.F.R. § 215.3(d). More specifically the Guidelines provide that the parties may "submit objections, if any, to the referred terms," while, at the same time, the parties are "encouraged" to arrive at "a mutually agreeable solution to objections any party has to the terms and conditions of referral." 29 C.F.R. § 215.3(d)(1).

The Amalgamated Transit Union objected to the proposed terms for employee protection certification contained in the Department's referrals for the above-referenced grants on December 20, 2012.[6] The union stated that contrary to the requirements of section 13(c)(1) and (2), the new law will "remove or limit certain mandatory and/or traditional subjects of collective bargaining." The union also stated that among other mandates, PEPRA will impermissibly require participating employers to unilaterally implement changes to retirement benefits without first bargaining with their employee representatives(s) by:

- Raising the minimum retirement ages;
- Reducing pension benefits for new public employees;
- Imposing new formulas for calculating pensions for new public employees;
- Imposing various measures designed to avoid pension "spiking"; and
- Adjusting the compensation cap annually and requiring certain contributions from employees to equal one-half of the normal costs of the plan.

Letter from Jessica M. Chu to John Lund (December 20, 2012), "Objections to Referral Terms".

The Department reviewed the union's objections concerning PEPRA and found the objections sufficient. On January 10, 2013, the Department

---

[6] On August 30, 2013, the Department consolidated grant amendment CA-03-0806-03 with grant amendment CA-03-0806-04. As such, this determination covers both grant amendments.

communicated to the parties that PEPRA appeared to have removed mandatory and traditional subjects of collective bargaining from the consideration of the parties and to have prevented the continuation of collective bargaining rights of employees. 49 U.S.C. § 5333(B)(2)(b). The Department determined that PEPRA constitutes a change in legal or factual circumstances that may materially affect the rights or interests of employees represented by the unions. See 29 C.F.R. § 215.3(d)(3)(ii).

Pursuant to DOL's Guidelines at 29 C.F.R. § 215(d)(3)(ii), the parties were directed on January 10, 2013, to engage in good faith negotiations/discussions to seek a mutually acceptable resolution of issues concerning the continuation of collective bargaining between SacRTD and ATU Local 256 in light of the recently enacted PEPRA.

The parties failed to negotiate a resolution of the issues and were directed to brief certain specified issues under a Briefing Schedule provided by the Department on April 18, 2013. The Department determined and notified the parties at that time that an interim certification of the grants would not be issued because PEPRA might present circumstances inconsistent with section 13(c). The parties submitted initial briefs on May 8, and reply briefs on May 20, 2013.

### SacRTD Pension Benefits

The collective bargaining agreement (CBA) and the Retirement Plan covering ATU Local 256 (Retirement Plan or Plan) set forth the pension arrangements between SacRTD and ATU. ATU Brief ("Br."), Exhs. 6 and 7. The Retirement Plan was initially adopted by SacRTD in 1974 and states that "the District has amended and restated the Plan on numerous occasions." Retirement Plan (Retire. Plan.), Art. 1. ATU states that it has negotiated aspects of the Retirement Plan at least 11 times between 1974 and 2004. ATU Br. p. 19; *see also* SacRTD Initial Br. 16.

The parties' CBA provides that "there shall be no employee contributions towards said pension plan." CBA Art. 67. Further, the CBA stipulates that SacRTD is to pay the total cost of the pension plan. Retire. Plan Article (Art.) 12.2; *see also* CBA Art. 67, § 2; CBA Art. 97, § 4. The Retirement Plan caps pensionable compensation at the IRS limit ($255,000 for 2013). Retire. Plan Art. 2.6(c); IRS Code Sect. 401(a)(17)(b). Under Article 7.1 of the Retirement Plan, members may retire after 25 years of service or at age 55 with at least 10 years of service. Retire. Plan Art. 7.1. The formula under the Retirement Plan provides for pension payments that start at 2.0 percent of final compensation multiplied by the employee's years of service and increase 0.1 percent per year of service until reaching 2.5 percent at either age 60 or after 30 years of service. Retire. Plan Art. 7.1. Additionally, in calculating pensionable

- 6 -

compensation, the SacRTD-ATU Local 256 Plan permits the inclusion of payouts of overtime, shift differentials, bonuses, and cash in lieu of vacation or sick leave. *See* Retire. Plan Art. 2.6(a)(2)-(a)(4). Pensionable compensation under the Retirement Plan is based on the employee's highest consecutive 48-month period of compensation. Retire. Plan Art. 2.16. Article 7.9 of the Plan permits employees who return from disability leave to purchase airtime credit for the term of their disability. ATU claims that it also negotiated benefit enhancements to foster early retirement. ATU Initial Br. 13, Ex. 12.

SacRTD has taken steps to implement PEPRA as it relates to "new" employees. On February 19, 2013, SacRTD distributed a memo to "new" employees announcing that it would begin on March 1, 2013, to deduct from their pay the PEPRA-required 50 percent contribution to pension costs. See ATU Initial Br. 11, 16, Ex. 13.


Position of SacRTD

The Department has carefully reviewed all of SacRTD's submissions, including initial and reply briefs along with attached exhibits. SacRTD characterizes PEPRA as a valid exercise of the State's police powers to regulate public pension plans. SacRTD analogizes PEPRA's limits on pension benefits and its cost-sharing provisions to state-mandated employment benefits which have been held not to conflict with collective bargaining rights. SacRTD Initial Br. 3 (*citing Metropolitan Life Ins. Co. v. Mass.*, 471 U.S. 724 (1985) (upholding Massachusetts law mandating mental health insurance coverage). It suggests that PEPRA, like other state labor standards, merely provides a "backdrop" to negotiations between employers and employees. *Id.* at 2-3 (*citing Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987)(Maine law requiring severance payments not pre-empted by labor law).

SacRTD argues that PEPRA does not conflict with section 13(c) because the new law predominantly affects "new" employees who, it asserts, have no pre-existing protected section 13(c) rights. *See Id.* at 7-10. According to SacRTD, although the collective bargaining agreement "would cover new employees hired within the lifetime of the agreement," PEPRA does not impair their rights because "the contractual rights of new employees to pensions are determined and established at the time of hiring," not before. *Id.* Similarly, SacRTD argues that extending negotiated terms and conditions of employment that are contradictory to State law to "new" employees would create new collective bargaining rights beyond the scope of 13(c). *Id.* at 8.

Additionally, SacRTD states that the controlling decision in *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), holds that state law violates section 13(c) only when it prohibits, eliminates, and "totally prevent[s]"

- 7 -

bargaining over mandatory subjects. *See* SacRTD Initial Br. 5-6 (citing *Donovan*, 767 F.2d at 947). Thus, no violation of section 13(c) occurs when a state law leaves intact the parties' ability to engage in good faith negotiations over some elements of a mandatory subject of bargaining. SacRTD Reply Br. 4. Here, SacRTD asserts that PEPRA merely "restrict[s]" the scope of bargaining over pension rights but "preserve[s] the ability to bargain over retirement benefits generally." SacRTD Initial Br. 5-6.

Position of the ATU

The Department has carefully reviewed the Union's initial and reply briefs along with attached exhibits. The Union asserts that PEPRA violates section 13(c)(1) by making substantial unilateral changes to pension benefits under the current collective bargaining agreement and violates section 13(c)(2) by significantly restricting the scope of bargaining over pensions. Any remaining latitude under PEPRA to bargain over pensions cannot compensate for the substantial changes imposed on the benefits of both "new" and "classic" employees. The Union argues that SacRTD cannot cure its PEPRA-imposed inability to bargain over most key aspects of the pension benefit simply by offering its willingness to bargain over wages, deferred compensation, and other economic terms. According to ATU, negotiations must occur over the full range of mandatory subjects of collective bargaining, including pension benefits. Therefore, SacRTD cannot satisfy its duty to bargain by offering to discuss compensation in the aggregate. Moreover, the Union asserts that a defined contribution plan cannot substitute for a defined benefit plan, because it is really a tax-advantaged savings and deferred compensation vehicle, not a pension benefit. ATU Initial Br. 17.

The Union does not claim that section 13(c) overrides PEPRA, but that PEPRA precludes SacRTD from meeting the requirements for Federal funding of public transit agencies under section 13(c). ATU states that the Secretary cannot certify protective conditions for SacRTD because PEPRA has caused employees to lose benefits to which they are entitled under the collective bargaining agreement and because it restricts the scope of bargaining over pensions.

Analysis of the Parties' Positions

Analyzing the parties' claims requires consideration of the Supreme Court's holding in *Jackson Transit Authority v. ATU, Local Division 1285*, 457 U.S. 15, 17-18 (1982). The Court recognized in *Jackson Transit* that section 13(c) mandates the preservation and continuation of collective bargaining rights as a precondition to receipt of federal transit aid. Specifically, the Court stated:

- 8 -

> To *prevent* federal funds from being used to destroy the collective-
> bargaining rights of organized workers, Congress included 13(c) in the
> Act . . . the statute lists several protective steps that *must be taken* before
> a local government may receive federal aid; among these is the
> preservation of benefits under existing collective bargaining agreements
> and the continuation of collective bargaining rights.

*Id.* at 17 (emphasis added). Shortly after *Jackson Transit*, the U.S. Court of
Appeals for the District of Columbia Circuit underscored section 13(c)'s
mandate to continue collective bargaining rights. *Donovan*, 767 F.2d at 939.
In *Donovan*, the union objected to the Department's section 13(c) certification
in the aftermath of a Georgia state law, Act 1506, which removed various
subjects from the scope of bargaining between the transit agency and the
union. The court, relying on *Jackson Transit*, reiterated that section 13(c) sets
forth mandatory requirements, "not simply general objectives or suggestions."
*Id.* at 944. Thus:

> [t]he Secretary is not free to certify a labor agreement that does not
> provide for the continuation of collective bargaining rights simply
> because he believes that, on balance, the agreement is fair. Rather, he
> must first determine that the requirements of the statute [i.e., the five
> enumerated sections of section 13(c)] are fully satisfied *before* he can find
> an agreement "fair and reasonable."

*Id.* at 946. Turning to the specific provisions of the Georgia law, the court
characterized the effect of the law as removing mandatory subjects from
collective bargaining. The court specifically noted that the provision in the
state law that barred the municipal transit agency from negotiating over
benefits for part-time employees prevented "the continuation of collective
bargaining over wages that section 13(c) mandates." *Id.* at 952. The court
concluded that while section 13(c) does not dictate or perpetuate the
substantive terms of a collective bargaining agreement, it requires that any
changes "be brought about through collective bargaining, not by state fiat." *Id.*
at 953.

While both parties cite to *Donovan* as setting forth the proper test for
determining whether a transit agency has satisfied section 13(c), the parties
interpret the holding in vastly different ways. The Union argues that under
*Donovan* the lessening or diminution of collective bargaining rights violates
section 13(c), and that PEPRA has such an effect. *See* ATU Initial Br. 5-6.
SacRTD seeks to narrow the applicability of the *Donovan* holding by arguing
that only the complete removal or elimination of a mandatory subject of
bargaining violates section 13(c), and that PEPRA does not completely remove
or eliminate pensions from collective bargaining. *See* SacRTD Initial Br. 5-6;
SacRTD Reply Br. 4.

- 9 -

*Donovan* provides no support for SacRTD's argument that only the elimination of pensions from the scope of collective bargaining would offend section 13(c). Indeed, the Court in *Donovan* noted that the Georgia law *"altered in several material respects* the existing statutory authorization of [the employer] to engage in collective bargaining" by reserving to management the inherent right to control various aspects of wages and working conditions. 767 F.2d at 951 (emphasis added). However, the law did not restrict the parties from negotiating over *entire* subjects of mandatory bargaining. For example, the law reserved to management the "right to subcontract service, other than for the operation of rail or bus vehicles, provided no employees are laid off." *Id.* This reservation left to the parties the ability to negotiate over subcontracting where layoffs would occur or subcontracting that did involve the operation of bus or rail. Similarly, under the law management reserved to itself "the right to hire part-time employees, for no more than 25 hours per week, without payment of fringe benefits." *Id.* This restriction still permitted bargaining over the hiring of part-time employees for more than 25 hours a week and where fringe benefits would be paid. In addition, the law reserved to management "the right to establish the number of regular hours that may be worked in a week, not to exceed 40 hours, and to fix the number of overtime hours, not to exceed 10 hours per week." *Id.* Once again, this removed only partially the subject of regular and overtime hours from the ambit of bargaining. Yet the court still concluded that the law violated Section 13(c)'s requirement to continue collective bargaining over mandatory subjects. Thus, we conclude that *Donovan* supports the union's position that restricting the right to bargain over mandatory subjects violates Section 13(c)(2).

Further, there is no support for SacRTD's removal or elimination approach in the language or history of section 13(c). Senator Morse, the sponsor of section 13(c), stated his intent that transit agencies that "lessen" collective bargaining rights not receive federal funding. As stated in the *Manager's Handbook: Guidance For Addressing Section 13(c) Issues,*[7] "supporters of the bill strongly asserted that the labor protection provisions were not intended to infringe upon or vitiate State or local laws, but rather to assure that the Federal assistance did not diminish any *existing* collective bargaining rights." (Emphasis in original).

---

[7] G. Kent Woodman, Attorney at Law, Eckert, Seamans, Cherin & Mellott, *Manager's Handbook: Guidance for Addressing Section 13(c) Issues,* (Publication written for the Public Private Transportation Network (PPTN), an Urban Mass Transportation Administration (UMTA) technical assistance program, p. 3. (February 24, 1987).(The opinions findings, and conclusions expressed in this publication are those of the author and not necessarily those of the PPTN, COMIS Corporation (administrator of the PPTN program), the United States Department of Transportation, UMTA, or the Office of the Secretary.) The author has provided services of a technical and advisory nature under contract to the PPTN and is considered an expert in his field.

- 10 -

There is nothing in *Donovan* or the language of section 13(c) that permits the Department to certify a transit grant if a change in state law substantially reduces existing benefits and significantly limits the scope of bargaining over them. Further, there is no support for SacRTD's removal or elimination approach in the language of sections 13(c)(1) and (2). In this instance, because SacRTD and its represented transit employees had the ability to bargain over the full panoply of pension rights, the process of collective bargaining with respect to those terms must continue in order for the Department to certify.

SacRTD argues that section 13(c) does not prevent a state from exercising its police powers by enacting a law regulating the pensions of state employees. *See* SacRTD Initial Br. 2-3; SacRTD Reply Br. 2-3, 7. SacRTD is correct, as section 13(c) does not supersede the operation of state law and impose federal policy on the state. Indeed, the State of California is free to pass any number of laws affecting public employees. However, if that law is inconsistent with the requirements of section13(c), the state must forego federal funding. As stated in *Donovan*, "Section 13(c) does not prescribe mandatory labor standards for the state but rather dictates the terms of federal mass transit assistance." 767 F.2d at 947. *See Jackson Transit*, 457 U.S. at 27 ("Congress intended that §13(c) would be an important tool to protect the collective-bargaining rights of transit workers, by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities") (footnote omitted); *Local Division 589 v. Commonwealth of Massachusetts,* 666 F.2d 618, 627 (1st Cir. 1981) (although section 13(c) does not invalidate state law, states that have laws that prevent the making of fair and equitable arrangements cannot obtain federal assistance).

Under the standard set forth in *Jackson Transit* and *Donovan,* the Department is legally obligated to deny certification where collective bargaining rights have neither been preserved nor continued.[8] As the court in *Donovan* stated, section 13(c)'s requirement that labor protective arrangements provide for continuation of collective bargaining rights means, at a minimum, "that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful, 'good faith' negotiations with their employer over wages, hours and other terms and conditions of employment." 767 F.2d at 951. The Department has consistently articulated this position in Departmental correspondence to grantees and unions. DOL's August 16, 2012, *Cover Letter for Referral for Michigan DOT Grant* (MI-04-0052-01); DOL's May 3, 2011, *Initial Response* and May 20, 2011

---

[8] The Department has similarly held that collective bargaining representatives are not obligated to bargain over benefits that have been unilaterally eliminated, or capped, nor must they bargain to a predetermined result. *ATU v. City Utilities of Springfield*, Dept. Case No. 9113c18 (June 1, 1999).

- 11 -

*Final Response to Objections for Michigan DOT Grant* (MI-95-x065); DOL's June 23, 2011 *Response to Objections for MBTA DOT Grant* (A-70-x001-01).

Relying on *Local 589*, 666 F.2d 618, SacRTD argues that PEPRA's modification to state law affecting public employee pensions, and by extension the scope of potential bargaining, comports with the letter and spirit of section 13(c).  In *Local 589*, the First Circuit upheld a Massachusetts law prohibiting the labor union from bargaining collectively over management's actions to hire, promote, assign, direct and discharge employees, to assign overtime, or to hire part-time employees.  The state law also forbade the transit authority from agreeing to pay pensions based upon overtime pay or to provide for automatic cost-of-living adjustments.  *See* SacRTD Reply Br. 1-2, n.1.  SacRTD's reliance on *Local 589* is misplaced.  That case dealt with the issue whether section 13(c) preempts a state law, not whether a state must provide protective arrangements consistent with section 13(c) in order to obtain federal grants. *See Donovan,* 767 F.2d at 947 n.9 ("We decide today the question the First Circuit did not reach, and hold that where a state, through its laws or otherwise, fails to satisfy the requirements of Sec. 13(c), the Secretary must cut off funds by denying certification."); *see also* FTA Legal Research Digest ("the Massachusetts case *left open the question of what would result if the state law precluded the state or its agencies from complying with 13(c),* which was essentially addressed in a subsequent decision involving an ATU challenge to a DOL certification" ((referencing *Donovan)* (emphasis added)).[9]

The DC Circuit's exhaustive decision in *Donovan* -- as opposed to the earlier First Circuit decision -- is the controlling case on this issue.  As discussed earlier, *Donovan* holds that the Secretary cannot certify a labor protective arrangement or agreement that fails to satisfy all five enumerated subsections of the Act.  Federal labor policy, rather than state law, defines the substantive meaning of the collective bargaining rights that must be continued for purposes of section 13(c).  Where a state statute forecloses negotiation between management and labor over mandatory subjects of collective bargaining, the Secretary cannot certify.  Here, there can be no dispute that pensions are a mandatory subject of bargaining. *Donovan,* 767 F.2d at 952, (citing *NLRB v. Black-Clawson Co.,* 210 F.2d 523 (6th Cir. 1954) (profit sharing plans are "wages")); *Detroit Police Officers Ass'n v. City of Detroit,* 391 Mich. 44, 214N.W.2d 803 (1974) (pensions are a mandatory subject).  Therefore, SacRTD erroneously claims that state law changes that foreclose collective bargaining over many aspects of pensions are legally consistent with section13(c).[10]

---

[9] G. Kent Woodman, Jane Sutter Starke, Leslie D. Schwartz, *Transit Labor Protection-A Guide to 13(c) Federal Transit Act,* Transportation Research Board Legal Research Digest, 10 (June 1995, No. 4), http://onlinepubs.trb.org/online pubs/tcrp/terp_lrd_04.pdf ( last visited August 27, 2013).

[10] SacRTD adds that PEPRA does not affect bargaining with respect to alternative benefits, such as life insurance or deferred compensation, that PEPRA neither affects nor eliminates.

- 12 -

Contrary to SacRTD's argument, denying certification in the instant matter is not inconsistent with the Department's recent certification in Massachusetts. Reply Br. SacRTD, pp. 1-3. The 2009 modifications to the enabling statute of the Massachusetts Bay Transportation Authority (MBTA), An Act Modernizing the Transportation System of the Commonwealth, St.2009, c. 25, §§ 140, 146, transferred the health care plans of active and retired MBTA employees to the Massachusetts General Insurance Commission (GIC), removing from collective bargaining that coverage and attending benefits. The Massachusetts Act did not place hard caps on health care benefits or impose restrictions on negotiating supplemental plans. The language of the Act specifically provided an exemption for all current collective bargaining agreements, preserving employees' existing rights and benefits. As a result, after extensive negotiations, MBTA and the union (ATU) were able to agree to a health and welfare trust plan that provided benefits and coverage supplementary to those provided by the mandated GIC coverage. In sum, contrary to the situation here, the Massachusetts Act fully preserved rights and benefits under existing collective bargaining agreements, and the parties were able to negotiate a supplemental health plan, thus continuing collective bargaining rights.

SacRTD argues that prospective employees have no vested right to any benefits. According to SacRTD, "new" employees have not suffered any diminution of rights, because they did not possess rights before PEPRA became effective. Rather, the rights of "new" employees are established at the time they are hired. *See* SacRTD Initial Br. 7-10. In essence, SacRTD asserts that the State remains free to alter unilaterally the terms of a collective bargaining agreement without running afoul of section 13(c) so long as the employees affected by those changes have not begun working yet. However, there is no applicable distinction between "new" and "classic" employees for purposes of sections 13(c)(1) and (2). Section 13(c)(1) specifically requires preservation of benefits under *existing* collective bargaining agreements, and section 13(c)(2) requires the continuation of collective bargaining rights. Thus, unlike sections 13(c)(3), (4) and (5), these first two subsections protect the collective rights of all bargaining unit members, not individual rights. Under well-established federal labor policy, "[u]nlike a standard commercial contract, a collective bargaining agreement binds both those members within a bargaining unit at the time the agreement is reached as well as those who later enter the unit." *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1106-07 (2d Cir. 1991).[11] In

SacRTD Initial Br. 14. The availability of collective bargaining over other aspects of pension benefits does not cure the fundamental conflict between PEPRA and section 13(c), namely, that PEPRA removes from the scope of collective bargaining many key aspects of pensions.
[11] *See Wood v. Nat'l Basketball Ass'n*, 602 F. Supp. 525, 529 (S.D.N.Y. 1984) (citing *J.I. Case Co. v. NLRB*, 321 U.S. 332, 335 (1944)), *aff'd*, 809 F.2d 954, 961 (2d Cir. 1987). Protections against unfair labor practices are also applicable to job applicants as "employees" under the NLRA. *See Reliance Ins. Companies v. NLRB*, 415 F.2d 1, 6 (8th Cir. 1969). To hold that

- 13 -

other words, a collective bargaining agreement is applicable to all bargaining unit members, regardless of their date of hire.[12]  As a result, the Secretary cannot certify a grant sought by a transit agency if the transit agency unilaterally reduces the negotiated benefits of any bargaining unit employees, regardless of their date of hire, or precludes the union from negotiating over benefits and contributions for employees hired during the term of the collective bargaining agreement.


## DETERMINATION

An analysis of PEPRA's effect on the collective bargaining rights of transit workers covered by the SacRTD-ATU Local 256 agreement reveals an impermissible conflict with sections 13(c)(1) and 13(c)(2).  PEPRA's imposition of a two-tier structure on the collective bargaining agreement primarily affects bargaining unit employees hired after January 1, 2013.  PEPRA both reduces existing benefit levels for such "new" employees (thus violating section 13(c)(1)'s "preservation of benefits" requirement), and diminishes a union's ability to bargain over benefits *and* contributions for "new" employees in the future (thus violating section 13(c)(2)'s "continuation of collective bargaining rights" requirement).

PEPRA has or will soon have an impact on many specific aspects of negotiated pension plan benefits for SacRTD employees. The impacts discussed below are intended to be illustrative, not exhaustive.

PEPRA has had an immediate effect on SacRTD's "new" employees.  Under the collective bargaining agreement in place, SacRTD pays the total cost of the pension plan. CBA Art. 67, § 2; CBA Art. 97, § 4; *see also* Plan Art. 12.2. In addition, it prohibits employees from contributing to the plan. CBA Art. 67. However, PEPRA, Article 4, Section 7522.30 requires that "new" employees pay at least 50 percent of the normal pension plan costs, and employers are

---

collective bargaining agreements do not bind these future employees "would turn federal labor policy on its head." *Nat'l Basketball Ass'n*, 602 F. Supp. at 529.

[12] *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859, 866 (5th Cir. 1966) (citing *Leroy Mach. Co.*, 147 NLRB 1431, 1431 (1964)).  Unions are "entitled" to bargain with employers over terms affecting new hires. *See id.*  In *Leroy Machine Company,* the National Labor Relations Board (NLRB) held that the employer violated the NRLA by refusing to bargain with the union over "rates of pay for new jobs, a mandatory subject of collective bargaining." 147 NLRB at 1431.  Furthermore, the employer has a duty to bargain "with the collective bargaining agent of the present employees" over conditions of employment "as [they apply] to future employees." *City of New Haven v. Conn. State Bd. of Labor Relations*, 410 A.2d 140, 145 (Conn. Super. Ct. 1979).

- 14 -

prohibited from paying any of the required employee contributions.[13]  SacRTD
has already advised "new" employees that it would begin deducting these
PEPRA-mandated costs from pay beginning March 1, 2013, *See* ATU Initial Br.
11, 16, Ex. 13, and has implemented that change.  Thus, as a direct result of
PEPRA, "new" SacRTD employees are paying 50 percent of the pension plan
costs, an amount the collective bargaining agreement does not require them to
pay.

PEPRA greatly affects the pension benefits for "new" employees. ATU poses
these two scenarios to explain PEPRA's effects, which SacRTD has not
disputed:

- 45 year old employee with 25 years of service could retire under
  the CBA with a benefit of 50% of his or her final salary.  Under
  PEPRA, the employee could not retire until age 52 with a 32%
  benefit.

- 55 year old employee with 30 years of service could retire under
  the CBA with 75% of his or her final average salary. Under
  PEPRA, the employee would receive 39% of his or her final
  average salary.

PEPRA also affects the calculation of final, pensionable compensation in
several ways, all of which have the effect of lowering the pension benefits of
"new" employees.  The Retirement Plan provides that pensionable
compensation includes payouts of overtime, shift differentials, bonuses, and
cash in lieu of vacation or sick leave, all of which appear to be barred by
PEPRA. *See* Retire. Plan Art. 2.6(a)(2)-(a)(4); PEPRA Sections 7522.34(a) and
7522.34(c).  Section 7522.34(c)'s prohibition against the inclusion of specific
forms of compensation in the calculation of pensionable compensation thus
eliminates certain amounts previously negotiated by the parties.  Further,
PEPRA requires a cap on pensionable compensation of $113,100, indexed to
annual changes in the cost of living.  PEPRA, Art. 4, Section 7522.10. In the
ATU negotiated pension plan, pensionable compensation is capped at the IRS
limit ($255,000 for 2013).  *See* Retire. Plan Art. 2.6(c); IRS Code Sect.
401(a)(17)(b).

Under Article 7.1 of the current Retirement Plan, members may retire after 25
years of service, or at age 55 with at least 10 years of service, to receive a
pension that starts at 2.0 percent of final compensation multiplied by years of
service.  That pension increases 0.1 percent per year of age or service, capping
at 2.5 percent at either age 60 or after 30 years of service.  For "new"

---

[13] The only exception is if an existing agreement contains a contrary provision and would
thereby be "impaired."  However, the exception is effective only until the agreement is amended,
extended, renewed, or expired.  *See* PEPRA, Article 4, Section 7522.30(f).

- 15 -

employees, PEPRA establishes a minimum age requirement of fifty two years
for retirement, and employees receive a multiplier of 1 percent that increases to
2.5 percent at age 67.  PEPRA, Art. 4, Section 7522.20.  In order to achieve a
2.0 percent multiplier,  "new" employees will have to work until age 62, at least
an additional seven years over the current plan requirement to a 2.0 percent
multiplier.  Under PEPRA, retirees will also have to wait until age 67 to receive
the maximum 2.5 percent multiplier rather than becoming eligible at age 60 or
at 30 years of service.

In addition to the reduced benefits, PEPRA effectively eliminates the CBA-
negotiated "25 and out" provision which provides for a pension benefit to an
individual with twenty five years of continuous service at any age. The
Department acknowledges that PEPRA does not explicitly forbid "25 and out"
provisions. However, the law's changes in retirement age and benefits upon
retirement significantly alter benefits associated with such plans for "new"
employees.  The effect on the negotiated "25 and out" option seriously affects
employees who began service with SacRTD prior to age twenty five.  Such
individuals will have to work longer to qualify for a pension but they will receive
lower monthly benefits.

SacRTD argues that PEPRA advantages participants in the instant matter
because the law provides for retirement at 52 years of age rather than
retirement at 55 years of age under the ATU plan. SacRTD Reply, p. 12.
SacRTD's claim, however,  fails to recognize that the ATU Retirement Plan
provides for retirement at age 55 *or* after 25 years of service.  SacRTD's claim
reads the 25 and out provision out of the Retirement Plan and, as established
above, PEPRA's effective elimination of this benefit affects the continuation of
collective bargaining rights.

PEPRA also affects the rights of current employees under the negotiated
pension plan. As of January 1, 2013, PEPRA prohibits employees from
purchasing service credit for years not worked for purposes of pension
entitlement ("airtime" or nonqualified pension service credit).  PEPRA, Art. 4,
Section 7522.46.  Article 7.9 of the Plan permits employees who recover and
return from disability leave to purchase airtime credit for the term of their
disability.  Retire Pen. Plan Art., 7.9.  *See also* SacRTD Initial Br. 11.[14]  PEPRA

---

[14] SacRTD asserts that PEPRA prevents payments for service credits for periods when an
individual is out of work due to disability.  SacRTD Initial Br. 11.  This assertion supports the
conclusion that PEPRA detrimentally affects current employees.  The interplay between PEPRA
and the Internal Revenue Code, 26 U.S.C. 415(n), is complex, however, and the Department
makes no conclusion that PEPRA's prohibition on the purchase of nonqualified service credit
(airtime) prevents all service credit for disability and medical leave.

- 16 -

thus invalidates the negotiated airtime provision for any employee returning from disability after January 1, 2013. Additionally, except for annual cost-of-living adjustments, PEPRA Section 7522.44 prohibits benefit enhancements for service performed prior to the operative date of the enhancement. *See* ATU Initial Br. 13, Ex. 12. Finally, PEPRA prevents SacRTD from creating new supplemental defined benefit plans or certain replacement benefit plans for "new" *or* current employees. PEPRA, Section 7522.18; Section 7522.43; *See also* SacRTD Reply Br. 11.

CONCLUSION

There is little dispute over the impact of PEPRA on the existing rights of employees covered by the SacRTD-ATU Local 256 collective bargaining agreement and on the scope of collective bargaining. Indeed, the Department has conferred extensively with the State to determine the contours of the law. SacRTD has thoroughly argued its legal and factual bases to support certification. We have carefully considered the arguments of both parties. We do not find persuasive SacRTD's arguments that these changes are consistent with certification under section 13(c).

Congress incorporated in section 13(c) the commonly-understood meaning of collective bargaining that requires, at a minimum, good faith negotiation to the point of impasse, if necessary, over wages, hours, and other terms and conditions of employment. *Donovan*, 767 F.2d at 949. Meaningful collective bargaining does not exist when a state mandates changes in what the parties have previously negotiated, dictates results, or removes relevant issues from consideration.

SacRTD is correct that PEPRA allows for negotiation over some aspects of pension benefits. However, the Department has concluded that PEPRA significantly reduces pension entitlements under the existing collective bargaining agreements for employees hired after January 1, 2013 and precludes the Union from negotiating many aspects of their pension plans, including the employee contribution rate, in subsequent agreements. Sections 13(c)(1) and (2) require the preservation of pension rights and benefits and the continuation of collective bargaining rights. These rights are prerequisites for federal assistance under section 5333(b) of the Transit Act. Under PEPRA, SacRTD cannot comply with the requirements of the Act.

- 17 -

Therefore, the effects of PEPRA render it legally impermissible, under the current circumstances, for the Department to certify fair and equitable employee protective conditions for grants to SacRTD.

Sincerely,

*Michael J. Hayes*

Michael J. Hayes, Director
Office of Labor Management Standards

cc:    Scheryl Portee/FTA
        G. Kent Woodman/Thompson Coburn LLP
        Robert A. Molofsky/ATU
        Jessica M. Chu/ATU
        Benjamin Lunch/Neyhart, Anderson, Flynn & Grosboll
        Edwin D. Hill/IBEW
        James T. Callahan/IUOE
        Lee Saunders/AFSCME
        Keith Uriarte/AFSCME Council 57
        Mary Kay Henry/SEIU
        Bonnie Morr/UTU
        Paul Knupp/Guerrieri, Clayman, Bartos & Parcelli, PC
        Geoff McCloud/IRSA
        David L. Neigus/IAM
        Ray Cobb/IBEW
        Michael Smith/Administrative Employees Association
        Richard Edelman/O'Donnell, Schwartz & Anderson, P.C.



Digitally signed by Yoshie Campbell
DN: cn=Yoshie Campbell, o=Department of Labor, ou=OLMS OUF, email=campbell.yoshie@dol.gov, c=US
Date: 2013.09.04 12:02:09 -04'00'

# Group Exhibit B

**U.S. Department of Labor**    Office of Labor-Management Standards
Washington, D.C. 20210



September 30, 2013

Leslie Rogers, Regional Administrator
Federal Transit Administration, Region IX
201 Mission Street, Suite 2210
San Francisco, California 94105

> Re:    FTA Applications
>
> Monterey-Salinas Transit
> Additional Funding for JARC Mobility
> Management
> CA-90-Z005-01
>
> California State DOT (CALTRANS)
> *on behalf of*
> Monterey-Salinas Transit
> JARC Mobility Management
> CA-90-Z117

Dear Mr. Rogers:

This is in reply to the requests from your office that we review the above-captioned applications for grants under Title 49 of the U.S. Code, Chapter 53.

On September 30, 2013, in the context of proposed Federal Transit Administration grant number CA-03-0823, the Department determined that Monterey-Salinas Transit (MST) cannot comply with the requirements of 49 U.S.C. Section 5333(b) due to the effects of California's Public Employee Pension Reform Act, Assembly Bill 340, (Furutani), Stats. 2012, Chapter 296 (PEPRA), based on the Department's longstanding interpretation of section 5333(b). Therefore, the Department ruled that the effects of PEPRA render it legally impermissible, under the current circumstances, to certify fair and equitable employee protective conditions for grants to MST. I adopt that decision, and it is incorporated herein by reference.

- 2 -

PEPRA presents identical obstacles to the certification of the above referenced grants for the benefit of MST. Consequently, the Department cannot, at this time, certify the referenced grants for purposes of 49 U.S.C. Section 5333(b).

Sincerely,

*Michael Hayes*

Michael Hayes, Director
Director, Office of Labor Management Standards

Attachment

cc:   Scheryl Portee/FTA
     Robert Molofsky/ATU
     Jessica M. Chu/ATU
     Margot Rosenberg/LEONARD CARDER, LLP
     David C. Laredo/De Lay & Laredo
     Carl Sedoryk/MST
     Michelle Overmeyer/MST
     Brian Travis/CALTRANS
     Sonia Bannister/MSEA
     Wesley Toy/SCCEAA
     Ray Cobb/IBEW
     Mary Kay Henry/SEIU
     David L. Neigus/IAM
     James P. Hoffa/IBT
     Bonnie Morr, c/o Cara McGint/UTU
     Elizabeth A. Roma/Guerrieri, Clayman, Bartos & Parcelli
     Carolyng Gomes/Guerrieri, Clayman, Bartos & Parcelli
     Richard Edelman/O'Donnell, Schwartz & Anderson



**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, D.C. 20210



September 30, 2013

Leslie Rogers, Regional Administrator
Federal Transit Administration, Region IX
201 Mission Street, Suite 2210
San Francisco, California 94105

Re:    FTA Application
       Monterey-Salinas Transit
       Purchase <30—Ft. Electric Trolley Bus,
       Rehab/Rebuild <30-Ft. Bus for Electrical
       Propulsion, Engineering-Design-
       Construction for Charging Infrastructure
       CA-03-0823
       (Previously CA-04-0265)

Dear Mr. Rogers:

This is in reply to the request from your office that we review the above-
captioned application for a grant under section 13(c) of the Urban Mass
Transportation Act, 49 U.S.C. § 1609(c) (1964), now codified as part of the
Federal Transit Act, 49 U.S.C. § 5333(b).

This is the Department's final determination on the issue of Monterey-Salinas
Public Transit System Joint Powers Agency d/b/a Monterey-Salinas Transit's
(MST) ability to preserve and continue, consistent with section 13(c), the
pension benefits and collective bargaining rights of its employees represented
by the Amalgamated Transit Union, Local 1225 (ATU or the Union).

Federal Transit law requires as a condition of financial assistance that the
interests of employees affected by the assistance be protected under
arrangements the Secretary of Labor certifies are fair and equitable, 49 U.S.C.
§ 5333(b)(1). The law specifically provides:

000046

- 2 -

> Arrangements . . . shall include such provisions as may be
> necessary for –
> (1)    the preservation of rights, privileges, and benefits (including
>        continuation of pension rights and benefits) under existing
>        collective bargaining agreements or otherwise;
> (2)    the continuation of collective bargaining rights;
> (3)    the protection of individual employees against a worsening of
>        their positions with respect to their employment;
> (4)    assurances of employment to employees of acquired mass
>        transportation systems and priority of reemployment of
>        employees terminated or laid off; and
> (5)    paid training or retraining programs.

49 U.S.C. § 5333(b)(2).[1] These arrangements are commonly referred to as
section 13(c) agreements because the requirement for such arrangements
originated in section 13(c) of the Urban Mass Transportation Act of 1964, 78
Stat. 307.  Because the Secretary of Labor's certification is a "condition" for
the award of a grant, the Secretary must certify the protective arrangements
before the Department of Transportation can award funds to grantees.  73 Fed.
Reg. 47,046, 47,047 (Aug. 13, 2008) (preamble to current Department
Guidelines).

In exercising the Department's discretion to ensure fair and equitable
protective arrangements in compliance with section 13(c), the Department has
reviewed California's Public Employee Pension Reform Act, Assembly Bill 340,
(Furutani), Stats. 2012, Chapter 296 (PEPRA), in consultation with the State of
California's Office of the Governor and the Labor and Workforce Development
Agency with respect to the precise contours of the statute.[2] The Department
has also reviewed the relevant collective bargaining agreements, pension plans,
and the parties' briefs and supplemental materials concerning the provisions of
the parties' collective bargaining agreements and PEPRA's effects to determine
the effects of PEPRA on rights protected by section 13(c).  We have concluded
that PEPRA makes significant changes to pension benefits that are inconsistent
with section 13(c)(1)'s mandate to preserve pension benefits under existing
collective bargaining agreements and section 13(c)(2)'s mandate to ensure
continuation of collective bargaining rights.  Thus, PEPRA precludes the
Department from providing the requisite certification to the Federal Transit
Authority.[3]

---

[1] Note the text of the statute was codified from this earlier version in 1994 to separate the
fourth assurance into two separate and lettered paragraphs.
[2] Along with the Department's independent review of PEPRA, attorneys from these California
state government offices provided the Department with a useful summary of the PEPRA
provisions, upon which the Department relied.
[3] This denial of certification is issued without prejudice to MST's right to seek or obtain
certification under changed circumstances.

- 3 -

## Background – State Law Change to Collective Bargaining Rights

On September 12, 2012, Governor Edmund G. Brown, Jr. signed into
California law PEPRA and related pension reform changes. These statutory
provisions became effective on January 1, 2013. PEPRA applies to most
California transit systems.[4]  PEPRA's practical and legal effect on the
employees of transit agencies depends on each union's separately negotiated
collective bargaining agreement and the type of pension plan in which the
employees participate.[5]   In general, PEPRA is immediately effective for
employees hired on or after January 1, 2013.  These employees are termed
"new" employees or, when referring to their participation in any type of a public
retirement system or plan, "new" members. PEPRA Article 4, Section 7522.04(e)
and (f).  For the purpose of this determination, the Department adopts the term
"classic," as used by the California Public Employee Retirement System, for all
those employees who do not meet the definition of "new."  PEPRA introduces a
two-tier pension benefit system for these two classes of employees.  *Id.*

PEPRA ultimately determines the pension contributions and every significant
aspect of the pension benefit calculation for "new" employees.  It controls the
benefit formula (i.e., percent multiplier of final compensation at various years
of service), the definition of compensation used to determine the pension
benefit ("pensionable compensation"), and the minimum age for receipt of a
pension; it imposes a cap on the amount of final compensation that can be
used in the pension benefit determination, and requires "new" employees to
pay 50 percent of normal pension costs.  Additionally, "new" employees are not
eligible to participate in supplemental defined benefit plans.  PEPRA Article 4,
Sections 7522.10, 7522.20, 7522.32, 7522.34(c), 7522.18(c).

PEPRA also affects the rights of "classic" employees.  As of January 1, 2018,
PEPRA authorizes employers to set "classic" employees' contribution level at 50
percent of the normal cost of pension benefits after bargaining to impasse,
restricted only by a cap set forth in Section 31631.5(a)(1).

## Procedural Background – The Parties' Negotiations

The section 13(c) process begins when the Department receives a copy of an
application for Federal assistance along with a request for certification of
employee protective arrangements from the Department of Transportation.

---

[4] Those operated by charter cities and charter counties not participating in the California Public
Employees Retirement System (CalPERS) or the 1937 Act County Requirement System and
those operated by the University of California are not affected.  In addition, transit systems that
use private contractors for the operation of all service and vehicle maintenance, as well as
other supporting functions, are not affected. PEPRA Article 4, Section 7522.02(a)(2).
[5] PEPRA's effect on employees of transit agencies also depends on whether the pension plan
falls under either the 1937 County Act Systems, can be defined as an "independent" plan, or as
is the case with the MST-ATU is a CalPERS plan.

- 4 -

Upon receipt of an application involving employees represented by a labor organization, the Department refers a copy of the application to that organization and notifies the applicant of the referral. After referral and notice, the Department recommends the terms and conditions to serve as the basis for certification. The Department's implementing Guidelines (Guidelines) establish a practice that the previously certified protective arrangement is appropriate for application to the new grant. Therefore, the Department's referral will propose certification based on those terms and conditions. 29 C.F.R. § 215.3(b)(2).

Under the Department's implementing Guidelines, applicants and unions/employees may file "objections" to the terms of a proposed certification within fifteen days. The Department must then determine whether the objections are "sufficient," i.e., "raise[] material issues that may require alternative employee protections" or "concern[] changes in legal or factual circumstances that may materially affect the rights or interests of employees." 29 C.F.R. § 215.3(d). More specifically the Guidelines provide that the parties may "submit objections, if any, to the referred terms," while, at the same time, the parties are "encouraged" to arrive at "a mutually agreeable solution to objections any party has to the terms and conditions of referral." 29 C.F.R. § 215.3(d)(1).

Here, the ATU objected to the proposed terms for employee protection certification contained in the Department's referral for the above referenced grant on January 15, 2013. The ATU objected that PEPRA required "participating employers to unilaterally implement changes to retirement benefits without first bargaining with their employee representatives by: "raising the minimum retirement ages; reducing pension benefits for new public employees; imposing new formulas for calculating pensions for new public employees; imposing various measures designed to avoid pension spiking; and adjusting the compensation cap annually and requiring certain contribution from employees equal to one-half of the normal costs of the plan." *ATU Objections.*[6]

ATU states that "negotiations over all these benefit features have been central to public sector collective bargaining in California for decades, allowing parties to trade off various changes in pension benefits for other economic items of importance." *ATU Objections*, p. 4. ATU objected that PEPRA stripped ATU of the right to negotiate over any of these critical aspects of pension benefits, "effectively putting an end to collective bargaining relative to the core subject of retirement benefits." *ATU Objections*, p. 4.

---

[6] These objections were originally for grant CA-90-Z022. ATU incorporated them by reference and attachment to the grant at issue here. References to ATU Objections refer to those dated November 16, 2012.

- 5 -

The Department reviewed the ATU's objections concerning PEPRA and found the objections sufficient. On February 5, 2013, the Department communicated to the parties that PEPRA appeared to have removed mandatory and traditional subjects of collective bargaining from the consideration of the parties and to have affected the continuation of the collective bargaining rights of employees. 49 U.S.C. § 5333(B)(2)(b). The Department determined that PEPRA constitutes a change in legal or factual circumstances that may materially affect the rights or interests of employees represented by the unions. 29 C.F.R. § 215.3(d)(3)(ii).

Pursuant to the Department Guidelines, 29 C.F.R. § 215(d)(3)(ii), the Department directed MST and ATU to engage in good faith negotiations/discussions to seek a mutually acceptable resolution of issues concerning the continuation of collective bargaining in light of PEPRA. The parties did so on March 7, 2013, but failed to reach a resolution of the issues. On August 15, 2013, the Department directed the parties to respond to certain specified questions in the Briefing Schedule. The parties submitted responses, with accompanying exhibits, on September 6, 2013.

As set forth more fully below, ATU asserts that PEPRA has diminished or eliminated the rights of bargaining unit members. According to ATU, PEPRA makes changes to the substance of bargained-for pension rights for both "new" and "classic" employees and to the right to participate in the bargained for pension plans for "new" employees. ATU asserts that these changes cause an irreconcilable conflict with the requirements of Section 13(c). *ATU Objections and Br., passim*. MST, on the other hand, asserts that PEPRA presents no 13(c) conflict because it preserves the rights of "classic" employees and leaves ample room for bargaining over "new" employee pension benefits. *MST Br.*, p. 8.

MST Pension Benefits – CalPERS

California Public Employee Retirement System (CalPERS) is a defined benefit retirement plan which provides benefits that are calculated using a "defined formula." MST employees participate in one of CalPERS' "miscellaneous" member plans.[7] Retirement benefits are calculated using a member's years of service credit, age at retirement, and final compensation (average salary for a defined period of employment). CalPERS offers a "variety of retirement formulas

---

[7] "Miscellaneous" plans refer to plans provided to "those employed by the State and universities who are not involved in law enforcement, fire suppression, the protection of public safety, or employed in a position designated by law as industrial, patrol, peace officer/firefighter, or safety." (What You Need to Know About Your CalPERS State and Industrial Miscellaneous Benefits" http://www.calpers.ca.gov/eip-docs/about/pubs/member/your-benefits-your-health-state-misc-inds-benef.pdf, p.3.)

- 6 -

that are determined by the member's employer...; occupation...; and the specific provisions in the contract between CalPERS and the employer."[8]

According to CalPERS, participating "public agencies may include various contract options in their retirement plan or plans."[9]  While a "minimum level of benefits" is statutorily required, employers "can amend their contract to enhance the minimum benefits, or provide a range of additional optional benefits to employees." See n. 8 and 9. All employers when initiating a contract must choose (1) the service retirement formula they will offer; (2) 1 year or 3 year final compensation period; (3) the maximum cost of living adjustment; (4) the amount of lump sum death benefit for retired members; (5) the level of benefits to be provided to survivors of employees not covered by Social Security; and (6) whether to allow industrial disability retirement for miscellaneous members. *Id.* Among the optional benefits CalPERS makes available to miscellaneous members are the following retirement formulas: 1.5% at 65; 2% at 55; 2.5% at 55; 2.7% at 55; 2% at 60; and 3% at 60.  *Id.*

Prior to PEPRA, MST "classic" employees received a "2% at 55" pension, *i.e.* an annual pension, beginning at age 55, equal to 2 percent of the employee's "final compensation" multiplied by his or her number of years of service, with actuarial adjustments for earlier or later retirement dates. *ATU Objections*, p. 3; *ATU Br.*, p. 2. Final compensation for purposes of pension benefit was calculated on the basis of one year of pay.[10] *ATU Objections*, pp. 3-4; *ATU Br.*, p. 2.  In addition, MST paid all or half of employee contributions for "classic" employees, depending on when the employee was hired.  For employees hired on or before June 30, 2011, MST paid the entire employee share of the contributions.  For employees hired after that date, MST paid 50 percent of the employee share.  *ATU Objections*, p. 4; *ATU Br.*, p. 2. The MST plan provided for purchase of additional retirement service credit ("air time").[11]  *ATU Objections*, p. 4; *ATU Br.*, p. 4.  In addition, pensionable compensation included bonuses, overtime, pay for additional services, unused leave and severance pay.  *ATU Br.*, p. 3.

---

[8] http://www.calpers.ca.gov/index.jsp?bc=/about/benefits-overview/retirement/retirement-benefits.xml.

[9] http://www.calpers.ca.gov/eip-docs/employer/cir-ltrs/2011/200-039-11-attach.pdf. (8/30/13).

[10] ATU alleges the final compensation was based on the *highest* one year of pay.  MST refers to the period as "single year compensation."  *MST Br.*, p. 4.

[11] Air time refers to the purchase of service credit for purposes of service and benefit calculation.  Prior to PEPRA some retirement systems offered members the opportunity to purchase up to five years of service credit.  PEPRA prohibits a retirement system from accepting applications for the purchase of air time service credit on or after January 1, 2013.

- 7 -

## Position of ATU

ATU states that MST, or its predecessor, and ATU have been parties to collective bargaining agreements since September 26, 1973. The parties' current collective bargaining agreement expires on September 30, 2013. *ATU Br.*, Ex. 1. ATU asserts that MST (or its predecessor) has contracted with CalPERS to provide pension benefits to ATU employees since October 5, 1974. ATU states that the parties could, and frequently did, negotiate over the selection of one of five benefit formulas, employer-paid member contributions, as well as over a variety of other benefit options, including whether or not to allow employees to purchase "airtime", and how to determine final compensation. *ATU Br.*, p. 2; *ATU Objections*, p. 4.

ATU claims that PEPRA unilaterally changes the rights of employees to pension benefits obtained though bargaining with MST. In pertinent part, ATU alleges PEPRA's effect on "new" and "classic" employees as follows:

### *"New" Employees*

- Pension Formula: Under PEPRA, the benefit formula is changed from 2% at age 55 to 2% at age 62[12] (Govt. Code § 7522.20).
- Pensionable Compensation: Under PEPRA, pensionable compensation is based on the highest 3-year average (rather than the highest one-year average for "classic" employees under the current Plan). (§ 7522.32)
- PEPRA excludes certain types of pay from pensionable compensation for the first time, including but not limited to bonuses, overtime, pay for

---

[12] ATU provides the following chart based on 20 years of service and a final monthly salary of $5,000 to demonstrate the effect of this change:

| Retirement Age | Current Benefit "Classic" Employees | Benefit Under PEPRA "New" Employees |
|---|---|---|
| 50 | $1,426 | $0 |
| 52 | $1,628 | $1,000 |
| 55 | $2,000 | $1,300 |
| 58 | $2,156 | $1,600 |
| 60 | $2,262 | $1,800 |
| 62 | $2,366 | $2,000 |
| 63 | $2,418 | $2,100 |
| 65 | $2,418 | $2,300 |

ATU notes that this analysis understates PEPRA's effect because "CalPERS assumes 3% annual wage growth. Using that rate, the difference between final average compensation under the current Plan and under PEPRA is 2.88% of an employee's compensation in his or her final year. Thus, if the employee's compensation in the final year is $5,000 per month, that is the amount used under the current formula, whereas under PEPRA, only $4,856 would be used."

- 8 -

additional services outside normal working hours, cash payouts for
unused leave, and severance pay. (§ 7522.34)
- Employee Contributions: Under PEPRA, employee contributions are fixed
  at 50% of the annual normal cost (§ 7522.30), and employer 'pick-ups' of
  any portion of the employee contribution are prohibited. (§ 20516.5; §
  20683.2)
- Minimum Retirement Age: Under PEPRA, the minimum retirement age is
  changed from 50 to 52.

### *"Classic" Employees*

- Benefit Enhancements: PEPRA prohibits retroactive benefit
  enhancements. (§ 7522.44)
- Purchase of Service Credit: PEPRA eliminates purchase of service credit.

*ATU Br.*, pp. 3-4. ATU notes that beginning January 1, 2018, an employer who
has bargained to impasse and completed impasse procedures may unilaterally
increase the contribution of "classic" members to paying the normal cost of
their pension benefit by as much as 8 percent at any single negotiation, and
eventually over multiple negotiations to as high as 50 percent of that cost. *ATU
Br.*, p. 4 (citing § 20683.2).

In its March 25, 2013, letter to former OLMS Director John Lund incorporating
by reference the objections filed on January 1, 2013, ATU states that PEPRA
fundamentally limits MST's bargaining obligation over certain mandatory
subjects of bargaining relative to pension benefits.

Position of MST

MST states that its current collective bargaining agreement with ATU is for
three years, beginning October 1, 2010 and ending September 30, 2013, and
that the parties are "actively engaged in good faith bargaining as to the terms of
a successor" agreement.

In most respects, MST echoes ATU's description of its CalPERS plan: "2% @ 55,
with single year compensation calculation" benefit formula, with enhancements
for (1) "Military Service Credit," (2) the "Section 21571, 1959 Survivor
Allowance - First Level," and (3) the "Section 21548, Pre-Retirement Optional
Settlement 2 Death Benefit." *MST Br.*, p. 4.  MST also describes the same
employer paid member contributions for "classic" employees based on date of
hire: 100 percent employee share for those hired on or before June 30, 2011
and 50 percent for those hired after that date. *MST Br.*, p. 5.  MST also takes
the position that following expiration of the existing collective bargaining

agreement, on September 30, 2013, PEPRA changes the benefit calculation for both "new" and "classic" employees by requiring it to be based on the highest average 3 years of compensation.[13]   MST acknowledges that PEPRA sets a defined benefit formula of 2 percent at age 62, with an early retirement age of 52, and a maximum benefit factor of 2.5 percent at age 67.  *MST Br.*, p. 5.

However, MST argues that while section 13(c) preserves existing rights of employees, it does not preserve and continue rights that an employee never had, i.e., those rights that predated his or her employment.  MST states that section 13(c) protections for "new" employees are limited to the pension benefits that exist when they are hired and the permissible scope of collective bargaining over terms and conditions of employment, including pension issues, that exists when they are hired. MST asserts that "PEPRA does nothing to impair those rights."  Further, MST states that it has not hired any employees since January, 1, 2013, so it has no "new" employees under the existing collective bargaining agreement, which expires September 30, 2013, who have been or will be affected by PEPRA.[14]

MST further states that PEPRA does not limit its ability to negotiate alternative benefits or other forms of compensation to offset limitations imposed by PEPRA.  MST claims that it can make both "classic" and "new" ATU employees "whole" through bargaining over the options allowed under PEPRA.  *MST Br.*, p. 8.

---

[13] MST's statement appears to come from CalPERS' summary of PEPRA's changes to benefits. While section 7522.32 of PEPRA contains some ambiguity, we agree that this provision, which prohibits an employer, on or after January 1, 2013, from "modify[ing] a benefit plan to permit calculation of final compensation on a basis of less than the average annual compensation earned by the member during a consecutive 36 month period" applies to both classic and new members. CalPERS states that the provision affects classic members because it "prohibits employers from offering [a benefit of less than three years to classic members in the future." See *MST Br.*, Ex. D, p. 9.

[14] MST applied earlier for a grant for operating assistance for June 1, 2012 to June 30, 2013, and ATU raised PEPRA-based objections to certification. The parties reached an agreement that MST would not hire employees who would be considered "new" under PEPRA until after September 30, 2013, when the current collective bargaining agreement expires. MST also gave ATU assurances that it would not seek to implement PEPRA 's provisions during the limited term of the grant and would seek a waiver from CalPERS allowing it to maintain the employee-employer pension contributions. The Department  ultimately issued a certification based upon the parties' agreement.  However, the Department made plain that its certification was not precedential and would not affect determinations related to future MST grants. See Department's December 21, 2012, certification addressing MST Grant (CA-90-2022) and June 10, 2013 for CA-90-Z022-01 for the same operating period identified above. As discussed, *infra*, this fact does not alter PEPRA's effect on new employees hired after September 30, 2013, and does not solve the conflict between PEPRA and section 13(c) in this case.

- 10 -

## Analysis of the Parties' Positions

Analyzing the parties' claims requires consideration of relevant legal precedent in this area. In *Jackson Transit Authority v. ATU, Local Division 1285*, 457 U.S. 15, 17-18 (1982), the Supreme Court's recognized that section 13(c) mandates the preservation and continuation of collective bargaining rights as a precondition to receipt of federal transit aid. Specifically, the Court stated:

> To *prevent* federal funds from being used to destroy the collective-bargaining rights of organized workers, Congress included 13(c) in the Act . . . the statute lists several protective steps that *must be taken* before a local government may receive federal aid; among these is the preservation of benefits under existing collective bargaining agreements and the continuation of collective bargaining rights.

*Id*. at 17 (emphasis added). Shortly after *Jackson Transit*, the U.S. Court of Appeals for the District of Columbia Circuit underscored section 13(c)'s mandate to continue collective bargaining rights. *Donovan v. Amalgamated Transit Union*, 767 F.2d 939 (D.C. Cir. 1985), In *Donovan*, the union objected to the Department's section 13(c) certification in the aftermath of a Georgia state law, Act 1506, which removed various subjects from the scope of bargaining between the transit agency and the union. The court, relying on *Jackson Transit*, reiterated that section 13(c) sets forth mandatory requirements, "not simply general objectives or suggestions." *Id*. at 944. Thus:

> [t]he Secretary is not free to certify a labor agreement that does not provide for the continuation of collective bargaining rights simply because he believes that, on balance, the agreement is fair. Rather, he must first determine that the requirements of the statute [i.e., the five enumerated sections of section 13(c)] are fully satisfied *before* he can find an agreement "fair and reasonable."

*Id*. at 946. Turning to the specific provisions of the Georgia law, the court characterized the effect of the law as removing mandatory subjects from collective bargaining. The court specifically noted that the provision in the state law that barred the municipal transit agency from negotiating over benefits for part-time employees prevented "the continuation of collective bargaining over wages that section 13(c) mandates." *Id*. at 952. The court concluded that while section 13(c) does not dictate or perpetuate the substantive terms of a collective bargaining agreement, it requires that any changes "be brought about through collective bargaining, not by state fiat." *Id*. at 953.

Under *Donovan* the lessening or diminution of collective bargaining rights, even where they are not entirely eliminated, violates section 13(c). Indeed, the Court

- 11 -

in *Donovan* noted that the Georgia law "*altered in several material respects* the existing statutory authorization of [the employer] to engage in collective bargaining" by reserving to management the inherent right to control various aspects of wages and working conditions. 767 F.2d at 951 (emphasis added). However, the law did not restrict the parties from negotiating over *entire* subjects of mandatory bargaining. For example, the law reserved to management the "right to subcontract service, other than for the operation of rail or bus vehicles, provided no employees are laid off." *Id.* This reservation left to the parties the ability to negotiate over subcontracting where layoffs would occur or subcontracting that did involve the operation of bus or rail. Similarly, under the law management reserved to itself "the right to hire part-time employees, for no more than 25 hours per week, without payment of fringe benefits." *Id.* This restriction still permitted bargaining over the hiring of part-time employees for more than 25 hours a week and where fringe benefits would be paid. In addition, the law reserved to management "the right to establish the number of regular hours that may be worked in a week, not to exceed 40 hours, and to fix the number of overtime hours, not to exceed 10 hours per week." *Id.* Once again, this removed only partially the subject of regular and overtime hours from the ambit of bargaining. Yet the court still concluded that the law violated Section 13(c)'s requirement to continue collective bargaining over mandatory subjects. Thus, we conclude that *Donovan* supports the union's position that restricting the right to bargain over mandatory subjects violates Section 13(c)(2).

Senator Morse, the sponsor of section 13(c), stated his intent that transit agencies that "lessen" collective bargaining rights not receive federal funding. As stated in the *Manager's Handbook: Guidance For Addressing Section 13(c) Issues*,[15] "supporters of the bill strongly asserted that the labor protection provisions were not intended to infringe upon or vitiate State or local laws, but rather to assure that the Federal assistance did not diminish any *existing* collective bargaining rights." (Emphasis in original).

There is nothing in *Donovan* or the language of section 13(c) that permits the Department to certify a transit grant if a change in state law substantially reduces existing benefits and significantly limits the scope of bargaining over them. In this instance, because MST and its represented transit employees

---

[15] G. Kent Woodman, Attorney at Law, Eckert, Seamans, Cherin & Mellott, *Manager's Handbook: Guidance for Addressing Section 13(c) Issues*, (Publication written for the Public Private Transportation Network (PPTN), an Urban Mass Transportation Administration (UMTA) technical assistance program, p. 3. (February 24, 1987).(The opinions findings, and conclusions expressed in this publication are those of the author and not necessarily those of the PPTN, COMIS Corporation (administrator of the PPTN program), the United States Department of Transportation, UMTA, or the Office of the Secretary.) The author has provided services of a technical and advisory nature under contract to the PPTN and is considered an expert in his field.

- 12 -

had the ability to bargain over the full panoply of pension rights, the process of collective bargaining with respect to those terms must continue in order for the Department to certify.

MST asserts that section "13(c) does not deny the State of California the authority or prerogative to make prospective changes to address the economic condition of public pension systems." *MST Br.*, p. 3. MST is correct, as section 13(c) does not supersede the operation of state law and impose federal policy on the state. Indeed, the State of California is free to pass any number of laws affecting public employees. However, if that law is inconsistent with the requirements of section 13(c), the state must forego federal funding. As stated in *Donovan*, "Section 13(c) does not prescribe mandatory labor standards for the state but rather dictates the terms of federal mass transit assistance." 767 F.2d at 947. *See Jackson Transit*, 457 U.S. at 27 ("Congress intended that §13(c) would be an important tool to protect the collective-bargaining rights of transit workers, by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities") (footnote omitted); *Local Division 589 v. Massachusetts*, 666 F.2d 618, 627 (1st Cir. 1981) ("*Local 589*")(section 13(c) does not invalidate state law, but states that have laws that prevent the making of fair and equitable arrangements cannot obtain federal assistance).

Under the standard set forth in *Jackson Transit* and *Donovan*, the Department is legally obligated to deny certification where collective bargaining rights have neither been preserved nor continued.[16] As the court in *Donovan* stated, section 13(c)'s requirement that labor protective arrangements provide for continuation of collective bargaining rights means, at a minimum, "that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful, 'good faith' negotiations with their employer over wages, hours and other terms and conditions of employment." 767 F.2d at 951. The Department has consistently articulated this position in Departmental correspondence to grantees and unions. *See* the Department's August 16, 2012, *Cover Letter for Referral for Michigan DOT Grant* (MI-04-0052-01); the Department's May 3, 2011, *Initial Response* and May 20, 2011 *Final Response to Objections for Michigan DOT Grant* (MI-95-x065); the Department's June 23, 2011 *Response to Objections for MBTA DOT Grant* (A-70-x001-01).

Quoting *Local 589*, 666 F.2d 618, MST states that 13(c) does not mandate that the substantive terms of collective bargaining agreements remain frozen. *MST Br.*, p. 3, In *Local 589*, the First Circuit upheld a Massachusetts law prohibiting

---

[16] The Department has similarly held that collective bargaining representatives are not obligated to bargain over benefits that have been unilaterally eliminated, or capped, nor must they bargain to a predetermined result. *ATU v. City Utilities of Springfield*, Dept. Case No. 9113c18 (June 1, 1999).

- 13 -

the labor union from bargaining collectively over management's actions to hire, promote, assign, direct and discharge employees, to assign overtime, or to hire part-time employees.   The state law also forbade the transit authority to agree to pay pensions based upon overtime pay or to provide for automatic cost-of-living adjustments.   MST's reliance on *Local 589* is misplaced.   That case dealt with the issue whether section 13(c) preempts a state law, not whether a state must provide protective arrangements consistent with section 13(c) in order to obtain federal grants. As the court in *Donovan* remarked, 767 F.2d at 947 n.9 (emphasis added), "*We decide today the question the First Circuit did not reach,* and hold that where a state, through its laws or otherwise, fails to satisfy the requirements of Sec. 13(c), the Secretary must cut off funds by denying certification."; *See also* FTA Legal Research Digest ("the Massachusetts case *left open the question of what would result if the state law precluded the state or its agencies from complying with 13(c)*, which was essentially addressed in a subsequent decision involving an ATU challenge to a Department certification" ((referencing *Donovan*) (emphasis added)).[17]

The DC Circuit's exhaustive decision in *Donovan* -- as opposed to the earlier First Circuit decision -- is the controlling case on this issue. As discussed earlier, *Donovan* holds that the Secretary cannot certify a labor protective arrangement or agreement that fails to satisfy all five enumerated subsections of the Act.  Federal labor policy, rather than state law, defines the substantive meaning of the collective bargaining rights that must be continued for purposes of section 13(c).  Where a state statute forecloses negotiation between management and labor over mandatory subjects of collective bargaining, the Secretary cannot certify.  Here, there can be no dispute that pensions are a mandatory subject of bargaining. *Donovan,* 767 F.2d at 952, (citing *NLRB v. Black-Clawson Co.*, 210 F.2d 523 (6th Cir. 1954) (profit sharing plans are "wages")); *Detroit Police Officers Ass'n v. City of Detroit*, 391 Mich. 44, 214 N.W.2d 803 (1974) (pensions are a mandatory subject). Therefore, MST erroneously claims that state law changes that foreclose collective bargaining over many aspects of pensions are legally consistent with section 13(c).[18]

MST argues that PEPRA does not affect the rights of "new" employees in this case because it has not hired any "new" employees.  While MST agreed not to hire any "new" employees for the term of the current collective bargaining agreement, which expires on September 30, 2013 (see n. 14), it has made no such commitment for the life of the grant in the instant case, which spans

---

[17] G. Kent Woodman, Jane Sutter Starke, Leslie D. Schwartz, *Transit Labor Protection-A Guide to 13(c) Federal Transit Act*, Transportation Research Board Legal Research Digest, 10 (June 1995, No. 4), http://onlinepubs.trb.org/online pubs/tcrp/terp_lrd_04.pdf.
[18] MST asserts that PEPRA does not affect bargaining with respect to alternative benefits, such as life insurance or deferred compensation, that PEPRA neither affects nor eliminates.  The availability of collective bargaining over other aspects of pension benefits does not cure the fundamental conflict between PEPRA and section 13(c), namely, that PEPRA removes from the scope of collective bargaining many key aspects of pensions.

- 14 -

multiple years beyond that date. Thus, the rights of "new" employees hired after September 30, 2013, are clearly affected by PEPRA in the ways described above, and the fact that MST has not yet hired "new" employees is of no consequence.

Moreover, MST asserts that prospective employees have no vested right to any benefits. According to MST, new employees have not suffered any diminution of rights, because they did not possess rights before PEPRA became effective. Rather, the rights of new employees are established at the time they are hired. *See MST Br.*, p. 6. In essence, MST maintains that the State remains free to alter unilaterally the terms of a collective bargaining agreement without running afoul of section 13(c) so long as the employees affected by those changes have not begun working. However, there is no applicable distinction between "new" and "classic" employees for purposes of sections 13(c)(1) and (2). Section 13(c)(1) specifically requires preservation of benefits under *existing* collective bargaining agreements, and section 13(c)(2) requires the continuation of collective bargaining rights. Thus, unlike sections 13(c)(3), (4) and (5), these first two subsections protect the collective rights of all bargaining unit members, not individual rights. Under well-established federal labor policy, "[u]nlike a standard commercial contract, a collective bargaining agreement binds both those members within a bargaining unit at the time the agreement is reached as well as those who later enter the unit." *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1106-07 (2d Cir. 1991).[19] In other words, a collective bargaining agreement is applicable to all bargaining unit members, regardless of their date of hire.[20] As a result, the Secretary cannot certify a grant sought by a transit agency if the transit agency unilaterally reduces the negotiated benefits of any bargaining unit employees, regardless of their date of hire, or precludes the union from negotiating over benefits and contributions for employees hired during the term of the collective bargaining agreement.

---

[19] *See Wood v. Nat'l Basketball Ass'n*, 602 F. Supp. 525, 529 (S.D.N.Y. 1984) (citing *J.I. Case Co. v. NLRB*, 321 U.S. 332, 335 (1944)), *aff'd*, 809 F.2d 954, 961 (2d Cir. 1987). Protections against unfair labor practices are also applicable to job applicants as "employees" under the NLRA. *See Reliance Ins. Companies v. NLRB*, 415 F.2d 1, 6 (8th Cir. 1969). To hold that collective bargaining agreements do not bind these future employees "would turn federal labor policy on its head." *Nat'l Basketball Ass'n*, 602 F. Supp. at 529.

[20] *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859, 866 (5th Cir. 1966) (citing *Leroy Mach. Co.*, 147 NLRB 1431, 1431 (1964)). Unions are "entitled" to bargain with employers over terms affecting new hires. *See id.* In *Leroy Machine Company*, the National Labor Relations Board (NLRB) held that the employer violated the NRLA by refusing to bargain with the union over "rates of pay for new jobs, a mandatory subject of collective bargaining." 147 NLRB at 1431. Furthermore, the employer has a duty to bargain "with the collective bargaining agent of the present employees" over conditions of employment "as [they apply] to future employees." *City of New Haven v. Conn. State Bd. of Labor Relations*, 410 A.2d 140, 145 (Conn. Super. Ct. 1979).

- 15 -

## DETERMINATION

An analysis of PEPRA's effect on the collective bargaining rights of transit workers covered by the parties' collective bargaining agreement reveals an impermissible conflict with sections 13(c)(1) and 13(c)(2). PEPRA both reduces existing benefit levels for such "new" employees (thus violating section 13(c)(1)'s "preservation of benefits" requirement), and diminishes a union's ability to bargain over benefits *and* contributions for "new" and "classic" employees in the future (thus violating section 13(c)(2)'s "continuation of collective bargaining rights" requirement).

CalPERS has published several documents that discuss how PEPRA affects the plan. Below is a summary of a chart which CalPERS published, that MST attached to its brief as Exhibit D, showing some of the changes PEPRA makes to the plan:

| Summary of Change | PEPRA § | Affects Classic Members | Affects New Members |
|---|---|---|---|
| Defines "new" member as one who is brought into CalPERS membership for first time on or after 1/1/13 | 7522.04(f) | X | X |
| Reduces benefit formula and increases retirement ages for "new" members. 2% at age 62 for all "new" members with an early retirement age of 52 and a maximum benefit factor of 2.5% at age 67. | 7522.15 7522.20 7522.25 | | X |
| Caps pensionable compensation at $113,700 | 7522.10 | | X |
| Imposes equal cost sharing (i.e. 50% of the total normal cost of their pension benefits) on "new" members and prohibits employer paid member contributions.  As of 1/1/18, employers, following bargaining to impasse, may unilaterally require classic members to pay up to 50% of the total normal cost of their pension benefits subject only to a percentage cap on the increase | 7522.30 20516.5 20683.2 | X | X |
| Prohibits purchase of additional retirement service credit (ARSC or "Airtime") on or after 1/1/13. | 7522.46 | X | X |
| Redefines "pensionable compensation" for "new" members as "the normal monthly rate of pay or base pay of the member paid in cash to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours, pursuant to publicly available pay schedules." | 7522.34 | | X |
| Requires 3 year final compensation for "new" members. (i.e. Final compensation means the highest average annual pensionable compensation earned by a member during a period of at least 36 consecutive months).  And prohibits employer from adopting less than 3 yr. final compensation period for "classic" members who are currently subject to a 3 year period. | 7522.32 | underlined provision affects "classic" employees | X |

000060

- 16 -

http://www.calpers.ca.gov/eip-docs/employer/program-services/summary-pension-act.pdf.

PEPRA also affects the specific MST-ATU plan at issue in similar fashion. Prior to PEPRA, the MST-ATU plan provided for employer-paid member contributions at the rate of 100 percent for those hired before June 30, 2011, and 50 percent for those hired after that date. "Classic" employees received a "2% at 55" pension benefit. Final compensation was calculated based on one year. Employees could purchase airtime, and pensionable compensation included bonuses, overtime, pay for additional services, unused leave and severance pay.

PEPRA unilaterally changes those benefits. For "new" employees, PEPRA reduces the benefit formula and increases retirement ages (2 percent at age 62 for all "new" members and a maximum benefit factor of 2.5 percent at age 67); changes the definition of "final compensation" for benefit calculation purposes to the highest average annual compensation during a consecutive 3-year period; imposes equal cost sharing; prohibits employer paid member contributions; and redefines "pensionable compensation." For "classic" employees PEPRA allows employers, as of 2018, following bargaining to impasse, to require classic members to pay up to 50 percent of the total normal cost of their pension benefits subject only to a percentage cap on the increase and prohibits employers from modifying the final compensation formula to anything less than a three-year average.  For both "new" and "classic" employees, PEPRA prohibits purchase of airtime on or after June 1, 2013, and caps pensionable compensation at $113,700.

By unilaterally imposing these terms, PEPRA forecloses bargaining on these issues for both "new" and "classic" employees.  The PEPRA-mandated changes in benefits demonstrate that the benefits under the parties' *existing* collective bargaining agreements are not preserved in accordance with section 13(c)(1). In essence, "new" employees will have to pay more to fund their pensions and work longer to achieve the same benefit they would have been entitled to before PEPRA.  "Classic" employees will be restricted in the range of benefits and will not be able to bargain for benefits they previously enjoyed. and will not be able to purchase airtime and, as of 2018, will likely pay more for their benefits.

MST argues that although PEPRA affects "new" employees, any "new" employees would have no vested right to any benefits because the rights of employees are established at the time they are hired.  According to MST, "new" employees have not suffered any diminution of rights, because they did not possess rights before PEPRA became effective.  Sections 13(c)(1) and (2) protect the collective rights of all transit employees covered by collective bargaining agreements, not individual rights. No applicable distinction between "new" and "classic" employees exists for purposes of these sections. As stated above, a

collective bargaining agreement is applicable to all bargaining unit members, regardless of their date of hire.

PEPRA, by operation of law, has altered those terms and conditions affecting the existing rights of bargaining unit members, contrary to section 13(c)(1). Further, these changes impact rights under section 13(c)(2) as they foreclose bargaining on these terms and, accordingly, do not allow for the continuation of collective bargaining rights.

Prior to PEPRA, the parties were able to bargain over a variety of CalPERS benefit formulas and other terms affecting contributions and benefits. Future bargaining over many of those issues has been restricted by state fiat and fails section (c)(2)'s obligation for continuation of bargaining rights. Therefore, the Department cannot certify the grant sought by MST because PEPRA has resulted in a unilaterally imposed reduction of the existing benefits of bargaining unit employees as well as an impermissible effect on the continuation of collective bargaining.

CONCLUSION

There is little dispute over the impact of PEPRA on the existing rights of employees covered by the parties' collective bargaining agreement and on the scope of collective bargaining. Indeed, the Department has conferred extensively with the State to determine the contours of the law. MST has set forth bases to support certification. We have carefully considered the arguments of both parties. We do not find persuasive MST's arguments that these changes are consistent with certification under section 13(c).

Congress incorporated in section 13(c) the commonly-understood meaning of collective bargaining that requires, at a minimum, good faith negotiation to the point of impasse, if necessary, over wages, hours, and other terms and conditions of employment. *Donovan*, 767 F.2d at 949. Meaningful collective bargaining does not exist when a state mandates changes in what the parties have previously negotiated, dictates results, or removes relevant issues from consideration.

MST is correct that PEPRA allows for negotiation over some aspects of pension benefits. However, the Department has concluded that PEPRA significantly reduces pension entitlements under the existing collective bargaining agreements for employees hired after January 1, 2013 and precludes the Union from negotiating many aspects of their and "classic" employees' pension plans, including the employee contribution rate, in subsequent agreements. Sections 13(c)(1) and (2) require the preservation of pension rights and benefits and the continuation of collective bargaining rights. These rights are prerequisites for federal assistance under section 5333(b) of the Transit Act. Under PEPRA, MST cannot comply with the requirements of the Act. Therefore, the effects of

- 18 -

PEPRA render it legally impermissible, under the current circumstances, for the Department to certify fair and equitable employee protective conditions for grants to MST.

Sincerely

*Michael Hayes*

Michael Hayes, Director
Office of Labor Management Standards

Attachment

cc:  Scheryl Portee/FTA
David C. Laredo/De Lay & Laredo
Michelle Overmeyer/Monterey-Salinas Transit
Robert Molofsky/ATU
Jessica M. Chu/ATU
Sonia Bannister/MSEA
Wesley Toy/SCCEAA
Ray Cobb/IBEW
Mary Kay Henry/SEIU
David L. Neigus/IAM
James P. Hoffa/IBT
Bonnie Morr, c/o Cara McGint/UTU
Elizabeth A. Roma/Guerrieri, Clayman, Bartos & Parcelli
Carolyng Gomes/Guerrieri, Clayman, Bartos & Parcelli
Richard Edelman/O'Donnell, Schwartz & Anderson



Digitally signed by
Tankha Campbell
DN: cn=Tankha
Campbell,
o=Department of
Labor, ou=OLMS OSP,
email=campbell.tankh
a@dol.gov, c=US
Date: 2013.09.30
16:51:32 -04'00'