1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   STATE OF CALIFORNIA, acting by and        Civ. No. 2:13-cv-2069 KJM DAD
     through the CALIFORNIA
12   DEPARTMENT OF
     TRANSPORTATION; and
13   SACRAMENTO REGIONAL TRANSIT              ORDER
     DISTRICT,
14
                 Plaintiffs,
15
           v.
16
     UNITED STATES DEPARTMENT OF
17   LABOR; and THOMAS E. PEREZ, in his
     official capacity as SECRETARY OF
18   LABOR,
19                Defendants.

20

21          This case considers the intersection between a state's interest in public pension

22   reform and provisions of the Urban Mass Transportation Act (UMTA) requiring state transit to

23   ensure the preservation and continuation of collective bargaining rights as a condition of

24   receiving federal funding for mass transit projects.

25          The case was before the court on September 30, 2014 for hearing on defendants'

26   motion to dismiss or for summary judgment, ECF No. 9, plaintiffs' motion for partial summary

27   judgment, ECF No. 54, and defendant's subsequent motion to dismiss plaintiffs' Spending Clause

28   claim.  ECF No. 64.  Stephen Higgins and Kathleen Kraft appeared for plaintiffs Sacramento

                                        1

Regional Transit District (SacRT)[1] and the California Department of Transportation (CalTrans); Ryan Parker and Susan Ullman appeared for defendants Perez and the Department of Labor (collectively DOL); Jeffrey Freund and Benjamin Lunch appeared for amicus Amalgamated Transit Union (ATU). There was no appearance for amicus Bay Area Rapid Transit (BART). After considering the parties' arguments, the court GRANTS defendants' motion to dismiss plaintiffs' Spending Clause claim, but DENIES its motion to dismiss or for summary judgment of plaintiffs' Administrative Procedures Act (APA) claims. The court GRANTS plaintiffs' motion for summary judgment of their APA claims.

I. BACKGROUND

Under Section 13(c) of the UMTA, now codified at 49 U.S.C. § 5333(b), state and local governments seeking federal grants for transit assistance must seek certification from the DOL that the "interests of employees affected by the assistance" are protected by "fair and equitable" arrangements. These employee protective arrangements are called 13(c) agreements.

In their complaint, filed October 4, 2013, plaintiffs SacRT and CalTrans challenge DOL's determination that California's enactment of the California Public Employees' Pension Reform Act of 2013 (PEPRA), Cal. Gov't Code § 7522, *et seq.*, prevented 13(c) certification. The complaint raises five claims: (1) DOL's interpretation of PEPRA and Section 13(c) was arbitrary and capricious in violation of the APA; (2) DOL acted in excess of statutory authority in denying 13(c) certification; (3) DOL's refusal to grant 13(c) certification is inconsistent with limits on federal power embodied in the Spending Clause and violates the state's fiscal sovereignty in violation of the Tenth Amendment; (4) DOL prejudged the merits of the issues before it and denied plaintiffs due process in violation of the APA; and (5) a declaratory judgment claim, 28 U.S.C. § 2201. Compl., ECF No. 1 at 15-23.

Defendants filed a motion to dismiss or for summary judgment along with the administrative record on December 9, 2013. Defs.' Mot. for Summ. J., ECF Nos. 9, 9-2, 9-3, 9-4, 9-5.

---

[1] DOL refers to SacRT in its documents as SacRTD.

On January 15, 2014, plaintiffs filed a motion to complete and supplement the administrative record and for limited discovery; on January 26, they filed their opposition to the motion to dismiss.  Opp'n, ECF Nos. 18, 21.  The court continued the hearing on the motion to dismiss pending the decision on the motion to supplement the record.  ECF No. 23.

On April 24, 2014, the court granted the motion to supplement in part and denied it in part and gave the parties the opportunity to file supplemental briefs.  Order, ECF No. 41.

On May 15, 2014, plaintiffs filed a supplemental brief in opposition to the motion to dismiss and a response to ATU's amicus brief.  Pls.' Suppl. Opp'n, ECF No. 43; Response, ECF No. 44.  Defendants filed their reply on May 15, 2014.

On June 6, 2014, plaintiffs gave notice of their intent to file a motion for partial summary judgment and on June 30, they filed their motion.  ECF Nos. 49, 54.

On July 23, 2014, the court granted the motion to dismiss plaintiffs' Spending Clause and declaratory judgment claims, but deferred ruling in light of plaintiffs' pending motion for summary judgment.

In an amended complaint, filed August 5, 2014, plaintiffs SacRT and CalTrans challenge DOL's determination that California's enactment of PEPRA prevented 13(c) certification.  The amended complaint raises four claims:  (1)  DOL's interpretation of PEPRA and Section 13(c) was arbitrary and capricious in violation of the APA; (2) DOL acted in excess of statutory authority in denying 13(c) certification; (3) DOL's refusal to grant 13(c) certification is inconsistent with limits on federal power embodied in the Spending Clause and violates the state's fiscal sovereignty in violation of the Tenth Amendment; and (4) DOL prejudged the merits of the issues before it and denied plaintiffs due process in violation of the APA.  Am. Compl., ECF No. 1 at 15-23.

On August 8, 2014, ATU and DOL filed oppositions to plaintiffs' motion for summary judgment.  ECF Nos. 60 & 61.

On September 2, 2014, DOL filed a motion to dismiss plaintiffs' spending clause claim.  ECF No. 64.  Plaintiffs filed their opposition on September 16 and DOL filed its reply on September 23, 2014.  ECF Nos. 66, 70.

1   Plaintiffs filed their replies to DOL's and ATU's oppositions on September 23,

2   2014.  ECF Nos. 71-72.

## II.   THE ALLEGATIONS OF THE AMENDED COMPLAINT AND THE ADMINISTRATIVE RECORD

3

4   A.   SacRT

5   SacRT is a special regional transit district formed under California law, Cal. Pub.

6   Util. Code § 10200, *et seq.*, based in Sacramento.  ECF No. 59 ¶ 29.  SacRT employs

7   approximately 942 people, 492 of whom are represented by ATU, Local Division 256.  *Id.* ¶ 41.

8   During the time at issue here, relations between SacRT and ATU were governed by a collective

9   bargaining agreement (CBA), effective September 1, 2009 through February 28, 2013.  AR 345.

10  The CBA defines the bargaining unit as "all employees within the service of this DISTRICT in

11  [certain] classifications or occupations" and requires all employees covered by it to become union

12  members as a condition of continued employment.  CBA, Art. 1 § 3 & Art. 3 § 1; AR 349, 350.

13  Under its statutory authority and through collective bargaining, SacRT has

14  established a pension plan for its unionized employees.  ECF No. 59 ¶¶ 42-43.  The plan in effect

15  at the relevant time was refined in 2010 to take account of certain changes in the tax laws and was

16  adopted by the SacRT Board of Directors on July 23, 2012.  AR 407, 409.  This defined benefit

17  plan[2] provides an annual benefit upon retirement, based on a percentage of the employee's final

18  average compensation multiplied by years of service.  ECF No. 59 ¶ 43; AR 409.   The plan is

19

20  _____

    [2] "A defined benefit plan promises to pay employees, upon retirement, a fixed benefit

21  under a formula.  A defined benefit plan consists of a general pool of assets rather than individual
    dedicated accounts.  The asset pool may be funded by the employer, employee, or both but the

22  employer typically bears the entire investment risk and must cover any underfunding that might
    occur as a result of the plan's investments." *Hurlic v. So. Ca. Gas Co.*, 539 F.3d 1024, 1029 (9th

23  Cir. 2008) (citations, internal quotations omitted).  There is a second type of pension plan, a
    defined contribution plan.  *Id.*  "A defined contribution plan provides for an individual account

24  for each participant and for benefits based solely upon the amount contributed to the participant's
    account.  Typically, in a defined contribution plan, the employer contributes a percentage of

25  payroll or profits to participants' accounts, and, at retirement, a participant is entitled to whatever
    assets are dedicated to his or her individual account, subject to investment gains and losses." *Id.*

26  (citations, internal quotations omitted).  "Defined contribution plans dominate the retirement plan
    scene today," but when ERISA was enacted in 1974 "the [defined benefit] plan was the norm of

27  American pension practice." *LaRue v. DeWolff, Bobert & Assocs., Inc.*, 552 U.S. 248, 255 (2008)

28  (citations, internal quotations omitted, alterations in original).

funded exclusively through employer contributions and earnings on plan assets.  *Id.*; *see also*
CBA Art. 67 § 2 & Art. 97 § 4 (transit officers); AR 386, 402.  "The Plan Document applies to
every Member who is credited with an Hour of Service on or after July 1, 2010."  AR 409.  An
"Hour of Service will be credited for each hour for which the Member is paid, or entitled to
payment, for the performance of duties for the District as an Eligible Employee subsequent to the
Member's most recent date of hire."  Plan, Art. 4 § 4.2(a), AR 411.  The Plan defines "Date of
Hire" as "the date on which an Employee is first entitled to payment for a Hour of Service for the
District."  Plan, Art. 2 § 2.9, AR 410.  A person becomes an "Eligible Employee on the date he or
she first (a) becomes an Employee; and (b) is a member of the bargaining unit represented by
ATU."  Plan, Art. 3 § 3.1, AR 411.  An employee is "any person who is employed by the District
under a common-law relationship. . . . A person's status as an Employee will be determined by
the District . . . ."  Plan, Art. 2 § 2.15, AR 411.

A Plan Member is eligible to retire when he or she is 55 years old and has worked
for ten years or has completed 25 years of service.  Plan, Art. 7 § 71, AR 413.  The retirement
payment is calculated using the employee's final compensation, years of service and a percentage
multiplier.  Plan, Art. 7 § 7.2, AR 413.  Pensionable compensation includes overtime, shift
differential, bonuses and cashed-out sick leave or vacation.  Plan Art. 2 § 2.6, AR 410.  A Plan
Member who has left employment because of a disability but who returns to service may
purchase additional years of service for the time of the disability.  Plan, Art. 7 § 7.9, AR 414.
The Plan may be modified or amended with the consent of the District and ATU; no such change
"may adversely affect any accrued rights of any Member without corresponding advantages, but
in all other respects such amendments, alterations, or modifications will be binding upon
Members."  Plan, Art. 12 § 12.3, AR 416.

In its 418-square mile service area, SacRT operates 69 bus routes with 3,140 bus
stops, 38.6 miles of light rail, 50 light rail stations, 33 bus and light right transfer centers, and 18
park-and-ride lots.  ECF No. 59 ¶ 40.  It "relies heavily on federal funding . . . for its capital
expenditures."  *Id*. ¶¶ 40, 44.  For example, in fiscal year 2014, SacRT budgeted $28 million from
federal grant funding, or 19.6 percent of its operating budget of $142 million; it cannot replace

federal grant funds with state or local funds. *Id.* ¶ 45. Without federal funding, SacRT would have been forced to reduce transit services by approximately 38 percent, reduce all levels of maintenance to the minimum required by law, lay off one-third of its staff, and put planned capital improvements on hold indefinitely, which could ultimately put SacRT in default of its contractual obligations to the Federal Transportation Agency (FTA). *Id.* ¶¶ 46-49.

On November 15, 2012, SacRT submitted its fourth application to the FTA for funding of approximately fifty percent of the costs to extend the south corridor, known as the Blue Line, of its light rail system and to construct new stations and a major transit center at Cosumnes River College. SacRT planned to use the funds as reimbursement of capital expenditures made before January 1, 2013. AR 15-52; ECF No. 59 ¶ 52. FTA designated the application as CA-03-0806-03. AR 15; ECF No. 59 ¶ 52.

On December 12, 2012, DOL notified SacRT and its unions of the DOL's intent to certify the pending grant on the basis of the existing 13(c) Agreement unless it received an objection. AR 1-13; ECF No. 59 ¶ 53. The letter did refer to PEPRA and its potential impact on 13(c) protective agreements. AR 1; ECF No. 59 ¶ 54.

ATU timely objected, citing the impact of PEPRA on collective bargaining for pensions and other retirement issues, among other things. AR 211-215; ECF No. 59 ¶ 55. SacRT took issue with ATU's characterization of the impact of PEPRA on collective bargaining. AR 699-702; ECF No. 59 ¶ 56.

In a letter dated January 10, 2013, DOL found ATU's objections to be sufficient and ordered ATU and SacRT to engage in good faith discussions with the aim of finding a mutually acceptable resolution. AR 111; ECF No. 59 ¶ 57. DOL also said it might not permit interim certification within five days of the end of negotiations because of the "substantial possibility that the parties' failure to negotiate a statutorily sufficient resolution to the issues . . . may render [SacRT] ineligible for the receipt of federal funds." AR 113; ECF No. 59 ¶ 59.

As the parties were unable to resolve the issues, each filed its final proposal with DOL on February 12, 2013. AR 264-266; ECF No. 59 ¶ 60. ATU proposed that SacRT agree that the pension benefits provided to bargaining unit employees hired after January 1, 2013 be the

1   same as those hired before January 1, 2013 and that SacRT join with ATU in seeking amendment

2   of PEPRA to exempt transit workers from PEPRA.  AR 265; ECF No. 1 ¶ 52.  SacRT proposed

3   that the parties bargain over the establishment of a new or supplemental defined contribution

4   plan, optional or supplemental retirement benefits for new and existing employees, and

5   pensionable compensation issues.  AR 705-706; ECF No. 59 ¶ 61.

6           On April 18, 2013, DOL declined to issue an interim certification, noting "[t]here

7   may be circumstances inconsistent with [Section 13(c)] based on certain provisions" of PEPRA.

8   DOL directed briefing of the issues.  AR 116-118, ECF No. 59 ¶¶ 62-63.

9           On September 4, 2013, DOL issued its final determination, concluding "the effects

10  of PEPRA render it legally impermissible, under the current circumstances, for the Department to

11  certify fair and equitable employee protective conditions for grants to SacRTD."  AR 136.  As

12  background to its conclusion, DOL examined PEPRA and a summary of its provisions provided

13  by attorneys from California's Office of the Governor and the Labor and Workforce Development

14  Agency, as well as SacRT's CBA and Retirement Plan.  AR 121.  DOL noted that PEPRA has

15  immediate impact on employees hired after January 1, 2013, called "new" employees, because

16  PEPRA controls "the benefit formula . . . , the definition of compensation used to determine the

17  pension benefit ("pensionable compensation"), and the minimum age for receipt of a pension; it

18  imposes a cap on the amount of final compensation that can be used in the pension benefit

19  determination, and requires 'new' employees to pay 50 percent of normal pension costs.

20  Additionally, 'new' employees are not eligible to participate in supplemental defined benefit

21  plans."  AR 122; Cal. Gov't Code §§ 7522.10 (imposing formulas on pensionable compensation),

22  7522.18(c) (limiting supplemental defined benefit plans), 7522.20 (a) (prescribing formulas for

23  defined benefit plans) 7522.32 (defining final compensation for determining retirement benefits),

24  7522.34 (restricting pensionable compensation).  DOL also observed that beginning January 1,

25  2018, PEPRA "authorizes employers to set 'classic employees' contribution level at 50 percent of

26  the normal cost of pension benefits after bargaining to impasse . . . ."  AR 122 (defining classic

27  employees as those who do not meet the definition of "new").

28  /////

7

1          DOL began its analysis by noting that "[a]nalyzing the parties' claims requires

2   consideration" of *Jackson Transit Authority v. ATU, Local Division 1285*, 457 U.S. 15 (1982) and

3   *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985).  AR 31-32.  DOL's

4   interpretation of 13(c) as a "mandate to continue collective bargaining rights" flowed from its

5   understanding of these two cases as well as from the legislative history of the UMTA and its own

6   *Manager's Handbook:  Guidance For Addressing Section 13(c) Issues*.  AR 126-128.  DOL

7   stated, "[t]here is nothing in *Donovan* or the language of section 13(c) that permits the

8   Department to certify a transit grant if a change in state law substantially reduces existing benefits

9   and significantly limits the scope of bargaining over them. . . . [B]ecause SacRTD and its

10   represented transit employees had the ability to bargain over the full panoply of pension rights,

11   the process of collective bargaining with respect to those terms must continue in order for the

12   Department to certify."  AR 129.

13          DOL rejected SacRT's claim that state law controlled the issues, saying that

14   *Donovan* was the controlling case and, under *Donovan*, "[f]ederal labor policy, rather than state

15   law, defines the substantive meaning of the collective bargaining rights that must be continued for

16   purposes of section 13(c)."  AR 130.   Relying on this understanding, DOL concluded that

17   "[w]here a state statute forecloses negotiation between management and labor over mandatory

18   subjects of collective bargaining, the Secretary cannot certify."  *Id*.

19          DOL also was not convinced by SacRT's argument that the PEPRA changes

20   affecting only new employees had no impact on certification:  "there is no applicable distinction

21   between 'new' and 'classic' employees for purposes of sections 13(c)(1) and (2)."  AR 131.  It

22   reasoned that these two subdivisions "protect the collective rights to all bargaining unit members,

23   not individual rights.  Under well-established federal labor policy, '[u]nlike a standard

24   commercial contract, a collective bargaining agreement binds both those members within a

25   bargaining unit at the time the agreement is reached as well as those who later enter the unit'" and

26   so "a collective bargaining agreement is applicable to all bargaining unit members, regardless of

27   their date of hire.  As a result, the Secretary cannot certify a grant sought by a transit agency if the

28   transit agency unilaterally reduces the negotiated benefits of any bargaining unit employees,

1    regardless of their date of hire, or precludes the union from negotiating over benefits and

2    contributions for employees hired during the term of the collective bargaining agreement."  AR

3    131-132 (quoting *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1106-07 (2d Cir. 1991).

4        B.  CalTrans

5            CalTrans is an executive department within the state of California, with

6    headquarters in Sacramento.  ECF No. 59 ¶ 28.  Under California Government Code section

7    14030, CalTrans has the authority to assist local transit agencies in the development and operation

8    of mass transit and the application for and use of federal funds.  *Id.* ¶ 35.  It ensures the

9    availability of funds for public transit programs by serving as the direct recipient of federal funds

10   under a number of FTA funding programs.  *Id.* ¶ 36.

11           In its assistance role, CalTrans sought FTA funds for Monterey-Salinas Transit's

12   (MST) Mobility Management Project, submitting an application on September 20, 2013; this was

13   denominated CA-90-Z117-00.  AR 141-145; ECF No. 59 ¶ 37.  DOL denied this application on

14   September 30, 2013, incorporating its denial of MST's earlier grant application.  AR 138-139;

15   ECF No. 59 ¶ 71 & Ex. B at 50-51.

16           MST was created as the "consolidated transportation services agency for

17   [Monterey] county."  Cal. Pub. Util. Code § 106012.  It is able to hire its own staff or contract

18   with any public agency or agency of the United States to provide services.  *Id.* § 106040.  At least

19   some of MST's workers are represented by ATU, which timely objected to 13(c) certification,

20   citing the impact of PEPRA on collective bargaining.  AR 773-776, 823 (CBA from October 1,

21   2010 through September 30, 2013).  MST participates in a miscellaneous plan[3] administered by

22   CalPERS and under its CBA, MST "shall make sufficient contributions to maintain the benefits

23   provided under the pre-existing PERS contract during the life of this Agreement."  CBA, Art. 14,

24   AR 824, 833.  For employees hired before June 30, 2011, "MST shall fund the full employee

25   share of PERS actuarial contributions," but for employees hired after that date, "MST shall fund

26   50% of PERS actuarial contributions and the employee shall fund 50%."  AR 824.  Under the

27   _____

28       [3] A miscellaneous plan is one offered to state employees not involved in law enforcement, fire suppression, or other such categories.  AR 194 n.7.

9

1    PERS provisions, the normal age of retirement for miscellaneous members is 55 and retirees

2    receive two percent of final compensation multiplied by years of service.  AR  829.  The MST

3    plan also provides for the purchase of "airtime" and permits the use of  bonuses, overtime, pay for

4    additional services and unused leave as pensionable compensation.  AR 195.

5            On December 26, 2012, and January 28, 2013, MST applied directly to FTA for a

6    separate grant to update its trolley system; this was ultimately assigned the number CA-03-0823.

7    AR 158-165, 172-179.  On  December 31, 2012, DOL notified MST and its unions of its intent to

8    certify the grant if there were no objections.  AR 147-150.  On January 15, 2013, ATU filed

9    objections.  AR 180.  On February 5, 2013, DOL found ATU's objections sufficient and directed

10    it to engage in good faith negotiations with MST.  AR 180-183.  DOL noted it did not anticipate

11    issuing an interim certification at the end of negotiations "**due to the substantial possibility that**

12    **the parties' failure to negotiate a statutorily sufficient resolution to the issues in this matter**

13    **may render MST ineligible for the receipt of Federal funds.**"  AR 182 (emphasis in original).

14            Despite negotiations, the parties were unable to resolve the questions about the

15    impact of PEPRA.  AR 783.  ATU's position was that "[u]nless modified through collective

16    bargaining, ATU Local 1125 and MST agree that the same pension benefits provided to ATU-

17    represented employees hired after January 1, 2013, will be the same as those hired before

18    January 1, 2013, so that the current terms and conditions of the pension plan will remain

19    unchanged for all employees represented by Local 1225."  AR 783.  MST responded it "cannot

20    agree to ignore the legal mandate imposed by PEPRA," and offered to negotiate alternate

21    retirement benefits, among other things.  AR 904.

22            On August 15, 2013, DOL asked the parties to submit briefs addressing a number

23    of questions.  AR 185-186.

24            On September 30, 2013, DOL issued its final determination.  As it did with

25    SacRT's application, DOL concluded that "PEPRA makes significant changes to pension benefits

26    that are inconsistent with section 13(c)(1)'s mandate to preserve pension benefits under existing

27    collective bargaining agreements and section 13(c)(2)'s mandate to ensure continuation of

28    collective bargaining rights.  Thus, PEPRA precludes the Department from providing the

1   requisite certification of the Federal Transit Authority."  AR 191 (footnote omitted).  As in the

2   SacRT decision, DOL began with an examination of the pertinent case law, the legislative history

3   and its *Manager's Handbook*, saying that "[u]nder the standard in *Jackson Transit* and *Donovan*,

4   the Department is legally obligated to deny certification where collective bargaining rights have

5   neither been preserved nor continued."  AR  (footnote omitted).   As it did in the SacRT decision,

6   it relied on *Donovan*'s prescription of "[f]ederal labor policy" to guide its determination and

7   relied on cases decided under the National Labor Relations Act (NLRA) to conclude that

8   PEPRA's effect on "new" employees prevented 13(c) certification because a CBA binds even

9   those who later enter the bargaining unit.  AR 201.  "As a result, the Secretary cannot certify a

10   grant sought by a transit agency if the transit agency unilaterally reduces the negotiated benefits

11   of any bargaining unit employees, regardless of their date of hire, or precludes the union from

12   negotiating over benefits or contributions for employees hired during the term of the collective

13   bargaining agreement."  AR 203.  DOL also said that "[t]he availability of collective bargaining

14   over other aspects of pension benefits does not cure the fundamental conflict between PEPRA

15   and section 13(c), namely, that PEPRA removes from the scope of collective bargaining many

16   key aspects of pensions."  AR 202 at n.18.  It said it could not issue the certification for funding

17   because "'new' employees will have to pay more to fund their pensions and work longer to

18   achieve the same benefit they would have been entitled to before PEPRA.  'Classic' employees

19   will be restricted in the range of benefits and will not be able to bargain for benefits they

20   previously enjoyed and will not be able to purchase airtime and, as of 2018, will likely have to

21   pay more for their benefits."  AR 205.  DOL again said that section 13(c)(1) and (c)(2) protect the

22   collective bargaining rights of all transit employees covered by collective bargaining, not

23   individual rights.  "No applicable distinction between 'new' and 'classic' employees exists for

24   purposes of these sections."   AR 205-206.

25   III.  THE APA CLAIMS

26          A.  Summary Judgment Under the APA

27              A court considering a challenge to agency action under the APA "sits as an

28   appellate tribunal," *Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and "the

11

complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Because the APA requires the court to review the whole record or those parts of it cited by a party, the court does not determine whether there are disputed issues of material fact, as it would in a typical summary judgment proceeding. *Occidental Eng'g Co. v. Immigration and Naturalization Serv*., 753 F.2d 766, 769 (9th Cir. 1985) (stating court's function is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did); *see also South Yuba River Citizens League v. Nat'l Marine Fisheries Serv*., 723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010) (stating usual summary judgment standards do not apply).

B.  Standard of Review

Under the APA,

[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

1
2

       (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

3

5 U.S.C. § 706.

4
5
6
7
8
9
10
11
12
13
14

      The parties agree that the claims in this case require this court to consider whether DOL properly interpreted and applied 13(c), but dispute the level of deference this court must apply to that determination.  Pls.' Mot. for Summ. J., ECF No. 54-1 at 7; Defs.' Mot. For Summ. J., ECF No. 9-1 at 12; Pls.' Opp'n to Defs.' Mot., ECF No. 21 at 8; Defs.' Opp'n to Pls.' Mot.,  ECF No. 61 at 8.  To identify the proper level of deference, the court looks beyond the language of the APA itself.  DOL argues the court must review the determination under the extremely deferential standard established by *Chevron v. Natural Resources Defense Council,* 467 U.S. 837 (1984).  Plaintiffs first argue that DOL's interpretation and application of 13(c) is a question of law subject to *de novo* review, and then says that even if some deference is appropriate, DOL's interpretation is not entitled to *Chevron* deference but rather a lesser degree of deference.

15
16
17
18
19
20
21
22
23
24
25
26
27

      In *Chevron*, the Supreme Court considered a challenge to regulations issued by the Environmental Protection Agency defining several terms.  The Court said that when it "reviews an agency's construction of the statute which it administers, it is confronted with two questions." 467 U.S. at 842.  The first is whether Congress has directly addressed the question.  *Id.* at 843.  If not, the second question is whether the agency's construction of the statute is permissible.  *Id.*  In considering the second question, a court examines whether "Congress has explicitly left a gap for the agency to fill," because such a gap "is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  *Id.* at 843-44.  Regulations adopted to fill a gap "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 844.  Deference under *Chevron* is appropriate when Congress has entrusted an agency with a particular expertise to fill this policy gap.  *Id.* at 843-44 (stating deference is appropriate "whenever the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given

28

/////

13

1    situation has depended upon more than ordinary knowledge respecting the matters subjected to

2    agency regulations") (citations & internal quotation marks omitted).

3             Plaintiffs point to *United States v. Mead Corporation*, a case in which the Supreme

4    Court held that "administrative implementation of a particular statutory provision qualifies for

5    *Chevron* deference when it appears that Congress delegated authority to the agency generally to

6    make rules carrying the force of law, and that the agency interpretation claiming deference was

7    promulgated in the exercise of that authority."  533 U.S. 218, 226-27 (2001); *see also Marmolejo-*

8    *Campos v. Holder*, 558 F.3d 903, 908-09 (9th Cir. 2009) (en banc) ("[B]efore we apply *Chevron*,

9    we must conclude that Congress delegated authority to the agency to interpret the statute in

10   question and that the agency decision under review was made with a lawmaking pretense.")

11   (internal quotation marks omitted).  In *Marmolejo-Campos*, the Ninth Circuit went on to say an

12   agency's interpretations of statutes made "in the course of adjudicating cases" might be subject to

13   *Chevron* deference if the agency's orders bind third-parties and are thus precedential, but

14   unpublished decisions are not because they do not bind future parties.  558 F.3d at 909.   The

15   court found the lesser *Skidmore* deference applicable "when an agency with rulemaking power

16   interprets its governing statute without invoking such authority."  *Id*. (citing *Skidmore v. Swift &*

17   *Co.*, 323 U.S. 134 (1944)).

18           As noted, plaintiffs argue that the questions raised by the motions in this case are

19   questions of law, subject to *de novo* review.   In *Securities & Exchange Commission v. Chenery*,

20   the Supreme Court said when an agency's action is "a determination based upon judge-made

21   rules," it cannot be upheld "if the agency has misconceived the law." 318 U.S. 80, 93-94 (1943);

22   *see also Aurora Packing Co. v. N.L.R.B.*, 904 F.2d 73, 75-76 (D.C. Cir. 1990) (*Chevron* deference

23   did not apply to NLRB determination whether worker was an employee or independent contractor

24   "because of the . . . congressional direction that the Board and the courts apply the common law

25   of agency to the issue").

26           There are few decisions reviewing section 13(c) certifications that clearly identify

27   a standard of review.  In *City of Macon v. Marshall*, the district court declined to "review[] or

28   'second guess[]'" DOL's determination about the "fair and equitable arrangements that will

1   protect the interests of employees," based on its conclusion that section 13(c) commits this type

2   of agency action to the "Secretary of Labor's discretion."  439 F. Supp. 1209, 1223 (M.D. Ga.

3   1977).  In *Kendler v. Wirtz*, the Third Circuit affirmed a district court's dismissal of an action by

4   transit employees seeking to enjoin DOL from certifying that fair and equitable arrangements had

5   been made to protect employee interests.  388 F.2d 381, 382 (3d Cir. 1968).  The court in *Kendler*

6   found "the scope of permissible review" to be limited, noting that "[a] mere difference of

7   judgment between a person disadvantageously affected by agency action and the responsible head

8   of the agency . . . is not judicially reviewable."  *Id*. at 383.

9           Then there is the District of Columbia Court of Appeals' decision in *Donovan*.  In

10   deciding it could review the issues before it, that court distinguished both *City of Macon* and

11   *Kendler* and gave scant recognition to *Chevron*, relying on the latter case only to reject any claim

12   that a certification decision was unreviewable.  767 F.2d at 945 n.7 (stating that neither case

13   "speak[s] to the present situation, where the Secretary has determined that an agreement that does

14   not satisfy all of section 13(c)'s objectives is nevertheless fair and reasonable.  In essence, this

15   case does not concern the exercise of recognized discretionary authority, but an agency's

16   interpretation of the authority delegated to it.  Such interpretations are always subject to judicial

17   review.").  The court rejected DOL's certification only after undertaking its own examination and

18   interpretation of Section 13(c) and specifying how DOL should interpret such agreements.

19   *Donovan* thus supports plaintiffs' claim that *de novo* review is appropriate.

20           The nature of the challenged decisions here also supports *de novo* review.  Rather

21   than conducting an essentially discretionary review of whether any arrangement could be fair and

22   equitable in light of PEPRA or relying on any administrative expertise, DOL relied on case law

23   and federal labor policy, as filtered through a number of NLRA cases, to reject the applications at

24   issue.

25           To the extent the DOL did rely on its expertise rather than on an interpretation of

26   case law, the court rejects *Chevron* deference.  Even though DOL has issued administrative

27   guidelines for issuing its 13(c) certifications, the statute does not give the agency rulemaking

28   authority, *City of Colorado Springs v. Solis*, 589 F.3d 1121, 1129-30 (10th Cir. 2009), and DOL's

1    guidelines are procedural rather than substantive.  *See* 29 C.F.R. § 215.1 ("The purpose of these

2    guidelines is to provide information concerning the Department of Labor's administrative

3    procedures in processing applications for assistance under the Federal Transit law . . . .").

4    Moreover, the letters at issue in this case were not published and so lack precedential effect.

5    *Marmolejo-Campos*, 558 F.3d at 908-09.   As in *Mead Corporation*, these factors show that the

6    agency was not using its expertise to fill a gap left by Congress.  *Chevron* deference is not

7    appropriate.  *Mead Corp.*, 533 U.S. at 231-32.  In this case, *Skidmore* deference at most controls.

8    *Id.* at 234-35.  Even when a decision is entitled to *Chevron* or *Skidmore* deference, it may still be

9    arbitrary and capricious.  *See Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766

10   F.3d 560, 567 (6th Cir. 2014) (citing *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359,

11   374 (1998) (stating the process by which an agency reaches its decision must be logical and

12   rational)); *see also Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) (finding agency letter's

13   "persuasive power" under *Skidmore* was "virtually nil" and the agency's decision was arbitrary

14   and capricious "for want  of reasoned decision-making).

15          In determining whether an agency's decision was arbitrary and capricious, the

16   court must consider

17          if the agency has relied on factors which Congress has not intended
            it to consider, entirely failed to consider an important aspect of the
18          problem, offered an explanation for its decision that runs counter to
            the evidence before the agency, or is so implausible that it could not
19          be ascribed to a difference in view or the product of agency
            expertise.
20

21   *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (applying

22   the standard to agency rule making); *Judulang v. Holder*, __ U.S. __,132 S. Ct. 476, 484 (2011)

23   (stating that arbitrary and capricious review ensures agencies have engaged in reasoned decision-

24   making); *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (applying arbitrary and capricious

25   review when the issue was whether the discharge of the agency's authority to define substantial

26   compliance with labeling guidelines was reasonable; discussing interplay of 5 U.S.C. § 706(2)(A)

27   and *Chevron*).

28   /////

1    In this case, to the extent the DOL's decisions are purely legal interpretations, the

2    court considers them *de novo*.  If there is any deference to be accorded to the letters, it is under

3    the lesser *Skidmore* standard.  To the extent the DOL's letters are entitled to deference, the court

4    thus undertakes *Skidmore* analysis, but when reviewing whether the DOL engaged in reasoned

5    decision-making, the court considers whether the decision was arbitrary and capricious.

6        C.  California's Public Employees' Pension Reform Act of 2013 ("PEPRA")

7    In 2012, California's Governor signed the PEPRA into law "to reform California's

8    public employee pension systems and to bring the staggering cost of funding such systems under

9    fiscal control."  ECF No. 59 ¶ 6.  Under PEPRA, employees hired after January 1, 2013 ("new"

10   employees) must contribute at least 50 percent of the normal costs of their defined benefit plan,

11   and PEPRA establishes a cap on the amount of compensation that can be used to calculate a

12   retirement benefit for new and "classic" employees.  *See* Cal. Gov't  Code §§ 7522.30(a),

13   7522.10(c), 20683.2.  The law ends the ability of public employees to purchase nonqualified

14   service time, or "airtime," toward their pensions, with no further applications for such credit

15   accepted after January 1, 2013.  *Id.* § 7522.46.  In addition, it implements a two percent at age 62

16   defined benefit for all new non-safety employees and uses the highest average annual

17   compensation over a three-year period as final compensation for pension calculations, excluding

18   bonuses, unplanned overtime and unused vacation or sick leave from this calculation.  *Id.*

19   §§ 522.32(a), 7522.34.  *See* AR 1319-1323 ("What Does PEPRA Do?").

20       D.  The Urban Mass Transportation Act of 1964 ("UMTA")

21   UMTA was enacted to further "the interest of the United States . . . to foster the

22   development and revitalization of public transportation systems . . ."  49 U.S.C. § 5301(a).  The

23   purposes of the Act are to "provide funding to support public transportation" and "promote the

24   development of the public transportation workforce," among other things.  49 U.S.C.

25   § 5301(b)(1),(8); *see Kramer v. New Castle Area Transit Auth.*, 677 F.2d 308, 310 (3d Cir. 1982)

26   (UMTA was force behind "[t]he whole move away from private transit systems and into public

27   systems" by providing "the financial support to allow the changeover to public transportation

28   companies").

17

Section 13(c) of UMTA provides in pertinent part:

> (b) Employee protective arrangements.--(1) As a condition of financial assistance . . . the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance . . . shall specify the arrangements.
>
> (2) Arrangements under this subsection shall include provisions that may be necessary for--
>
> (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;
>
> (B) the continuation of collective bargaining rights . . . .

49 U.S.C. § 5333(b)(1), (2)(A) & (B).

Here again, there is little case law interpreting Section 13(c) in the context of federal review of funding applications against a backdrop of potential conflicts between federal and state law.  *See In the Matter of NJ Transit Bus Operations, Inc.*, 592 A.2d 547, 559  (Sup. Ct. of N.J. 1991) ("With the possible exception of the *Donovan* opinion, however, there is virtually no guidance from the case law, legislative history, or documented action by the Department of Labor (DOL) to aid determining precisely at what point conflicts between state law and section 13(c) will result in the DOL's discretionary or mandatory decertification and defunding of a state transit system.").

In the early 1980s, some cases considered whether Section 13(c) gave rise to a federal cause of action.  In *Jackson Transit*, the Supreme Court considered whether Section 13(c) "by itself" converted a claimed breach of a collective bargaining agreement into a federal cause of action.  457 U.S. at 17, 21.  In the course of answering the question, the Court noted that a

> "consistent theme" in the legislative history [of the UMTA] was that "Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local government entities and transit workers.  Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act, and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations.

*Id*. at 27 (footnote omitted).  The Court added, "Congress designed § 13(c) as a means to

18

1    accommodate state law to collective bargaining, not as a means to substitute federal law of

2    collective bargaining for state labor law." *Id*. at 28.

3            A year before *Jackson Transit*, the First Circuit considered similar issues in a suit

4    filed by a union, arguing that its 13(c) agreement rendered Massachusetts law governing

5    collective bargaining unconstitutional.  *Local Division 589, Amalgamated Transit Union v.*

6    *Massachusetts*, 666 F.2d 618 (1st Cir. 1981).  As in *Jackson Transit,* the appellate court framed

7    the issue as "whether Congress intended § 13(c) or, to be more specific, whether it intended

8    assurances made pursuant to §13(c) to override conflicting state law."  *Id*. at 627.  The court

9    concluded that "the specific detailed assurances given by a union and a transit authority to the

10   Labor Department under (UMTA) §13(c) do not invalidate a state law to the contrary."  *Id*. at

11   636.  It characterized the legislative history as providing "a limited set of provisional protections

12   . . . . To erect upon § 13(c) assurances a near permanent set of specific collective bargaining

13   conditions which the state cannot change is to go beyond its limited purpose."  *Id.* at 634.  It

14   noted that the "threat of receiving no further UMTA funds" will often prevent a state from

15   changing its laws, so there was no need to have UMTA override state law.  666 F.2d at 634

16           On this point, both parties rely on the D.C. Circuit's decision in *Donovan*, as did

17   the DOL in both rulings at issue here.  ECF No. 9-1 at 14; ECF No. 54 at 13.  As noted, *Donovan*

18   was an APA challenge to the Secretary of Labor's certification of a 13(c) agreement that did not

19   did not permit collective bargaining on five subjects previously subject to bargaining.  767 F.2d at

20   943.  The court, in a 1985 decision, rejected the Secretary's argument that he could find an

21   agreement fair and equitable overall, saying that UMTA "prescribes statutory minima that both

22   circumscribe his discretion and dictate standards for determining the fairness and equity of

23   particular labor protective arrangements."  *Id*. at 944.   The court acknowledged *Jackson Transit*

24   and *Local 589*, agreeing that "labor protective agreements are to be the product of local laws and

25   local bargaining," but concluded "section 13(c) governs a state's right to federal funding."  *Id*. at

26   944.  It continued that "[s]tates are free to forego such assistance and thus to adopt any collective

27   bargaining scheme they desire . . . . But the statute does not allow states to eliminate collective

28   bargaining rights and still enjoy federal aid."  *Id*. at 947.

1    The court in *Donovan* then turned to defining "what 'the continuation of collective

2    bargaining rights' requires."  It examined the legislative history, which it believed showed that

3    Congress intended "to measure state labor laws against the standards of collective bargaining

4    established by labor policy," even though it "did not intend to subject local government

5    employers to the precise strictures of the NLRA." *Id*. at 948-49.  The court said that "Congress

6    used the phrase ["collective bargaining"] generically, incorporating the commonly understood

7    meaning of collective bargaining . . . [which] was universally understood to require at a minimum

8    good faith negotiations, to a point of impasse if necessary, over wages, hours and other terms and

9    conditions of employment."  *Id*. at 949 (emphasis in original).   It concluded that "[c]ollective

10   bargaining does not exist if an employer retains the power to establish wages, hours, and other

11   conditions of employment without the consent of the union or without at least first bargaining in

12   good faith to impasse over disputed mandatory subjects." *Id*. at 951.

13    Finally, the court said "section 13(c)'s requirement that collective bargaining

14   rights be continued does not in any way dictate the substantive provisions of a collective

15   bargaining agreement. . . . Section 13(c) does not perpetuate the *substantive* terms of pre-

16   acquisition bargaining agreements, but rather protects the *process* of collective bargaining.  The

17   substantive provisions of collective bargaining agreements may change, but section 13(c) requires

18   that the changes be brought about through collective bargaining, not by state fiat."[4] *Id*. at 953

19   (emphases in original).

20    E.  Claim One –The Continuation of Collective Bargaining Rights

21    Defendants argue that under *Donovan*, the union's reduced ability to bargain for

22   pension benefits, which are traditional subjects of collective bargaining, means that the

23   /////

24   _____

25    [4] In a later case, the Court of Appeals for the D.C. Circuit quoted this passage and said
      "[w]e are not sure what to make of this passage.  The ICC relies upon and quotes only the first

26   two sentences, while the RLEA and the UTU argue persuasively that they are made largely
      irrelevant by the last sentence.  Given this state of internal conflict, we do not undertake to say

27   what is the teaching of *Donovan* relevant to the present case."  *Railway Labor Execs. Ass'n v.
      United States*, 987 F.2d 806, 814 n.3 (D.C. Cir. 1993) (interpreting a now-repealed provision with

28   the same language as Section 13(c)).

1    continuation of collective bargaining has been undercut.  ECF No. 9-1 at 13-15; ECF No. 61 at

2    11-15.

3              Plaintiffs counter that *Donovan* cannot be read as holding that any diminution in

4    the ability to bargain means that the continuation of collective bargaining has been destroyed.

5    ECF No. 21 at 13-14.  They cite to an analysis from the General Counsel of California's Labor

6    and Workforce Development Agency analyzing PEPRA's changes, which says that PEPRA

7    permits collective bargaining over pensions, but rather simply changes the way employers may

8    offer defined benefits; they argue DOL should have relied on this analysis in reaching its

9    decision.  *Id.* (citing *Urban Mass Transportation Act of 1963:  Hearings on H.R. 3881 Before the*

10   *H. Comm. on Banking & Currency*, 88 Cong. 486 (1963)).  Plaintiffs also argue that the DOL's

11   decision here is contrary to its certification of a Massachusetts plan after Massachusetts had

12   enacted changes to public employee pension benefits similar to PEPRA, particularly because

13   DOL essentially adopted Massachusetts' analysis of the bill, while rejecting California's analysis

14   of PEPRA.  ECF No. 21 at 11-14; ECF No. 54 at 10-18.[5]

15             In reply, defendants note that DOL discussed and distinguished the Massachusetts

16   case and argue its decision is not arbitrary and capricious.

17             Relying on *Jackson Transit* and *Local 589* plaintiffs argue in essence that state law

18   determines the scope of negotiations about pension benefits but then does not restrict the parties

19   from bargaining in good faith within that defined space.  Defendants argue, to the contrary, that

20   under federal labor law, every aspect of pensions must be open to bargaining for the

21   "continuation of collective bargaining" to be satisfied.

22             Plaintiffs read *Jackson Transit* and *Local 589* too broadly.  Neither case

23   considered the interplay between state law and 13(c) certification.  In *Local* 589, the court

24   recognized that "§ 13(c) assurances need not override state law to make § 13(c) enforceable.  The

25   threat of receiving no further UMTA funds would often prevent a state currently receiving those

26

27   ───────────────
     [5] In an amicus brief, Bay Area Rapid Transit (BART) argues it was able to bargain with its
     employees over a number of pension-related matters.  ECF No. 26-1.  At the hearing on the
     motion, however, plaintiffs acknowledged that information about BART's bargaining experience
28   was not before DOL when it rejected the grant applications at issue.

1    funds from changing its laws contrary to the policy of § 13(c)."  666 F.2d at 634.  The issue in

2    *Jackson Transit* was "whether § 13(c) by itself permits a union to sue in federal court for alleged

3    violations  of an arrangement of this kind or of the collective-bargaining agreement between the

4    union and the local government transit authority."  457 U.S. at 16.  The Court continued that

5    although 13(c) "specifies five different varieties of protective provisions that must be included

6    among the § 13(c) arrangements; and it expressly incorporates the protective arrangements into

7    the grant contract between the recipient and the Federal Government," it is "a means to

8    accommodate state law to collective bargaining, not a means to substitute a federal law of

9    collective bargaining for state labor law."  *Id*. at 23-24, 28 (footnote omitted).  Although both

10   cases recognize the primacy of state law over collective bargaining, their determination that

11   Section 13(c) does not impose conditions on state labor law outside of the certification process

12   does not squarely answer the questions presented in this case.  Neither case interpreted Section

13   13(c) in the context of an application for funding.  *See Stockton Metro. Transit Dist. v. Div. 276 of*

14   *the Amalgamated Transit Union*, 132 Cal. App. 3d 203, 212 (1982) (UMTA "does not squarely

15   attempt to directly displace states' powers in the area of mass transit, rather it merely provides for

16   certain conditions to the receipt of federal aid to which a state or local government must agree").

17   This case, in contrast, considers the relationship between local governments and the federal

18   government in the funding application context.

19           Defendants argue that the restrictions on collective bargaining imposed by PEPRA

20   run afoul of *Donovan*.  Plaintiffs argue that *Donovan* is not controlling in this respect; the statute

21   in that case considered eliminated bargaining rights on a number of topics, whereas in this case,

22   PEPRA impacts but does not foreclose collective bargaining over pensions.

23           The court in *Donovan* considered a series of amendments to the statutes

24   establishing the Metropolitan Atlanta Rapid Transit Authority (MARTA) that "prohibited

25   MARTA from bargaining over five subjects that are at issue here" and changed the procedures for

26   interest arbitration.  767 F.2d at 941, 943.  The Secretary of Labor nevertheless issued a Section

27   13(c) certification and the union brought an APA action, challenging the fairness of an agreement

28   "that did not permit collective bargaining on five subjects over which the union was previously

1    entitled to bargain." *Id*. at 943.

2          The *Donovan* court recognized that "Section 13(c) does not prescribe mandatory

3    labor standards for the states, but rather dictates the terms of federal mass transit assistance. . . .

4    [T]he statute does not allow the states to eliminate collective bargaining rights and still enjoy

5    federal aid." *Id*. at 947.  It then turned to "what 'the continuation of collective bargaining rights'

6    requires," and concluded that "federal labor policy" rather than state law informed the inquiry.

7    *Id*. at 948.  The court recognized that this federal labor policy was not established by the NLRA,

8    because "Congress neither imposed upon the states the precise definition of 'collective

9    bargaining' established by the NLRA, nor did it employ a term of art devoid of meaning, leaving

10   the states free to interpret and define it as they saw fit.  Instead, Congress used the phrase

11   generically, incorporating within the statute the commonly understood meaning of 'collective

12   bargaining.'" *Id*. at 949.  The *Donovan* court defined that meaning as "'[g]ood faith bargaining,

13   to a point of impasse if necessary, over wages, hours and other terms and conditions of

14   employment [which is] the essence of federally-defined collective bargaining rights; indeed . . it

15   is the almost universally recognized definition of collective bargaining in the United States." *Id*.

16   at 950-51.  Under this definition, "[c]ollective bargaining does not exist if an employer retains the

17   power to establish wages, hours and other conditions of employment without the consent of the

18   union or without at least first bargaining in good faith to impasse over disputed mandatory

19   subjects." *Id*.

20         Plaintiffs read too much into *Donovan* to argue that it means 13(c) certification

21   should be withheld only when statutory changes completely preclude collective bargaining.  But

22   defendants also read too much into the case when they say it controls the interpretation of Section

23   13(c) in this case.

24         In *Donovan*, the state had amended laws specifically applicable to MARTA,

25   "prohibit[ing]  MARTA from bargaining over five subjects," *id*. at 943, and giving MARTA

26   "unilateral control" over a number subjects.  *Id*. at 952.  The statute was thus designed to change

27   the balance of power in one particular labor relationship.

28   /////

1          In this case, the statute before the DOL did not give one party control over

2   collective bargaining but rather made across-the-board changes in public employee pension law:

3   PEPRA changes the parameters within which collective bargaining may proceed but does not

4   give unilateral authority to SacRT or MST.   In issuing its denial letters, DOL relied on *Donovan*

5   reflexively, without properly distinguishing its factual context.   Moreover, DOL ignored the fact

6   that even under federal labor policy, "[b]oth employers and employees come to the bargaining

7   table with rights under state law that form a 'backdrop' for their negotiations." *Fort Halifax*

8   *Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987).   Part of this backdrop may be pension reform,

9   because there is nothing in federal labor policy "which expressly forecloses all state regulatory

10  power with respect to those issues, such as pension plans, that may be the subject of collective

11  bargaining." *Malone v. White Motor Corp*., 435 U.S. 497, 504-05, 508 (1978) (under now

12  superseded Disclosure Act, no "distinction between collectively bargained and all other plans . . .

13  with regard to . . . the regulatory functions that would remain with the States"); *see also Metro.*

14  *Life Ins. Co. v. Mass. Travelers Ins. Co*., 471 U.S. 724, 756 (1985) ("[f]ederal labor law . . . is

15  interstitial, supplementing state law where compatible, and supplanting it only when it prevents

16  the purposes" of federal law); AR 447, Unified Protective Agreement, Pursuant to Section

17  5333(b) (Jan. 3, 2011) at 2 ("All rights, privileges, and benefits (including pension rights and

18  benefits) of employees covered by this arrangement . . . under existing collective bargaining

19  agreements or otherwise. . . , shall be preserved and continued; provided, however, that such

20  rights, privileges and benefits which are not foreclosed from further bargaining under applicable

21  law or contract may be modified by collective bargaining and agreement by the Recipient and the

22  Union involved to substitute other rights, privileges and benefits.").   DOL thus erred in its

23  interpretation of the intersection between federal labor policy and a state's system-wide changes

24  in some aspects of public employment.

25          Moreover, by finding that PEPRA prevents collective bargaining over pensions,

26  DOL essentially determined that a pension is necessarily a defined benefit plan and found that

27  PEPRA's restrictions on such plans means that collective bargaining on these issues could not be

28  continued.   As plaintiffs observe, nothing in PEPRA prevents bargaining over defined

1    contribution plans, which are another form of pension.  DOL's determination essentially writes a

2    substantive term into labor-management agreements, outside of DOL's authority to do so.

3                 Finally, DOL failed to consider the realities of public sector bargaining:

4            Public employee bargaining is distinctive in that at least a portion of
             the union's attention is directed away from the bargaining table,
5            even for what would be designated the standard terms and
             conditions of employment under the NLRA:
6
             "[I]n the private sector, the employer must send someone to the
7            bargaining table with authority to make a binding agreement.  In the
             public sector this may not be legally possible or politically sensible.
8            Wages and other benefits directly affect budget and the tax rates;
             but adopting budgets and levying taxes are considered, within our
9            governmental system, fundamental legislative polices to be decided
             by a legislative body, not by a negotiator at the bargaining table. . . .
10           Modifications in state pension plans cannot, in most states, be made
             binding by negotiators, but must be ratified by the legislature.  In
11           the public sector, agreement at the bargaining table may be only an
             intermediate, not a final, step in the decisionmaking process."
12

13   *Robinson v. State of New Jersey*, 741 F.2d 598, 607 (3d Cir. 1984) (quoting Summers, Public

14   Sector Bargaining:  Problems of Governmental Decisionmaking, 44 U. Cinn. L. Rev. 669, 670-71

15   (1975)).  DOL's failure to consider the realities of the process of public sector bargaining renders

16   its decision arbitrary and capricious; *see also Skidmore*, 323 U.S. at 140 (stating deference

17   depends in part on the "thoroughness evident" in the department's consideration).   In light of this

18   determination, the court does not reach plaintiffs' argument that DOL failed to distinguish its own

19   prior decisions regarding pension reform in Massachusetts and Section 13(c) certification.

20   Plaintiffs' motion for summary judgment is granted as to claim one.

21           F. Claim Two—Preservation of Collective Bargaining

22                 Defendants say that based on PEPRA's undisputed changes to pension

23   contribution formulas for "new" employees, hired after January 1, 2013, DOL properly concluded

24   that PEPRA did not preserve existing collective bargaining rights.  ECF Nos. 9-1 at 17-19 & 61 at

25   15-18.

26                 Plaintiffs argue that DOL acted in excess of its authority when it rejected state law

27   defining when a public employee becomes entitled to pension benefits and say that employees

28   /////

                                                  25

1  hired after PEPRA's effective date have no rights to other pension formulas to be preserved.  ECF

2  No. 54-1 at 22-24; ECF No. 21 at 15-16.

3          In reply, defendants do not dispute the points about the vesting of pensions under

4  California law, but argue this is not relevant because DOL is tasked with interpreting the federal

5  law on the preservation of rights in existing collective bargaining agreements.

6          Defendants do cite cases suggesting, at least under the NLRA, mandatory

7  collective bargaining includes wages for unrepresented, non-union members; they argue that the

8  bargaining unit for a CBA includes employees not yet hired.  *See, e.g., Wood v. Nat'l Basketball*

9  *Ass'n*, 602 F. Supp. 525, 529 (S.D. N.Y. 1984) (rejecting plaintiff's argument that he was not

10  bound by a CBA because "he was not an NBA player when the union and owners reached

11  agreement on the issues in contention here"); *but see Merk v. Jewel Co.*, Inc., 848 F.2d 761, 764

12  (7th Cir. 1988) (stating that employees hired in the future "by definition are not yet members of

13  the bargaining unit").

14          DOL relied on *Wood*  and other cases, but failed to consider whether the snippets it

15  excerpted from case law were sufficiently analogous to the situation before it.  The DOL cited

16  *Gvozdenovic v. United Airlines, Inc*. for the proposition that "a collective bargaining agreement

17  binds both those members within a bargaining unit at the time the agreement is reached as well as

18  those who later enter the unit."  933 F.2d 1100, 1106-07 (2d Cir. 1991).  In the case, the plaintiffs

19  sought to vacate an arbitration award, arguing they were not bound by the CBA's arbitration

20  provisions because they had not been employed by United Airlines at the time the agreement was

21  reached.  *Id.*  In *Wood*, the plaintiff sought to negotiate a different employment contract with the

22  NBA, a contract in conflict with the CBA.  602 F. Supp. at 529.  In *J.I. Case v. N.L.R.B.*, the

23  employer sought to avoid negotiating with the union, relying instead on individual contracts with

24  its employees.  321 U.S. 332 (1944).  The Supreme Court said that "individual contracts obtained

25  as the result of an unfair labor practice may not be the basis of advantage to the violator of the

26  [NLRA] nor of disadvantage to the employees."  *Id*. at 336.  In *Wood* and *Gvozdenovic*, in other

27  words, employees attempted to avoid provisions of the CBA they believed affected them unfairly;

28  in *J.I, Case*, it was the employer who did so.  *See also Melanson v. United Air Lines, Inc*., 931

26

1   F.2d 558, 561 (9th Cir. 1991) ("Allowing an employee or employer, by virtue of an individual

2   agreement, to establish an employment status different from that of other employees would

3   undermine the efficacy of collective bargaining.  The effect on the federal labor scheme of

4   allowing individual agreements that conflict with the CBA would be the same whether the

5   agreement is reached prior to or during a formal employment relationship."); *Clarett v. Nat'l*

6   *Football League*, 369 F.3d 124, 139 (2d Cir. 2004) ("[A]n NFL club would commit an unfair

7   labor practice were it to bargain with Clarett individually without the union's consent.").

8          In this case, neither "new" employees nor the employers are pursuing individual

9   agreements or are seeking some advantage outside the CBA, but rather are constrained by PEPRA

10  as a backdrop to their employment relationship.  DOL misapplied federal labor policy in relying

11  on the cases it did to evaluate PEPRA's impact on the preservation of collective bargaining rights.

12  By finding as-yet-not-hired employees covered by a CBA, DOL arrogated to itself the authority

13  to define a bargaining unit, an authority it does not have.  SacRT's CBA, which was in the

14  administrative record before the DOL, defines the bargaining unit as employees in SacRT's

15  service.  An employee cannot be "in service" before he or she has started work.  *See* Oxford

16  American Dictionary Online (defining "service" as "[t]he action of helping or doing work for

17  someone").  The portion of MST's CBA defining the bargaining unit does not appear to be in the

18  administrative record, yet DOL apparently assumed that its understanding of a bargaining unit

19  comported with the definition in that document.  AR 203; *see Stanford Hosp. & Clinics v. NLRB*,

20  370 F.3d 1210, 1213 (D.C. Cir. 2004) (rejecting the NLRB's order adding employees to a

21  bargaining unit because "the representation clause of the CBA clearly exclude[d]" the

22  employees).

23         In rejecting certification based on its evaluation of PEPRA's impact on new

24  employees, DOL misinterpreted the law and did not consider all relevant factors.   Plaintiffs'

25  motion for summary judgment on this claim also is granted.

26      G.  Claim Three—Prejudging the Merits

27         In light of the resolution of the other claims, the motion to dismiss claim three is

28  denied as moot.

27

1    IV.  THE SPENDING CLAUSE

2        A.  Allegations of the Amended Complaint

3            California's public transit network and operations would not be self-sustaining

4    without federal funds.  ECF No. 59 ¶ 33.   In fiscal year 2013, the available federal transit funding

5    for California totaled nearly $2 billion; California's total spending on transit for that period was

6    approximately $8.5 billion.  ECF No. 59 ¶ 33.

7            On August 1, 2013, the Secretary of Labor wrote to California's Governor,

8    informing him that absent immediate legislation, $1.6 billion in federal transit grants to California

9    agencies, amounting to almost 80 percent of federal transit funds for which California was

10   eligible, would be withheld because PEPRA prevented compliance with Section 13(c).  ECF

11   No. 59 ¶ 10.  In addition to the two denials at issue in this case, on September 30, 2013, DOL

12   issued final determinations of pending FTA grants for the Santa Clara Valley Transportation

13   Authority, Monterey-Salinas Transit, the Alameda-Contra Costa Transit District, the Golden Gate

14   Bridge, Highway Transportation District on essentially similar grounds.  ECF No. 59 ¶ 26.

15           On September 11, 2013, the California Legislature passed Assembly Bill 1222,

16   which provides a temporary exemption of transit workers' pension plans from PEPRA to allow

17   critical work on affected projects to continue pending resolution of the transit agencies' challenge

18   to the DOL's actions.  ECF No. 59 ¶ 15.  The Governor signed the bill on October 4, 2013.  *Id.*

19   The exemption expires on either the date of a judicial ruling that the DOL erred in its

20   determination regarding PEPRA and Section 13(c) or on January 1, 2015, whichever is earlier.

21   ECF No. 59 ¶ 16.  Plaintiffs allege the DOL thus coerced California into exempting transit

22   workers from PEPRA, impairing the state's fiscal and legislative sovereignty.  ECF No. 59 ¶ 25.

23       B.  Standard for a Motion to Dismiss

24           Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

25   dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court may

26   dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged

27   under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

28   1990).

1    Although a complaint need contain only "a short and plain statement of the claim

2    showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a

3    motion to dismiss this short and plain statement "must contain sufficient factual matter . . . to

4    'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

5    (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include

6    something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or

7    "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.*

8    (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint will survive a motion to

9    dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to

10   draw on its judicial experience and common sense."  *Id.* at 679.  Ultimately, the inquiry focuses

11   on the interplay between the factual allegations of the complaint and the dispositive issues of law

12   in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

13   In making this context-specific evaluation, this court must construe the complaint

14   in the light most favorable to the plaintiff and accept as true the factual allegations of the

15   complaint.  *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  This rule does not apply to "'a legal

16   conclusion couched as a factual allegation,'" *Papasan v. Allain*, 478 U.S. 265, 286 (1986) quoted

17   in Twombly, 550 U.S. at 555, nor to "allegations that contradict matters properly subject to

18   judicial notice" or to material attached to or incorporated by reference into the complaint.

19   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001).  A court's

20   consideration of documents attached to a complaint or incorporated by reference or matter of

21   judicial notice will not convert a motion to dismiss into a motion for summary judgment.   *United*

22   *States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003); *Parks Sch. of Bus. v. Symington*, 51 F.3d

23   1480, 1484 (9th Cir. 1995);  *see Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980

24   (9th Cir. 2002) (noting that even though court may look beyond pleadings on motion to dismiss,

25   generally court is limited to face of the complaint on 12(b)(6) motion).

26   C.  The Spending Clause

27   "The Spending Clause of the Federal Constitution grants Congress the power '[t]o

28   lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common

1   Defence and general Welfare of the United States." *Agency for Int'l Dev. v. Alliance for Open*

2   *Soc'y Int'l, Inc.*, __ U.S. __, 133 S. Ct. 2321, 2327 (2013) (quoting U. S. Const., Art. I, § 8,

3   Cl. 1).  Although the federal government's authority is broad, the Spending Clause does impose

4   limits:

> First, the exercise of the spending power must be in the pursuit of
> the general welfare.  Second, the conditions on receipt of federal
> funds must be reasonably related to the articulated goal.  Third,
> Congress' intent to condition funds on a particular action must be
> authoritative and unambiguous, "enabl[ing] the States to exercise
> their choice knowingly, cognizant of the consequences of their
> participation."  Fourth, the federal legislation may be invalid if an
> independent constitutional provision bars Congressional actions.
> The independent constitutional bar rule "stands for the
> unexceptionable proposition that the power may not be used to
> induce the States to engage in activities that would themselves be
> unconstitutional.

12   *Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989) (citations omitted).  In *South Dakota v.*

13   *Dole*, the Supreme Court suggested another limit on spending authority:  "in some circumstances

14   the financial inducement offered by Congress might be so coercive as to pass the point at which

15   'pressure turns into compulsion.'"  483 U.S. 203, 211 (1987) (quoting *Steward Mach. Co. v.*

16   *Davis*, 301 U.S. 548, 590 (1937)).  In *Dole*, the Court found that Congress's conditioning of the

17   receipt of highway funds on South Dakota's raising its drinking age to 21 did not reach the point

18   of compulsion when the penalty for refusing would be the loss of only 5 percent of highway grant

19   funds.  *Id*. at 211.

20        In *Skinner*, the Ninth Circuit questioned the viability of the coercion theory, noting

21   it "has been much discussed but infrequently applied in federal case law and never in favor of the

22   challenging party"; the Circuit suggested this result has flowed from the "elusiveness" of the

23   theory.  884 F.3d at 448; *see also Constantine v. Rectors & Visitors of George Mason Univ.*,

24   411 F.3d 474, 493 (4th Cir. 2005) ("Although there might be a federal funding condition that is

25   unconstitutionally coercive, neither the Supreme Court nor any federal court of appeals has yet

26   identified one.").

27        Recently, however, the Supreme Court has upheld a Spending Clause challenge to

28   the Medicaid expansion portion of the Affordable Care Act.  In *National Federation of*

1  *Independent Business v. Sibelius (NFIB)*, the Court found the federal government's financial

2  inducement was coercive when Congress threatened to withhold Medicaid funding, in light of the

3  fact that Medicaid spending "accounts for over 20 percent of the average State's total budget."

4  __ U.S. __, 132 S. Ct. 2566, 2604 (2012).  It contrasted the "'relatively mild encouragement'" in

5  *Dole* to the threatened loss of all of a state's Medicaid funding, which it described as "a gun to the

6  head." *Id.* (quoting *Dole*, 483 U.S. at 211).  The Court continued:

7          It is easy to see how the *Dole* Court could conclude that the
        threatened loss of less than half of one percent of South Dakota's
8       budget left that State with a 'prerogative' to reject Congress's
        desired policy, "not merely in theory but in fact."  The threatened
9       loss of over 10 percent of a State's overall budget, in contrast, is
        economic dragooning that leaves the States with no real option but
10      to acquiesce in the Medicaid expansion.

11  *NFIB*, 132 S. Ct. at 2604-05 (citation omitted).

12          Defendants argue plaintiffs' amended claim must be dismissed because it

13  "contains a basic use restriction" and so is not coercive.  Mot. to Dismiss, ECF No. 64-1 at 11.

14  They also argue plaintiffs plead the impact on the transit budget rather than on the state's budget

15  as a whole and so do not satisfy any pleading minimum.

16          Plaintiffs argue the provision here is not a basic use restriction because it

17  conditions the receipt of money for transit on a separate goal of protection of collective

18  bargaining rights.  They also argue there is no formula for evaluating the coercive nature of the

19  conditions.

20          Although the complaint alleges some coercive impact in pleading that the

21  Legislature enacted and the Governor signed legislation to exempt transit workers from PEPRA,

22  it does not set forth the impact on the state's budget as a whole.  Although there may be no

23  precise formula that applies, the court has not found and plaintiffs have not cited a case evaluating

24  the impact on the budget of a state agency alone rather than on the state's budget as a whole.  The

25  motion to dismiss is granted in this respect.

26          IT IS THEREFORE ORDERED that:

27          1. Defendants' motion to dismiss the Spending Clause claim, ECF No. 64, is

28  granted without leave to amend.

31

2.  Defendant's motion to dismiss or for summary judgment on the APA claims, ECF No. 9-1, is denied;

3.  Plaintiffs' motion for summary judgment on the APA claims, ECF No. 54, is granted; and

4.  This matter is remanded to the Department of Labor for further proceedings consistent with this order.

DATED:  December 30, 2014.

_____
UNITED STATES DISTRICT JUDGE