1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   STATE OF CALIFORNIA, acting by and          No.  2:13-cv-2069 KJM DAD
     through the CALIFORNIA
12   DEPARTMENT OF
     TRANSPORTATION; and
13   SACRAMENTO REGIONAL TRANSIT               ORDER
     DISTRICT,
14
                    Plaintiff,
15
              v.
16
     UNITED STATES DEPARTMENT OF
17   LABOR; and THOMAS E. PEREZ, in his
     official capacity as SECRETARY OF
18   LABOR,

19                  Defendant.

20

21

22              The California Department of Transportation (Caltrans) and the Sacramento

23   Regional Transit District (SacRT), the plaintiffs in this action, seek an order directing the United

24   States Department of Labor (the DOL) to certify their applications for funding under section

25   13(c) of the Urban Mass Transportation Act of 1964.  They seek this relief in the form of a

26   motion to enforce this court's previous order, which remanded the matter to the DOL for further

27   proceedings.  The plaintiffs also request leave to file a supplemental complaint to challenge

28   several aspects of the post-remand proceedings.  The matter was submitted for decision without a

                                        1

1  hearing.  As explained below, the motion to enforce is GRANTED IN PART, and the motion for

2  leave to file a supplemental complaint is GRANTED.

3  I.        MOTION TO ENFORCE

4            A.        General Background

5                      The general background of this case is unchanged since the issuance of this court's

6  previous order, reported at *California v. Department of Labor*, 76 F. Supp. 3d 1125 (E.D. Cal.

7  2014).  To summarize, under section 13(c) of the Urban Mass Transportation Act of 1964

8  (UMTA), codified at 49 U.S.C. § 5333(b), state and local governments seeking federal financial

9  assistance for transit projects must obtain certification from the DOL that the interests of

10 employees affected by any assistance granted are protected by "fair and equitable" arrangements,

11 49 U.S.C. § 5333(b)(1).  Specifically, these arrangements must preserve the employees' "rights,

12 privileges, and benefits (including continuation of pension rights and benefits) under existing

13 collective bargaining agreements or otherwise."  *Id.* § 5333(b)(2)(A).  Similarly, arrangements

14 must include provisions "necessary for . . . the continuation of collective bargaining rights."  *Id.*

15 § 5333(b)(2)(B).

16                     Caltrans is an executive department of the state of California.  Under authority of

17 state law, it assists local transit agencies in their efforts to develop and operate mass transit

18 systems, including applications for federal funds.  Monterey-Salinas Transit (MST) is a local

19 transit agency and recipient of pass-through funds from Caltrans.  SacRT is a special regional

20 transit district based in Sacramento, California.  SacRT operates dozens of bus routes, light rail

21 lines, light rail stations and park-and-ride lots, and thousands of bus stops.  It relies heavily on

22 federal funding.  SacRT employs more than 900 people, about 500 of whom are represented by

23 the Amalgamated Transit Union, or ATU.  Its unionized employees participate in a defined

24 benefit pension plan that pays an annual benefit upon retirement.  Each employee's benefits are

25 calculated as a percentage of his or her final average compensation multiplied by years of service.

26 The plan is funded exclusively by employer contributions and earnings on plan assets.

27                     In 2012, the Governor of California signed the California Public Employees'

28 Pension Reform Act of 2013 (PEPRA), which was intended to reform the state's public employee

1   pension systems and reduce the cost of funding those systems.  Under PEPRA, among other

2   provisions, employees hired after January 1, 2013 must contribute at least 50 percent of the costs

3   of a defined benefit retirement plan, the amount of compensation usable in calculations of

4   retirement benefits is capped, and public employees may no longer purchase non-qualified service

5   time toward their pensions.

6          In November 2012, SacRT submitted an application to the Federal Transportation

7   Agency for mass transit funding.  The money it sought would contribute to an extension of its

8   light rail system.  The next month, the DOL notified SacRT and its unions that it intended to

9   certify the grant under UMTA section 13(c).  It invited objections and referred to PEPRA.  The

10   ATU objected, citing the effect of PEPRA on the collective bargaining of pensions and retirement

11   issues, among other things.  In January 2013, the DOL ordered the ATU and SacRT to engage in

12   good faith discussions aimed at finding a resolution acceptable to both parties, but SacRT and the

13   ATU were unable to reach an agreement, and the DOL eventually declined certification.

14          In September 2013, Caltrans sought federal funds on behalf of MST.  ATU, which

15   represents some of MST's employees, also objected to this application, citing the effects of

16   PEPRA.  The DOL also denied the Caltrans-MST application.  The plaintiffs then filed this

17   action, challenging the DOL's decisions under the federal Administrative Procedure Act (APA)

18   and the U.S. Constitution's Spending Clause.  *See* Am. Compl., ECF No. 59.

19          B.      This Court's Previous Order

20          In December 2014, this court issued an order dismissing the Spending Clause

21   claims, denying the DOL's motion to dismiss the APA claims, granting the plaintiffs' motion for

22   summary judgment on the APA claims, and remanding the matter to the DOL for further

23   proceedings consistent with the court's order.  *California v. Dep't of Labor*, 76 F. Supp. 3d

24   at 1148.[1]  The court identified several aspects of the DOL's decision that violated the APA.

25          First, the DOL had relied reflexively on a particular decision of the D.C. Circuit,

26   *Amalgamated Transit Union v. Donovan*, without accounting for factual differences between that

27   _____

28          [1]  Subsequent citations to this decision include only the numerical volume and page
    number, and not the case name.

3

1   case and this one.  *See* 76 F. Supp. 3d at 1142–43 (citing *Donovan,* 767 F.2d 939 (D.C. Cir.

2   1985)).  Specifically, in *Donovan,* the circuit court reversed the certification of an agreement that

3   did not permit collective bargaining on several subjects previously subject to bargaining.

4   *Donovan,* 767 F.2d at 941, 943.  PEPRA, by contrast, does not eliminate collective bargaining

5   rights or grant the plaintiffs unilateral authority; rather, it changes the parameters within which

6   collective bargaining may proceed.  *See* 76 F. Supp. 3d at 1142–43.

7            Second, the DOL had ignored the fact that under federal labor policy, "'[b]oth

8   employers and employees come to the bargaining table with rights under state law that form a

9   backdrop for their negotiations.'"  76 F. Supp. 3d at 1143 (quoting *Fort Halifax Packing Co., Inc.*

10   *v. Coyne*, 482 U.S. 1, 21 (1987)) (alteration in original).  Pension reform may be part of this

11   "backdrop," because no provision of federal labor policy "'expressly forecloses all state

12   regulatory power with respect to those issues, such as pension plans, that may be the subject of

13   collective bargaining.'"  *Id.* (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504–05

14   (1978)).

15            Third, "by finding that PEPRA prevents collective bargaining over pensions, [the

16   DOL] essentially determined that a pension is necessarily a defined benefit plan . . . ."  *Id.*  But

17   "nothing in PEPRA prevents bargaining over defined contribution plans, which are another form

18   of pension."  *Id.*  The DOL had therefore written a substantive term into the parties' agreement,

19   which it had no authority to do.  *Id.*

20            Fourth, the DOL had not considered "the realities of public sector bargaining."  *Id.*

21   Bargaining in the public sector differs from bargaining in the private sector.  A private employer

22   may send a single representative to the bargaining table, with the authority to make a binding

23   agreement, whereas a public employer may not be able to make concessions or change policy

24   absent legislative enactment.  In short, "[i]n the public sector, agreement at the bargaining table

25   may be only an intermediate, not a final, step in the decisionmaking process."  *Id.* at 1143–44

26   (quoting *Robinson v. State of N.J.*, 741 F.2d 598, 607 (3d Cir. 1984)).

27            Fifth, to conclude that PEPRA did not preserve existing collective bargaining

28   rights of employees hired after January 1, 2013, the DOL relied on *Wood v. National Basketball*

4

1    *Association* and similar cases, but it did not consider whether factual differences between those

2    cases and this one undermined their persuasive effect.  *See id.* at 1144–45 (citing 602 F. Supp.

3    525, 529 (S.D.N.Y. 1984)).  In this case, unlike those on which the DOL relied, "neither 'new'

4    employees nor the employers are pursuing individual agreements or are seeking some advantage

5    outside the [collective bargaining agreement], but rather are constrained by PEPRA as a backdrop

6    to their employment relationship."  76 F. Supp. 3d at 1145.  On a related note, the DOL

7    essentially redefined "bargaining unit" when it found that employees who had not yet been hired

8    were covered by a collective bargaining agreement.  *Id.*

9           The DOL filed an appeal, but later dismissed that appeal voluntarily.  *See* Not.

10   Appeal, ECF No. 83; Order Dismissing Appeal, ECF No. 86.  On August 13, 2015, the DOL

11   issued its decision on remand, concluding as it did before that the plaintiffs' grant applications

12   could not be certified under section 13(c).  *See* Kraft Decl. Ex. A (Remand Decision), ECF

13   No. 87-3.  It reached this conclusion on two independent grounds: (1) "PEPRA prevents the

14   'continuation of collective bargaining' as that phrase is used in section 13(c)(2)"; and

15   (2) "PEPRA prevents 'the preservation of rights, privileges, and benefits (including continuation

16   of pension rights and benefits) under existing collective bargaining agreements,' contrary to

17   section 13(c)(1)."  *Id.* at 8.

18          The plaintiffs moved to enforce this court's previous order on September 10, 2015.

19   *See* Mot. Enforce, ECF No. 87.  They argue the DOL ignored this court's order and simply

20   disagreed with this court's interpretation of the law.  Mem. P. & A. 5–12, ECF No. 87-1.  They

21   also argue a quick response is warranted in light of the DOL's delay tactics and attempts to coerce

22   them into unfavorable and illegal agreements.  *Id.* at 13–18.  The plaintiffs request an order

23   directing the DOL to certify their funding applications within thirty days and ordering immediate

24   compliance with this court's previous decision.  *Id.* at 18.  The DOL opposes the motion, arguing

25   its decision on remand complies with this court's previous order.  Opp'n Enforce, ECF No. 93.

26   The plaintiffs have replied.  ECF No. 95.

27   /////

28   /////

5

1         C.       <u>Authority to Enforce</u>

2         Federal courts have inherent jurisdiction to enforce their judgments.  *See Peacock*

3 *v. Thomas*, 516 U.S. 349, 356 (1996).  Without this jurisdiction, "the judicial power would be

4 incomplete and entirely inadequate to the purposes for which it was conferred by the

5 Constitution." *Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166, 187 (1868).  This general rule

6 extends to the specific context of a mandate issued to a federal agency.  *See, e.g.*, *Flaherty v.*

7 *Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014).  Should an agency neglect the orders of a federal

8 court, an order enforcing the original mandate is in fact "particularly appropriate." *Int'l Ladies'*

9 *Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984).

10         A motion to enforce the court's previous judgment may be granted when the

11 prevailing party demonstrates its opponent has not complied with the judgment's terms.

12 *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004), *aff'd sub nom. Heartland*

13 *Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24 (D.C. Cir. 2005).  The court may grant the moving party

14 only that relief to which it is entitled under the original judgment. *Id.* (citing *Watkins v.*

15 *Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)).  Were this not the rule, motions to enforce

16 would allow an end run around the prevailing party's original burden to establish an injury and

17 entitlement to relief.  For example, a plaintiff who is awarded compensatory damages of $1

18 million and receives no payment, might then request the court "enforce" its previous order by

19 instructing the disobedient defendant to pay $2 million.

20         Here, the court's previous order remanded the matter to the DOL to conduct

21 further proceedings "consistent with" the court's order.  76 F. Supp. 3d at 1148.  The court did

22 not instruct the DOL to reach any particular result, even though the plaintiffs had requested such

23 an instruction. *See* Mot. Summ. J. 2, ECF No. 54 (requesting the court "remand the matter to the

24 Department with specific instruction to enter certification decisions on the SacRT and Monterey-

25 Salinas Transit grant applications").  The court cannot grant the plaintiffs' request to instruct the

26 DOL to certify the grants.  On this motion, the plaintiffs could, at most, obtain an order directing

27 the DOL again to conduct proceedings consistent with this court's previous order, if the court

28 were persuaded the DOL's proceedings in the interim were not consistent.

1    Although the court cannot enforce an order it did not previously issue, the

2   plaintiffs may yet obtain the relief they seek in a renewed challenge and direct review.  In *Food*

3   *Marketing Institute v. Interstate Commerce Commission*, for example, the court considered an

4   agency's post-remand decisions on direct review, taking care to "recognize the danger that an

5   agency, having reached a particular result, may become so committed to that result as to resist

6   engaging in any genuine reconsideration of the issues."  587 F.2d 1285, 1290 (D.C. Cir. 1978).

7   Furthermore, on direct review in a renewed challenge, remand may be unnecessary and wasteful

8   in a number of situations: when "[t]here is not the slightest uncertainty as to the outcome of a

9   proceeding," *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); "in rare

10  circumstances" of "overwhelming evidence" and the agency's "massive delays and inadequate

11  decision-making," *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th

12  Cir. 2002); or within specific statutory regimes, *see Benecke v. Barnhart*, 379 F.3d 587, 593 (9th

13  Cir. 2004) (Social Security benefits appeals).  In these instances, the court has authority to forego

14  games of judicial-agency ping-pong and simply reverse.  *See Wyman-Gordon*, 394 U.S. at 766 &

15  n.6.

16    But here, because the court previously remanded the matter "to the Department for

17  further proceedings consistent with [the prior] order," the court considers only whether the

18  proceedings post-remand were consistent with that previous order.

19    D.    The DOL's Post-Remand Decision

20        1.    Reliance on *Donovan*

21    As summarized above, the court's previous order concluded the DOL had relied on

22  *Amalgamated Transit Union v. Donovan* without considering critical factual differences between

23  PEPRA and the statute under review in that case.  *See* 76 F. Supp. 3d at 1142–43 (citing 767 F.2d

24  at 943, 949–51).  On remand, the DOL expressed its disagreement with this court's analysis,

25  including the court's analysis of its previous reliance on *Donovan*.  Remand Decision at 7.

26  Nevertheless, the DOL considered anew whether it would reach the same result without relying

27  on *Donovan* at all.  *See id.* at 7–8.  The DOL considered the text of UMTA section 13(c) and that

28  statute's legislative history, *see id.* at 8–11, then concluded the plaintiffs' application of PEPRA

1    did not preserve employees' rights or provide for the continuation of collective bargaining.  This

2    analysis was not inconsistent with the court's order as it pertained to *Donovan*.

3                                    2.      PEPRA as a Backdrop

4              The court's previous order concluded the DOL had ignored the fact that under

5    federal labor policy, pension reform may be a "backdrop" to the bargaining table, because no

6    provision of federal labor policy "'expressly forecloses all state regulatory power with respect to

7    those issues, such as pension plans, that may be the subject of collective bargaining.'"

8    76 F. Supp. 3d at 1143 (quoting *Fort Halifax*, 482 U.S. at 21, and *Malone*, 435 U.S. at 504–05,

9    and citing *Metro. Life Ins. Co. v. Mass. Travelers Ins. Co.*, 471 U.S. 724, 756 (1985)).  On

10   remand, in a lengthy and detailed analysis, the DOL recognized that "not all state laws that 'form

11   a backdrop to' public employee collective bargaining interfere with section 13(c) rights."

12   Remand Decision at 13.  It considered *Fort Halifax*, *Malone*, and *Metropolitan Life*, but

13   concluded "PEPRA is not the kind of state law that can remove issues from the collective

14   bargaining obligation established by section 13(c)."  *Id.*  This analysis also was not inconsistent

15   with the court's previous order, which noted the backdrop to collective bargaining "may be

16   pension reform."  76 F. Supp. 3d at 1143.

17                                   3.      Pensions as Defined Benefits Plans

18             The court's previous order concluded the DOL had acted in excess of its authority

19   when it "essentially determined that a pension is necessarily a defined benefit plan . . . ."  76 F.

20   Supp. 3d at 1143.  To address this error, the DOL considered the differences between defined

21   benefits plans and defined contribution plans.  Remand Decision at 20.  It concluded that

22   "[e]mployees faced with [the] investment risks and decisions in a defined contribution plan quite

23   reasonably may prefer to keep an existing defined benefit plan, particularly if their union has been

24   able to negotiate generous terms."  *Id.*  Therefore, it found, "[w]hen a law like PEPRA makes

25   fundamental changes and substantial benefit rollbacks to defined benefit plans, employees can

26   also reasonably view the possibility of a defined contribution plan as insufficient to make up for

27   those losses."  *Id.* (citation omitted).  This analysis was not inconsistent with the court's previous

28   /////

                                                    8

1    order, which did not require the DOL to conclude that any replacement for the previous defined

2    benefit plan warranted certification under section 13(c).

3               4.        The Realities of Public-Sector Bargaining

4               The court previously held that the DOL had not considered "the realities of public

5    sector bargaining," and most importantly, the role of the legislature.  *See* 76 F. Supp. 3d at 1143–

6    44 (citing *Robinson*, 741 F.2d at 607).  To address this error, the DOL expressly considered the

7    realities of public sector bargaining.  Remand Decision at 17–18.  In light of the fact that

8    "SacRTD admit[ted] that it is required by state law to bargain collectively, and cite[d] nothing in

9    state law that requires the state legislature to ratify the agreements it reaches through collective

10   bargaining," the DOL found "ratification by the state legislature is not an issue for SacRTD."  *Id.*

11   at 17.  Because the court's previous order only required the DOL to consider these questions, not

12   to consider them and reach a particular conclusion, the DOL's decision on remand is not

13   inconsistent with the court's previous order in this respect.

14               5.        New Employees

15               The DOL previously found that PEPRA did not preserve existing collective

16   bargaining rights for employees hired after January 1, 2013.  *See* 76 F. Supp. 3d at 1144.  To

17   reach its conclusion, the DOL relied on several "cases suggesting, at least under the [National

18   Labor Relations Act, or NLRA], mandatory collective bargaining includes wages for

19   unrepresented, non-union members. . . ."  *Id.*  But the court held these cases were distinguishable

20   and found the DOL had misinterpreted the law by relying on them as it did.  *Id.* at 1144–45.  The

21   court's previous order also found the DOL had redefined "bargaining unit" for purposes of the

22   collective bargaining agreement.  *Id.* at 1145.  In particular, because the agreement defines

23   bargaining unit as employees in SacRT's service, and because an employee cannot be "in service"

24   before he or she starts work, an employee who has not yet been hired is not part of a bargaining

25   unit.  *Id.*

26               On remand, the DOL found this court's order to be "in error," and found the

27   collective bargaining agreement indeed applies to new employees.  Remand Decision at 21.  For

28   this reason, the DOL stood by its original conclusion that SacRTD did not preserve the rights of

1   employees under its collective bargaining agreement "as it is properly construed."  *Id.* at 21–22.

2   That conclusion is inconsistent with this court's order.  The DOL may not disregard this court's

3   orders simply because it disagrees with them or finds they are premised on a misinterpretation of

4   law or fact.  The appellate bodies designed to fulfill that role are the Ninth Circuit Court of

5   Appeals and the United States Supreme Court.

6           The decision on remand is therefore vacated inasmuch as the DOL concluded

7   SacRTD has not preserved rights under an existing collective bargaining agreement.

8   Nevertheless, because the DOL relied on this conclusion as "an independent reason for denying

9   certification," Remand Decision at 8, the matter need not be remanded.

10  II.     LEAVE TO FILE A SUPPLEMENTAL COMPLAINT

11          Federal Rule of Civil Procedure 15(d) allows the court to grant a plaintiffs' motion

12  to serve a supplemental complaint, "setting out any transaction, occurrence, or event that

13  happened after the date of the pleading to be supplemented."  The rule allows district courts broad

14  discretion to permit supplemental pleadings.  *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988).

15  Rule 15(d) is meant to avoid the costs, delays, and wastes associated with separate actions.  *Id.*

16  The Ninth Circuit has even held that a motion to file a supplemental pleading "ought to be

17  allowed as of course" absent specific reasons to the contrary.  *Id.* (citation and quotation marks

18  omitted).  Rule 15(d) allows supplemental claims under new statutes, and supplemental claims

19  need neither arise out of the same transaction or occurrence nor involve common questions of law

20  or fact.  *Id.* at 474.

21          Nevertheless, supplemental pleadings should not be used to introduce entirely

22  separate and distinct claims into an existing action.  *Planned Parenthood of S. Ariz. v. Neely*,

23  130 F.3d 400, 402 (9th Cir. 1997).  "[S]ome relationship must exist between the newly alleged

24  matters and the subject of the original action."  *Keith*, 858 F.2d at 474.  In determining whether a

25  supplemental pleading will serve the goal of "judicial efficiency," the court considers whether the

26  entire controversy ought to be settled in one action.  *Planned Parenthood*, 130 F.3d at 402.

27          The Ninth Circuit has expressed doubt about the advisability of a supplemental

28  complaint when, as here, the original action has reached its final disposition.  *See id.* (citing a

1    "handful of cases" where post-judgment supplemental pleadings were permitted).  Resurrecting a

2    case this way may be appropriate when the plaintiff alleges the defendant has attempted to

3    contravene earlier rulings.  *See id.* 402 (citing *Griffin v. County Sch. Bd.*, 377 U.S. 218 (1964);

4    *Keith*, 858 F.2d at 467; *Poindexter v. La. Fin. Assistance Comm'n*, 296 F. Supp. 686 (E.D. La.),

5    *aff'd sub nom. La. Comm'n for Needy Children v. Poindexter*, 393 U.S. 17 (1968)).

6           Here, the proposed supplemental complaint addresses the same general factual

7    matter as the original complaint, and its filing promotes judicial efficiency.  Both the original and

8    supplemental complaints contest the DOL's decision not to certify the grants under section 13(c),

9    and the proposed supplemental complaint alleges the DOL has undertaken a continuing and

10   unjustified effort to find PEPRA inconsistent with section 13(c).  The DOL has identified no

11   inefficiency that would result from the supplemental complaint's filing.  It argues only that "the

12   issues raised in [the] supplemental complaint will have to be decided separately."  Opp'n Suppl.

13   Compl. at 6.  And it has identified only one source of prejudice: the possibility that the court may

14   require its response "within a specified time."  *Id.* at 7–8 (quoting Fed. R. Civ. P. 15(d)).  The

15   DOL's detailed arguments that the supplemental complaint would be futile undermine this theory

16   of prejudice by demonstrating it has already anticipated the substance of a responsive pleading.

17   *See id.* at 8–12.

18          Finally, the DOL also argues the supplemental complaint invites unnecessary

19   litigation because it states no claim.  *See id.*  Futility may preclude the filing of an amended

20   complaint under Rule 15(a), *see, e.g.*, *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th

21   Cir. 1987), and federal courts have concluded that "[t]he legal standard for granting or denying a

22   motion to supplement under Rule 15(d) is the same as the standard for granting or denying a

23   motion under Rule 15(a)," *Yates v. Auto City 76*, 299 F.R.D. 611, 614 (N.D. Cal. 2013) (citation

24   and quotation marks omitted).  Here, the supplemental complaint's legal sufficiency will be better

25   tested by later motion, not in the parties' current opposition and reply papers.  The motion for

26   leave to file a supplemental complaint is granted.

27   /////

28   /////

11

III.     <u>CONCLUSION</u>

The motion to enforce is GRANTED IN PART.  The decision on remand is VACATED IN PART inasmuch as the DOL concluded SacRT has not preserved rights under an existing collective bargaining agreement.

The motion for leave to file a supplemental complaint is GRANTED.  The proposed supplemental complaint, ECF No. 88-2, is DEEMED FILED.  The defendants shall file a responsive pleading within thirty days of the date this order is filed.

This order resolves ECF Nos. 87 and 88.

IT IS SO ORDERED.

DATED:  January 7, 2016.

_____
UNITED STATES DISTRICT JUDGE