UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, *et al.*,

              Plaintiffs,

    v.

UNITED STATES DEPART-
MENT OF LABOR, *et al.*,

              Defendants.

No. 2:13-cv-02069-KJM-DB

ORDER

In 2012, California passed a law that substantially reformed the pen-
sion system for public employees, the California Public Employees Pension
Reform Act (PEPRA). Soon after PEPRA was passed, two California transit
agencies subject to PEPRA submitted applications for federal funding under
the Urban Mass Transportation Act of 1964 (UMTA). UMTA requires that
before the federal government can approve a grant, the U.S. Department of
Labor (DOL) must provide a specific certification: that arrangements between
the transit employers applying for funds and their employees include provi-
sions necessary for the preservation of certain employee rights and for the
continuation of the employees' collective bargaining rights, among other
things.

The DOL denied the two transit agencies' requests because, as DOL
determined, PEPRA allowed for neither preservation of the transit employees'
pension rights nor a continuation of their collective bargaining rights over
pensions. The two transit agencies successfully challenged the DOL's deci-
sions under the Administrative Procedure Act (APA) in this court in 2013, and
the matter was remanded to the DOL for reconsideration. The DOL issued

new decisions in 2015, again denying certification. Again the transit agencies sought relief in this court. The DOL moved to dismiss or for summary judgment, and the transit agencies likewise sought summary judgment in response. Those motions are now pending. A union of the transit agencies' employees, the Amalgamated Transit Union (ATU), filed an *amicus curiae* brief in support of the DOL's decisions.

The court held a hearing on those motions on May 13, 2016. Kathleen Kraft and Stephen Higgins appeared for the plaintiffs, Sacramento Regional Transit District (SacRT) and Monterey Salinas Transit (MST). Ryan Parker and Susan Ullman appeared for the DOL. Benjamin Lunch, who represents ATU, observed the hearing. The DOL's motion is denied in part, the transit agencies' motion is granted in part, the plaintiffs are granted leave to amend their supplemental complaint, and the parties are both allowed short supplemental briefs as explained below.

## I.    BACKGROUND

### A.    The Urban Mass Transportation Act of 1964

Congress enacted UMTA to further the United States' interest in "the development and revitalization of public transportation systems." 49 U.S.C. § 5301(a). Among other purposes, UMTA is meant to provide federal funding for public transportation and "promote the development of the public transportation workforce." *Id.* § 5301(b)(1)–(8). UMTA prompted a nationwide shift away from private to public operation of mass transportation systems. *See Jackson Transit Auth. v. Amalgamated Transit Union*, 457 U.S. 15, 17 (1982); *Kramer v. New Castle Area Transit Auth.*, 677 F.2d 308, 310 (3d Cir. 1982).

UMTA allows state and local transportation agencies to obtain federal grants. Transportation agencies can obtain these grants only with a certification from the DOL. Section 13(c) of UMTA, 49 U.S.C. § 5333(b), specifies what this certification entails: "[T]he interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable." *Id.* § 5333(b)(1). These arrangements "shall include provisions that may be necessary for," among other things, (1) "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise," and (2) "the continuation of collective bargaining rights." *Id.* § 5333(b)(2)(A)–(B). The first requirement, "preservation," is commonly cited as section 13(c)(1) of UMTA, and the

2

second requirement, "continuation," is commonly referred to as section 13(c)(2) of the same law.

### B. The California Public Employees' Pension Reform Act (PEPRA)

As summarized in this court's previous orders, in 2012, the Governor of California signed PEPRA into law. *California v. U.S. Dep't of Labor* (Remand Order), 76 F. Supp. 3d 1125, 1130 (E.D. Cal. 2014); *California v. U.S. Dep't of Labor* (Enforcement Order), ___ F. Supp. 3d ___, 2016 WL 98746, at *1–2 (E.D. Cal. Jan. 8, 2016). As elected officials often do, the Governor issued a press release describing PEPRA as a "sweeping reform" that limited pension benefits for state employees, increased the retirement age, required state employees to pay for half of their pension costs, and stopped abusive pension practices. Office of Gov. Edmund G. Brown, Jr., Press Release (Aug. 28, 2012).[1]

This court, of course, looks to PEPRA's relevant sections, which provide that employees hired after January 1, 2013 are "new" employees and must pay half of the costs of their defined benefit retirement plans: "Equal sharing of normal costs between public employers and public employees shall be the standard." Cal. Gov't Code § 7522.30(a). Employees hired before January 1, 2013 are "classic" employees and may also be required to pay the same fifty percent share after good-faith collective bargaining. *Id.* § 20516.5(c). PEPRA sets January 1, 2018 as the effective deadline for collective bargaining on this contribution requirement. *See id.* Beginning on that date, a public employer "may require that members pay fifty percent of the normal cost of benefits." *Id.* § 20516(b), (c).

PEPRA also makes changes to the way retirement benefits are calculated, both for new and classic employees. If a public employee's retirement benefits are calculated as a percentage of his or her pre-retirement compensation, PEPRA sets specific limits on the amount of the employee's compensation that can be used in that calculation: Public employees may no longer purchase "nonqualified service credit" or "airtime."[2] Cal. Gov't Code § 7522.46. For new employees,

---

[1] At the time this order was filed, this press release was available at https://www.gov.ca.gov/news.php?id=17694.

[2] PEPRA defines these phrases by reference to the U.S. Internal Revenue Code. *See* Cal. Gov't Code § 7522.46(a) (citing 26 U.S.C. § 415(n)(3)(C)). Generally speaking, "nonqualified service time" or "airtime" is made up of time credits an employee may purchase to increase his or her retirement benefits. These credits add fictitious years to the true number of years the employee worked before retirement. *See* 26 U.S.C. § 415(n). The additional years are significant because retirement benefits are often calculated by multiplying a percentage of the employee's pre-retirement

PEPRA defines a percentage-based formula for the calculation of retirement benefits; benefits are calculated using a multiplier that increases with the employee's age at retirement, from one percent at the earliest retirement age, fifty-two, to a maximum of two-and-one-half percent at age sixty-seven. *See id.* § 7522.20(a). Previously, the earliest retirement age was fifty, and the multiplier reached its maximum value at age sixty-three. 2013 Administrative Record (AR) 1321. PEPRA also prevents "pension spiking"—pre-retirement, short-term increases in an employee's wages to inflate pension benefits—by calculating benefits for new employees based on the employee's highest average annual salary in the three years leading up to retirement. Cal. Gov't Code § 7522.32. For new employees, the final level of compensation that may be taken into account excludes unused vacation time, ad hoc payments and bonuses, and other amounts. *Id.* § 7522.34(c).

### C.     The Plaintiff Transit Agencies

SacRT is a special regional mass transit district based in Sacramento. Remand Order, 76 F. Supp. 3d at 1129. It operates dozens of bus routes, thousands of bus stops, almost forty miles of light rail track, fifty light rail stations, more than thirty bus-to-light-rail transfer stations, and eighteen park-and-ride lots. *Id.* at 1130. It relies heavily on federal funding. *Id.* at 1130–31.

Many of SacRT's approximately one thousand employees are represented by the ATU. *Id.* 1129–30. SacRT alleges it has authority under California statute to establish an independent retirement system for its employees. *Id.* Through collective bargaining with the ATU, SacRT established a pension plan for its unionized employees.[3] *Id.* The plan is a defined benefit plan, meaning SacRT pays a fixed benefit to retirees under a formula: a retiring employee's benefits are calculated as a percentage of his or her pay multiplied by the number of years he or she worked for SacRT, known as the number of years "in service." *See* 2013 AR 407–27. SacRT funds these benefits entirely; employees do not contribute to the plan fund. *See* 2013 AR 402, 416. A member of the retirement plan is eligible for retirement if he or she has worked ten years or more at age fifty-five or if he or she has completed twenty-five years of service, regardless of age. 2013 AR 413. Benefits for employees who retire at age fifty-five with twenty-five years of service are calculated using a two percent multiplier, and benefits for employ-

---

compensation by the number of years that employee worked. If an employee can artificially add years to her tenure, she can add to her retirement benefits.

[3] The SacRT and MST plan provisions described here are those the DOL reviewed on submission of the plaintiffs' funding application.

ees who retire at age sixty or later with thirty or more years' service are calculated using a two-and-one-half percent multiplier. *Id.* Cash received in lieu of unused vacation time, ad hoc payments, or shift differentials, and other amounts may be used in calculating benefits. 2013 AR 410. SacRT and ATU have negotiated over this benefit scheme in the past. 2013 AR 213.

MST is the consolidated transportation services agency for Monterey County, California. Remand Order, 76 F. Supp. 3d at 1133. Some of MST's employees are represented by the ATU. *Id.* For employees hired before June 30, 2011, MST agreed to fully fund pension contributions for its defined benefits plan. *See* 2013 AR 802–10, 24. Employees hired after June 30, 2011 pay half of the contributions. *See* 2013 AR 824. Under this plan, fifty-five is the normal age of retirement, and employees receive retirement benefits equal to the product of their final compensation, a percentage multiplier, and the number of years of their service. 2013 AR 793–94, 824, 829–31. The MST plan also allows employees to purchase airtime and allows bonuses, overtime, and other amounts to be included in the calculation of retirement benefits. *See* 2013 AR 794. The amount of compensation used in this calculation is the highest twelve-month average compensation. *Id.*

### D.     SacRT's and MST's Grant Applications, 2013 Complaint and Remand Order

This case concerns four applications for federal funding. The first was submitted by SacRT in November 2012, which, as noted above, required the DOL's certification under UMTA section 13(c). ATU objected and argued that the DOL should not certify the grant, citing PEPRA provisions that raise minimum retirement ages, define formulas for calculating pensions, and require new employees to contribute half the cost of their retirement plan. 2013 AR 211–15. Among other legal authorities, ATU cited *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), which it interpreted to hold that the DOL must not certify arrangements under UMTA section 13(c) "where workers previously enjoyed collective bargaining rights but those rights were subsequently diminished or eliminated altogether by state law." 2013 AR 214. SacRT disagreed with ATU's description of PEPRA and distinguished PEPRA from the state law at issue in *Donovan*. 2013 AR 699–702. The DOL ordered ATU and SacRT to negotiate in an effort to find a resolution on their own, but those negotiations were unsuccessful. In April 2013, the DOL declined to issue an interim certification, and in September 2013, the DOL issued its final decision, which denied certification in light of PEPRA. 2013 AR 120–36.

The remaining three funding applications were submitted by the Califor-nia Department of Transportation on MST's behalf in September 2013, and by MST on its own behalf in December 2012 and January 2013. ATU objected to all three applications and argued PEPRA precluded certification under UMTA section 13(c). Despite negotiations, ATU and MST were unable to resolve their dispute. They submitted briefing to the DOL, and in September 2013, the DOL issued its final decision. As in SacRT's case, the DOL declined to certify MST's arrangements, citing PEPRA. 2013 AR 190–207.

SacRT and MST filed a complaint in this court in October 2013. They argued that the DOL had acted arbitrarily and without authority in violation of the APA; that it had prejudged their applications, also in violation of the APA; and that the DOL's decisions imposed unconstitutional conditions on the award of federal funds. ECF No. 1. In December 2014, this court issued an order dis-missing the transit agencies' constitutional claims, denying the DOL's motion to dismiss the other claims, granting the plaintiffs' motion for summary judgment on the APA claims, and remanding the matter to the DOL for further proceed-ings. Remand Order, 76 F. Supp. 3d at 1148. The court identified five aspects of the DOL's decision that violated the APA.

First, the DOL had relied on *Donovan*, *supra*, 767 F. 2d 939, without ac-counting for factual differences between that case and this one. *See* Remand Or-der, 76 F. Supp. 3d at 1142–43. Specifically, in *Donovan*, the circuit court re-versed the certification of an agreement that did not permit collective bargaining on several subjects previously subject to bargaining. 767 F.2d at 941, 943. PEPRA, by contrast, does not eliminate collective bargaining rights or grant SacRT and MST unilateral authority; rather, it changes the parameters within which collective bargaining may proceed. *See* Remand Order, 76 F. Supp. 3d at 1142–43.

Second, the DOL had overlooked the fact that under federal labor policy, "[b]oth employers and employees come to the bargaining table with rights under state law that form a backdrop for their negotiations." *Id.* at 1143 (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987)) (alteration in original). Pension reform may be part of this "backdrop," because no provision of federal labor policy "expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining." *Id.* (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504–05 (1978) (plurality opinion)).

Third, "by finding that PEPRA prevents collective bargaining over pensions, [the DOL] essentially determined that a pension is necessarily a defined benefit plan . . . ." *Id.* But "nothing in PEPRA prevents bargaining over defined contribution plans, which are another form of pension." *Id.* The DOL had therefore written a substantive term into the parties' agreement, which it had no authority to do. *Id.*

Fourth, the DOL had not considered "the realities of public sector bargaining." *Id.* Bargaining in the public sector differs from bargaining in the private sector. For example, a private employer may send a single representative to the bargaining table, with the authority to make a binding agreement, whereas a public employer may not be able to make concessions or change policy so simply. In short, "[i]n the public sector, agreement at the bargaining table may be only an intermediate, not a final, step in the decisionmaking process." *Id.* at 1143–44 (quoting *Robinson v. State of New Jersey*, 741 F.2d 598, 607 (3d Cir. 1984)).

Fifth, to conclude that PEPRA did not preserve existing collective bargaining rights of employees hired after January 1, 2013, the DOL relied on *Wood v. National Basketball Association*, 602 F. Supp. 525, 529 (S.D.N.Y. 1984), and similar cases, but it did not consider whether factual differences between those cases and this one undermined their persuasive effect. *See id.* at 1144–45. In this case, unlike those on which the DOL relied, "neither 'new' employees nor the employers are pursuing individual agreements or are seeking some advantage outside the [collective bargaining agreement], but rather are constrained by PEPRA as a backdrop to their employment relationship." *Id.* at 1145. On a related note, the DOL essentially redefined "bargaining unit" when it found that future employees who had not yet been hired were covered by a collective bargaining agreement. *Id.*

**E.      DOL's 2015 Denial Letters**

The DOL initially noticed an appeal of this court's 2014 remand order, but later dismissed that appeal voluntarily over the plaintiffs' objections. *See* Not. Appeal, ECF No. 83; Order Dismissing Appeal, ECF No. 86. On August 13, 2015, the DOL issued its decisions on remand, concluding as it did before that the plaintiffs' grant applications could not be certified under section 13(c). *See* SacRT Decision, ECF No. 88-4; MST Decision, ECF No. 88-5. It reached this conclusion on two independent grounds: (1) as applied by SacRT and MST, "PEPRA prevents the 'continuation of collective bargaining' as that phrase is used in section 13(c)(2)"; and (2) as applied by SacRT and MST, "PEPRA prevents 'the preservation of rights, privileges, and benefits (including continuation

of pension rights and benefits) under existing collective bargaining agreements,'
contrary to section 13(c)(1)." SacRT Decision at 8; MST Decision at 8.

With respect to section 13(c)(2), because the DOL could not accept this
court's reading of *Donovan*, it instead interpreted the language and legislative his-
tory of section 13(c) without reference to *Donovan*. *See* SacRT Decision at 7–11;
MST Decision at 7–11. It also consulted several mid-twentieth-century judicial
decisions interpreting the National Labor Relations Act (NLRA) to understand
the likely contemporary meaning of "collective bargaining" in the pension con-
text. SacRT Decision at 11–13; MST Decision at 11–13. Together, this analysis
led the DOL to conclude that Congress meant to prevent the "lessening" or
"worsening" of collective bargaining rights, even if collective bargaining rights
were not completely eliminated. The NLRA decisions it consulted confirmed this
understanding, and the DOL summarized its determination that "as a general
rule, section 13(c) certification is unavailable to a transit agency that unilaterally
sets or changes the terms of pensions covering employees in a collective bargain-
ing unit." SacRT Decision at 13; MST Decision at 13.

The DOL also considered whether PEPRA is the "kind of state law that
can remove issues from the collective bargaining obligation established by section
13(c)." SacRT Decision at 13; MST Decision at 13. It contrasted PEPRA with
state laws that Congress had not meant to preempt when it passed the NLRA.
These state laws, it found, were beneficial to employees on balance: they estab-
lished minimum labor standards or ensured adequate mental health treatment,
for example. SacRT Decision at 13–14; MST Decision at 13–14. In contrast,
PEPRA more closely resembled the types of state laws that Congress had meant
to preempt, including state laws that superficially served a benign purpose but
actually overrode collectively bargained agreements. *See* SacRT Decision at 14–
17; MST Decision at 14–16.

The DOL then considered the realities of collective bargaining in the pub-
lic sector. SacRT Decision at 17–18; MST Decision at 17–18. It found that
SacRT was required by state law to bargain collectively, and that SacRT could
bargain without the need for legislative ratification. SacRT Decision at 17. Simi-
larly, MST was not required to obtain legislative ratification of its pension poli-
cies. MST Decision at 17. The DOL also found that although public transit au-
thorities come to the bargaining table under the watchful eye of a state-policy
chaperone, Congress had long understood similar policy concerns. It had decided
to allow states a choice: provide for the continuation of collective bargaining
rights, regardless of state policy, or forego federal funding. SacRT Decision at

17–18; MST Decision at 17–18. The DOL noted that Congress had allowed states to forbid public transportation strikes and decide on a form of dispute resolution other than binding arbitration, which it understood to indicate that Congress had already addressed the issue of conflicting state policy. SacRT Decision at 17–18; MST Decision at 17–18. As for budget constraints, the DOL wrote, "The solution is for parties with collective bargaining obligations to bargain within budget constraints, not for an employer to use budget constraints as a reason for unilaterally removing a subject from bargaining." SacRT Decision at 18; MST Decision at 17. The DOL therefore found that the realities of public-sector bargaining did not allow it to certify SacRT's or MST's arrangements.

### F.   Enforcement Order and Supplemental Complaint

Following the DOL's 2015 decisions, SacRT and MST returned to this court and argued that the DOL had not complied with the court's 2014 order. They asked the court to enforce that order and allow them to file a supplemental complaint.

The court granted the motion to enforce in part. *See generally* Enforcement Order, 2016 WL 98746. First, the court concluded that because the DOL had not relied on *Donovan* at all, its decision was not inconsistent with the Remand Order, where the court found the DOL had previously relied on *Donovan* reflexively. *Id.* at *4. Second, the court found that because the DOL's decisions on remand had considered whether PEPRA formed a permissible state-law backdrop, those decisions were not inconsistent with the Remand Order. *Id.* Third, because DOL no longer arbitrarily equated pensions and defined benefit plans, its decisions were not inconsistent with the Remand Order. *Id.* at *5. Similarly, on remand the DOL had addressed the realities of collective bargaining in the public sector, so the court found its decisions were not inconsistent with the Remand Order in this way. *Id.* But because the DOL rejected this court's conclusions with respect to whether "new" employees, who had not yet been hired, were protected by existing collective bargaining agreements, the agencies' motion was granted and the inconsistent portions of the DOL's SacRT decision on remand were vacated. *Id.* at *5. As a matter of remedies, the court did not remand the case again because the inconsistent portions were presented as alternative grounds for the DOL's decisions. *Id.*

Instead, the transit agencies' were allowed to file a supplemental complaint. *Id.* at *6–7. In their supplemental complaint, SacRT and MST allege the DOL's 2015 decisions on remand violated the APA by interpreting sections 13(c)(1) and (2) of the UMTA arbitrarily, capriciously, and in excess of the

DOL's authority. In their first claim, the agencies argue the DOL "erroneously concluded that 'lessening or diminution of collective bargaining rights, even when they are not entirely eliminated, violates section 13(c).'" Suppl. Compl. ¶¶ 89–90, ECF No. 88-2. They argue the DOL's analysis was "one-sided" and "incomplete," "ignored both the historical context for the requirement to continue collective bargaining rights," "misapplied judicial precedent under the National Labor Relations Act," reached conclusions that contradicted this court's previous order, "persisted in its position that 'pension rights' mean only 'defined benefit pension rights,'" and "rendered its decision without adequately distinguishing prior, inconsistent Department interpretations and application of Section 13(c)." *Id.* ¶¶ 92–96.

In the plaintiffs' second claim, they argue the DOL erroneously "found that new employees have pension rights under existing collective bargaining agreements that predate their employment." *Id.* ¶ 106. They argue the DOL arbitrarily "decreed that any state-law change to the terms of a collective bargaining agreement violates Section 13(c)(1) on the ground that such an agreement is applicable to new employees." *Id.* ¶ 107.

The DOL moved to dismiss the supplemental complaint, and in the alternative, requested summary judgment that its 2015 decisions did not violate the APA. Def.'s Br., ECF No. 99-1. The plaintiffs filed a cross-motion for summary judgment and opposition, Pls.' Br., ECF No. 104-1, and the parties each filed responsive briefing, Def.'s Resp., ECF No. 107; Pls.' Resp., ECF No. 110. With the court's permission, the ATU also filed an *amicus curiae* brief in support of the DOL's motion, ATU Br., ECF No. 106, and the plaintiffs filed a response, Pls.' Resp. ATU, ECF No. 111.

## II.   THE LAW OF THIS CASE

The parties both ask this court to revisit conclusions in the Remand and Enforcement Orders that are adverse to their current positions. The court therefore clarifies what role those orders play here.

When a court makes a decision in a final order, for example by granting summary judgment, and the decision is express or necessarily implied, the court must generally avoid revisiting that decision later on in the same case. *See United States v. Lummi Nation*, 763 F.3d 1180, 1185 (9th Cir. 2014). This is one aspect of the "law of the case" doctrine. *Id.* It is a rule of "judicial intervention designed to aid in the efficient operation of court affairs." *Id.*

The law of the case doctrine does not bar a district court from reconsidering its own non-final rulings in the same case. *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc), *cert. denied*, 135 S. Ct. 946 (2015). For example, the court may reconsider a prior order in which it denied summary judgment, *id.* at 1088–89, or granted a preliminary injunction, *see Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013). A district court also has discretion to depart from the law of the case if the first decision was clearly erroneous, if the law, evidence, or other circumstances changed in the meantime, or if applying the law of the case would work a manifest injustice. *See, e.g.*, *Gallagher v. San Diego Unified Port Dist.*, 14 F. Supp. 3d 1380, 1389 (S.D. Cal. 2014) (citing *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998)).

On a similar note, the Ninth Circuit and Supreme Court recognize a district court's inherent authority to reconsider non-final, or interlocutory decisions: "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles v. Santa Monica BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (citation omitted). This is also the practical effect of Federal Rule of Civil Procedure 54(b), which authorizes a district court to revise "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." That said, as a general rule, district courts do not revisit their interlocutory decisions when the law and evidence are unchanged, when no clear error has occurred, and when no manifest injustice would result. *See, e.g.*, *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 649 F. Supp. 2d 1063, 1069–70 (E.D. Cal. 2009). In this way, a district court's decision to depart from the law of the case or to reconsider an interlocutory order will often rest on similar reasoning. *Cf. Jadwin v. Cty. of Kern*, No. 07-0026, 2010 WL 1267264, at *9 (E.D. Cal. Mar. 31, 2010) (district courts look to similar standards when deciding whether to reconsider under Rule 54(b) and whether to grant a motion under Rules 59(e) or 60(b)).

In this case, the Remand Order was a final order: it dismissed claims, granted summary judgment, and remanded the matter to the DOL, and judgment was entered on the same day it was filed. ECF No. 82. The court therefore considers its decisions in that order to be the law of this case. Moreover, the DOL appealed the Remand Order, but voluntarily dismissed its appeal. Although the question ultimately is one for an appellate tribunal to decide, this likely prevents further appellate review of the merits of that appeal. *See United States*

*v. Arevalo*, 408 F.3d 1233, 1236 (9th Cir. 2005) (quoting *Barrow v. Falck*, 977 F.2d 1100, 1103 (7th Cir. 1992)). The DOL may not now relitigate the merits of the Remand Order.

The Enforcement Order, by contrast, did not finally adjudicate any claims, but addressed a motion based on the previously filed final order and allowed the case to continue by way of a supplemental complaint. The Enforcement Order was therefore an intermediate-stage order that this court may reconsider or modify, even in the absence of any intervening evidentiary or legal developments.

Rather than dividing the parties' arguments and this court's previous findings more granularly into final and non-final categories here, the court addresses its previous decisions as they arise in context below.

### III.   LEGAL STANDARD

When, as here, a plaintiff challenges a federal agency's actions under the APA, the district court assumes an appellate role, and the entire case presents a question of law. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The court does not identify disputed issues of material fact, as it would in a typical summary judgment proceeding. *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010). Rather, the reviewing court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g*, 753 F.2d at 769; *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) ("Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record.").

The court now turns to the plaintiffs' first claim, under section 13(c)(2), which concerns "the continuation of collective bargaining rights." As summarized above, the DOL concluded on remand that SacRT and MST have implemented PEPRA in a way that prevents the continuation of their employees' collective bargaining rights. SacRT and MST argue the DOL's decisions both misinterpreted the UMTA and were arbitrary and capricious.

**IV.    THE CONTINUATION OF COLLECTIVE BARGAINING RIGHTS**

**A.    Statutory Interpretation—is the UMTA Unambiguous?**

This case concerns foremost the DOL's interpretation of the UMTA. When a district court is asked to review an agency's interpretation of a statute, the court must first check whether the statute's language itself answers the questions in the case, provided that the agency did not act unconstitutionally or outside the authority Congress allotted to it. *United States v. Mead Corp.*, 533 U.S. 218, 227–28 & n.6 (2001); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). "[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 842–43, and agencies must always "operate within the bounds of reasonable interpretation," *Util. Air Regulatory Grp. v. Envt'l Prot. Agency*, ___ U.S. ___, 134 S. Ct. 2427, 2442 (2014) (citation and quotation marks omitted). The judicial branch is the final authority on statutory interpretation, *Chevron*, 467 U.S. at 843 n.9; that is, an agency receives no consideration or deference from federal courts when it incorrectly interprets unambiguous law.

The court must therefore first decide whether "the continuation of collective bargaining rights" has an unambiguous meaning. *Id.* at 842–43. Each party argues the other's interpretation is simply incorrect. This itself suggests the phrase is ambiguous, which the court concludes it is, as explained below.

A statute's words are always the place to begin. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, ___ U.S. ___, 132 S. Ct. 1670, 1680 (2012); *Jackson Transit*, 457 U.S. at 23. Unless Congress says otherwise, those words have the same meanings as usual. *Roberts v. Sea-Land Servs., Inc.*, ___ U.S. ___, 132 S. Ct. 1350, 1356 (2012). Context also matters, both "the specific context in which that language is used and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). One interpretation of a word or phrase might lead to a result that clashes with the rest of the law. *Util. Air*, 134 S. Ct. at 2442. Context might even overwhelm the most grammatically correct understanding of a single word. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69–70 (1994).

Here, section 13(c) provides, in relevant part,

(1) As a condition of financial assistance . . . the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. . . .

(2) Arrangements under this subsection shall include provisions that may be necessary for—

13

(A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;

(B) the continuation of collective bargaining rights;

(C) the protection of individual employees against a worsening of their positions related to employment;

(D) assurances of employment to employees of acquired public transportation systems;

(E) assurances of priority of reemployment of employees whose employment is ended or who are laid off; and

(F) paid training or retraining programs.

49 U.S.C. § 5333(b)(1)–(2).

SacRT and MST believe the phrase "the continuation of collective bargaining rights" means the opposite of "the end of collective bargaining rights." By contrast, the DOL concluded on remand and argues now that the phrase means the opposite of the "diminution" or "lessening" of collective bargaining rights. Neither interpretation is obviously correct. Consider, for example, the D.C. Circuit's interpretation of the phrase in the mid-1980s. The *Donovan* court understood "the continuation of collective bargaining rights" to mean "[m]aintaining the status quo" or "substantially preserving collective bargaining rights that had been established by federal labor policy." 767 F.2d at 948. This suggests the DOL's interpretation is reasonable: the status quo is not maintained and a right is not "preserved" if it diminishes. But only two years after *Donovan* was decided, two different panels of the same court found "the ordinary meaning of the term 'continuation' . . . would seem to be 'without interruption.'" *United Transp. Union, AFL-CIO v. Brock*, 815 F.2d 1562, 1564 (D.C. Cir. 1987) (quoting *Amalgamated Transit Union v. Brock*, 809 F.2d 909, 916 (D.C. Cir. 1987)).[4] This suggests SacRT and MST have it right. *Donovan* therefore does not provide a dispositive definition of "continuation."

These conflicting readings fit the many synonyms and antonyms of "continuation" suggested by a variety of new and old reference guides. *See, e.g.*, *Webster's New World Dictionary of the American Language* 319 (college ed. 1962) (defining "continuation" as "a keeping up or going on without interruption; prolonged and unbroken existence or maintenance"); *Roget's Int'l Thesaurus* 32–34, 68 (3rd

---

[4] Although *United Transportation Union v. Brock* and *Amalgamated Transit Union v. Brock* were before different panels, both opinions were written by the same judge.

ed. 1962) (synonyms of "continuation" include extension, maintenance, suste-
nance, and persistence; antonyms include cessation, close, discontinuance, end,
ending, and abandonment); Merriam-Webster's Online Dictionary (defining
"continuation" as "the act or fact of continuing in or the prolongation of a state
or activity"; suggesting "abidance, ceaselessness, continuance, continuity, con-
tinuousness, durability, duration, endurance, persistence, subsistence" as syno-
nyms and "cessation, close, discontinuance, discontinuity, end, ending, expira-
tion, finish, stoppage, surcease, termination" as antonyms);[5] Oxford English
Online Dictionaries (defining "continuation as "[t]he action of carrying some-
thing on over a period of time or the process of being carried on" or "[t]he state
of remaining in a particular position or condition"; suggesting "carrying on, con-
tinuance, extension, prolongation, protraction, perpetuation" as synonyms and
"end" as an antonym);[6] American Heritage Online Dictionary (defining "contin-
uation" as "[t]he act or fact of going on or persisting" and "[t]he state of continu-
ing in the same condition, capacity, or place").[7]

On remand, the DOL relied on the 1962 Webster's New World Diction-
ary's definition, quoted first in the previous paragraph, presumably because
UMTA was passed soon after it was published. *See* SacRT Decision at 9; MST
Decision at 8–9. That definition demonstrates the ambiguity of "continuation" in
section 13(c)(2): "keeping up or going on" suggests a right would not diminish,
whereas "without interruption" and "unbroken" suggests a right will not be ex-
tinguished for any period of time.

The Supreme Court recently interpreted a similar word, "continued," to
mean "carried on or kept up without cessation," "extended in space without in-
terruption or breach of connection," or "stretching out in time or space esp.
without interruption," *Adoptive Couple v. Baby Girl*, ___ U.S. ___, 133 S. Ct. 2552,
2560 (2013) (citations, quotation marks, and alterations omitted). The Court sug-
gested the verb "continue" meant "[t]o go on with a particular action or in a par-
ticular condition; persist," "[t]o remain in the same state, capacity, or place," or
"go on with an action that is preexisting." *Id.* (citations, quotation marks, and
alterations omitted). Thus, under 25 U.S.C. § 1912(f),[8] a provision of the Indian

[5] http://www.merriam-webster.com/dictionary/continuation

[6] http://www.oxforddictionaries.com/us/definition/american_english/
continuation; http://www.oxforddictionaries.com/us/definition/
american_english-thesaurus/continuation

[7] https://ahdictionary.com/word/search.html?q=continuation

[8] That section provides, "No termination of parental rights may be ordered
in such proceeding in the absence of a determination, supported by evidence beyond

Child Welfare Act of 1978, the words "continued custody" meant that custody had existed both before and after a particular point in time. This discussion suggests the plaintiffs' definition may be just as correct as the DOL's: although "continued" can mean "to remain in the same state," in *Adoptive Couple*, it meant "without cessation," and as the Court eventually concluded, in the relevant statutory context, it meant essentially "existing both before and after." *See* 133 S. Ct. at 2560–61.

Section 13(c) itself also appears to offer a synonym for "continuation" when it lists "the preservation of rights, privileges, and benefits" and then clarifies parenthetically that this phrase includes the "continuation of pension rights and benefits." 48 U.S.C. § 5333(b)(2)(A). But "preserve," like "continue," could plausibly mean both to "[m]aintain . . . in its original or existing state," as in preserving records, or to "[m]aintain or keep alive," as in preserving a memory. *See* Oxford Online American English Dictionary.[9] Again, either definition of "preservation," like "continuation," is reasonably supported by the text of section 13(c).

The context of section 13(c)(2) also shows "continuation" could mean both the opposite of "end" and "diminution." Section 13(c) requires protections for employees affected by federal assistance. It tasks the Secretary of Labor with a review of the relevant "arrangements" to ensure they are "fair and equitable." 59 U.S.C. § 5333(b)(1). Congress required these arrangements to include whatever provisions were necessary to guarantee "the preservation of rights, privileges, and benefits . . . under existing collective bargaining agreements"; "the continuation of collective bargaining rights"; "the protection of individual employees against a worsening of their positions related to employment"; and "assurances of employment to employees of acquired public transportation systems," among other things. *Id.* § 5333(b)(2). In this context, "continuation" could reasonably mean either "staying the same" or "not ceasing." The court reached this same conclusion in its previous order when it rejected the plaintiffs' argument that "certification should be withheld only when statutory changes completely preclude collective bargaining." Remand Order, 76 F. Supp. 3d at 1142.

---

a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

[9] These definitions and examples are those provided by the American English version of the Oxford Online English Dictionary, available at the time this order issued at http://www.oxforddictionaries.com/us/definition/american_english/preserve.

This ambiguity would not have arisen had Congress instead required arrangements necessary to avoid the "diminution" or "termination" of collective bargaining rights. Congress did use the word "worsening" in another provision of section 13(c): "Arrangements under this subsection shall include provisions that may be necessary for— . . . the protection of individual employees against a worsening of their positions related to employment." 49 U.S.C. § 5333(b)(2)(C). This more specific word choice may suggest Congress had something other than a "worsening" in mind when it referred to "the continuation" of collective bargaining rights. That is, if Congress had intended to prevent more than just the termination of collective bargaining, it could have written, "Arrangements under this subsection shall include provisions that may be necessary for— . . . the protection against a worsening of employees' collective bargaining rights." And a "worsening" would have encompassed a termination just as well as a diminution.

By using the word "continuation" in section 13(c)(2), Congress could have meant to prevent the end of collective bargaining between the employees and employers of mass transportation systems in the United States. Congress could also have meant to prevent state and local governments from chipping away at the collective bargaining rights of their mass transportation employees. In sum, SacRT's and MST's interpretation is plausible; so is the DOL's. The statute is ambiguous.

**B.       Deference to the DOL's Interpretations—In General**

If a statute's words are ambiguous, the court must decide whether the agency's interpretation is a permissible one. *Chevron*, 467 U.S. at 843–44. For this reason, courts must often also decide what leeway or deference to allow an agency's decisions.

In some instances, Congress delegates interpretive authority to an agency. *See id.* If that is the case, a federal court does not "simply impose its own construction of the statute," but must adopt the agency's interpretation, which is in fact binding "unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Mead*, 533 U.S. at 227. This approach is known as *Chevron* deference. *See id.*; *Chevron*, 467 U.S. at 842–43. An agency is entitled to permissive judicial review under *Chevron* only if it appears both that "Congress delegated authority to the agency generally to make rules carrying the force of law" and that the interpretation in question "was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. Applying these rules, the Ninth Circuit considers the binding power of an agency's decisions on third par-

ties—their precedential value—to be "*the* essential factor in determining whether *Chevron* deference is appropriate." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009) (en banc) (emphasis in original) (citation and quotation marks omitted).

If an agency's decisions are not allowed the deference defined in *Chevron*, the agency's reasoning is often persuasive nonetheless. *Mead*, 533 U.S. at 227. The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* (quoting *Chevron*, 467 U.S. at 844). The deference allowed to an agency depends on a number of commonsense considerations: How thorough and careful is the agency's reasoning? Is the agency's decision consistent with its earlier and later pronouncements? Is its reasoning valid? Does the decision concern a subject matter within the agency's technical expertise? *See id.* at 228. These considerations may lead a court to view a decision with anything from great respect to indifference. *Id.* This less-permissive and widely varying level of deference is usually referred to in shorthand as *Skidmore* deference, after *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

This court decided in the Remand Order that the DOL's interpretations in the 2013 letters were not entitled to *Chevron* deference. Now, as before, in issuing the 2015 letters, "[r]ather than conducting an essentially discretionary review of whether any arrangement could be fair and equitable in light of PEPRA or relying on any administrative expertise, DOL relied on case law and federal labor policy, as filtered through a number of NLRA cases, to reject the applications at issue." Remand Order, 76 F. Supp. 3d at 1137. These circumstances support the conclusion Congress did not mean to delegate interpretive authority to the DOL, which means *Chevron* does not apply. *See also id.* ("The [*Donovan*] court rejected DOL's certification only after undertaking its own examination and interpretation of Section 13(c) and specifying how DOL should interpret such agreements. *Donovan* thus supports plaintiffs' claim that de novo review is appropriate." (citing 767 F.2d at 940)). Moreover, this is the law of the case.

The DOL argues, however, its most recent decisions are nonetheless entitled to *Chevron* deference because circumstances have changed. It argues its 2015 decisions were issued under authority granted to the DOL by Congress and have the force of law. DOL Br. at 7. The court disagrees. The DOL indeed acted within its authority by applying the mandatory factors of section 13(c), but Congress did not "delegate[] authority to [the DOL] generally to make rules carrying the force of law," *Mead*, 533 U.S. at 226–27; *see also* Guidelines, Section 5333(b),

1  Federal Transit Law, 60 Fed. Reg. 62,964-01 ("There is no statutory authority to
2  issue regulations under section 5333(b).").

3      DOL's decisions also are not precedential. The DOL's argument to this
4  end relies on three facts: (1) California recognized the predictive power of the
5  DOL's decisions here by making exceptions from PEPRA for more employees
6  than those affected by this case; (2) the plaintiffs' briefing in this case compares
7  the Department's current decisions and its previous decisions; and (3) the De-
8  partment considered its own previous decisions on remand. DOL Br. at 7–8. If
9  these facts were enough to prove an agency's decisions are precedential, then al-
10  most any agency decision would be entitled to *Chevron* deference, because arbi-
11  trarily inconsistent pronouncements are always subject to reversal under
12  § 706(2)(A). *See, e.g.*, *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473
13  F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative pro-
14  cedure requires an agency to treat like cases alike. If the agency makes an excep-
15  tion in one case, then it must either make an exception in a similar case or point
16  to a relevant distinction between the two cases."); *Wilhelmus v. Geren*, 796 F.
17  Supp. 2d 157, 162 (D.D.C. 2011) (same). The DOL's decisions here are better
18  understood as unpublished, case-by-case determinations without significant legal
19  force; they are not precedent. As before, and as necessary, the court applies
20  *Skidmore* deference to the DOL's conclusions. *See* Remand Order, 76 F. Supp. 3d
21  at 1137.

22      **C.     Three General Concerns with the DOL's Decisions**

23      As summarized above, when an agency has interpreted an ambiguous
24  statutory term, the court must decide whether the agency's interpretation is a
25  permissible one. Here, because the deferential rules of *Chevron* do not apply, the
26  court allows the DOL's interpretation of "continuation" the weight commensu-
27  rate with the level of care, consistency, formality, expertness, and general persua-
28  siveness of its reasoning, under *Skidmore* and similar cases. *Mead*, 533 U.S.
29  at 228; *Skidmore*, 323 U.S. at 140. Before weighing the DOL's 2015 decisions in
30  detail, the court notes three larger trends in those decisions that counsel skepti-
31  cism.

32      First, the DOL purposefully ignored directly relevant authority: the *Do-*
33  *novan* case. As explained in this court's Remand Order, *Donovan* is one of very
34  few judicial interpretations of section 13(c). *See* Remand Decision, 76 F. Supp.
35  3d at 1139 (citing *In re NJ Transit Bus Operations, Inc.*, 125 N.J. 41, 65 (1991)). Its
36  importance is borne out in the record of this case. *See* 2013 AR 214 (ATU inter-
37  prets *Donovan* in its objection to SacRT's application); 2013 AR 699–702 (SacRT

argues *Donovan* does not control the DOL's decision); 2013 AR 127–30 (DOL's original decision discussing *Donovan*); Remand Order, 76 F. Supp. 3d at 1139–43 (discussing *Donovan* and the parties' interpretation of it). The DOL once described *Donovan* as "exhaustive" and "controlling." 2013 AR 130.

A few additional details illustrate the court's concern. In the Remand Order, after devoting several paragraphs to the Georgia statute at issue in *Donovan* and the D.C. Circuit's reasoning, this court could agree with neither the plaintiffs' nor the DOL's reading of UMTA:

> Plaintiffs read too much into *Donovan* to argue that it means 13(c) certification should be withheld only when statutory changes completely preclude collective bargaining. But defendants also read too much into the case when they say it controls the interpretation of Section 13(c) in this case.

*Id.* at 1142. Here, in contrast to the situation before the *Donovan* court, PEPRA does not give an employer unilateral control over collective bargaining; it makes larger-scale changes to state pension law. *Id.* at 1142–43. In the Remand Order, the court found the DOL had not appreciated this difference and remanded the matter. But on remand, rather than considering *Donovan* and this court's interpretation of it, the only judicial decisions wading into the intersection of general state law and section 13(c), the Secretary's designee thought it better to avoid *Donovan* altogether for the time being, even as it purported to preserve its ability to invoke its prior interpretation:

> I continue respectfully to disagree with the district court's assessment of my September 4, 2013 determination as arbitrary and capricious, including my reliance on *Donovan*. For purposes of any potential further judicial review, I hereby clarify that the Department adheres to the analysis set forth in my earlier certification decision, and that the Department preserves its rights to rely on that earlier reasoning and analysis as an independent basis for denying certification.
>
> For purposes of remand, however, this Analysis is intended to explain why the factors and issues identified by the district court do not support certification of this grant under Section 13(c). . . .
>
> . . . The court also did not preclude the Department from relying on either section 13(c)(1) or section 13(c)(2) if the Department again decided against certification. . . .
>
> . . . [I]n light of the district court's remand decision, I hereby set out an analysis of sections 13(c)(1) and (2) that does not rely on *Donovan* . . . .

SacRT Decision at 7–8; *see also* MST Decision at 7–8.

20

Reasonable readers may certainly disagree about the meaning of section 13(c) and what the *Donovan* court would have done with this case. But if the DOL truly believes that the parties' dispute may be resolved "as a matter of pure statutory construction" because "[t]he language of the UMTA is unambiguous and leaves no doubt as to Congress's intent," DOL Resp. at 3, then its current decision to avoid reliance on *Donovan* on remand is questionable. "The judiciary," which encompasses the D.C. Circuit in its *Donovan* decision, "is the final authority on issues of statutory construction . . . ." *Chevron*, 467 U.S. at 843 n.9. An agency may not simply disregard a federal court's interpretation of an unambiguous statute. *Id.*

At the same time, as explained above, the phrase "continuation of collective bargaining rights" is unclear. The DOL's decision to disregard relevant judicial authority in charting a new course is therefore not necessarily "arbitrary and capricious" gainsaying. Nor is the DOL's decision on remand facially inconsistent with the Remand Order, as this court pointed out in its Enforcement Order, as the DOL did not press forward with reflexive reliance on *Donovan*. But its decision to abandon an authority it once found controlling, without attempting to wrestle with this court's decision, undercuts its credibility. *See, e.g.*, *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (an agency's inconsistency detracts from the weight its conclusions are due); *Skidmore*, 323 U.S. at 140 (the persuasiveness of an agency's determination depends on its evident thoroughness); *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002) (evidence suggestive of prejudgment "diminishes the deference" owed an agency's decisions).

Second, the DOL reached the same conclusions on remand in 2015 as it did originally in 2013. Federal courts have long recognized that an agency may become so committed to a decision that it resists genuine reconsideration on remand. *Food Mktg. Inst. v. Interstate Commerce Comm'n*, 587 F.2d 1285, 1290 (D.C. Cir. 1978); *accord, e.g.*, *Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 899 (D.C. Cir. 2006); *Competitive Enter. Inst. v. Nat'l Hwy. Traffic Safety Admin.*, 45 F.3d 481, 484 (D.C. Cir. 1995). Similarly, the Supreme Court has "viewed critically" an agency's "post hoc rationalization." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "The agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result." *Food Mktg. Inst.*, 587 F.2d at 1290. "A reviewing court . . . will accord a somewhat greater degree of scrutiny to an order that arrives at substantially the same conclusion as an order previously remanded by the same court." *Greyhound Corp. v. Interstate Commerce Comm'n*, 668 F.2d 1354, 1358 (D.C. Cir. 1981).

Third, the DOL's 2015 decisions focus primarily on interpretations of statutes and federal judicial decisions rather than the technical specifics of this case. "[C]ourts, rather than agencies, have expertise in interpreting case law." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 320 (2d Cir. 2005) (citing *New York New York, LLC v. Nat'l Labor Relations Bd.*, 313 F.3d 585, 590 (D.C. Cir. 2002), and *University of Great Falls v. Nat'l Labor Relations Bd.*, 278 F.3d 1335, 1341 (D.C. Cir. 2002)). In the 2015 decisions, the DOL has not drawn significantly on its subject-matter expertise, previous decisions, or thorough factual research. For example, its decisions do not grapple with the differing challenges public and private employers face, an area it presumably would have expertise to evaluate, and an area the court asked it to consider on remand. It did not explain how its experience reviewing protective arrangements shows how PEPRA shifts the balance of power between union negotiators and transit agencies. It did not illustrate the impact of PEPRA's specific requirements. It did discuss the differences between defined benefit and defined contribution plans, but only generally, rather than investigating the details of the plans in this case. Given the marked shift in the pension landscape since UMTA was passed, the DOL must be in a position to clarify the stakes more consistently with its agency role. *Cf. LaRue v. DeWolff, Boberg & Associates, Inc.,* 552 U.S. 248, 255 (2008) (noting "[d]efined contribution plans dominate the retirement plan scene today," whereas in the 1970s and 1980s, "the [defined benefit] plan was the norm" (citation omitted; alterations in original)). In sum, the DOL attempted to develop rather than apply the law.

Nevertheless, some aspects of the DOL's 2015 decisions do show thoroughness and attention to detail. The DOL's conclusions are supported extensively by citations to legal authority and UMTA's legislative history, and the DOL relied on nontrivial, lengthy, and detailed analyses. *See, e.g.*, SacRT Decision at 13–22; MST Decision at 13–21. Although the DOL found that the considerations this court identified in the Remand Order did not lead it to a different conclusion, it explained why.

The court therefore reviews the DOL's reasoning with caution, but without prejudging the outcome.

### D.    Whether the DOL's Interpretation of Section 13(c)(2) Stands

As summarized above, section 13(c)(2) is ambiguous, and neither the plaintiffs' nor the DOL's motion can be granted on the basis of statutory construction alone. The court must therefore scrutinize the DOL's more detailed reasoning and decide whether its application of section 13(c)(2) is sufficiently persuasive, despite the three general concerns identified above, such that its mo-

tion may be granted. The DOL's findings are organized into four parts: (1) a discussion of legislative history; (2) a review of federal appellate decisions published near the time of section 13(c)'s enactment; (3) a discussion of collective bargaining in the public sector; and (4) an analysis of federal judicial decisions discussing how state and federal labor law interact under the National Labor Relations Act (NLRA). As explained in the next four subsections, the DOL's motion cannot be granted on the basis of these conclusions.

### 1.   Legislative History

Ambiguities in statutes may often be resolved by referring to their legislative histories. *See N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2011). As the *Donovan* court and the DOL both found, when section 13(c) was written in the early 1960s, at least some legislators understood "[t]he question of policy" to be, in the words of Senator Wayne Morse, section 13(c)'s sponsor, whether the federal government should "make available to cities, States and local governmental units Federal money to be used to strengthen their mass transit system when the use of that money would result in lessening the collective bargaining rights of existing unions?" *Donovan*, 767 F.2d at 946–47 (quoting 109 Cong. Rec. 5671–72 (1963)) (alteration omitted). The *Donovan* court believed Senator Morse "could not have been clearer about the purpose of" section 13(c). *Id.* Senator Morse's words indeed suggest concern that workers' bargaining rights might diminish.

Section 13(c)'s historical context could also support this conclusion. The UMTA was enacted "to foster the development and revitalization of public transportation systems." 49 U.S.C. § 5301(a). Its purposes included promoting "the development of the public transportation workforce." *Id.* § 5301(b)(8). Congress wanted to support mass transportation with federal funds, but worried that public ownership of mass transportation agencies would threaten rights private employees had won. *Jackson Transit*, 457 U.S. at 17, 23–24. "To prevent federal funds from being used to destroy the collective-bargaining rights of organized workers, Congress included § 13(c) in the Act." *Id.* at 17. "Congress intended that § 13(c) would be an important tool to protect the collective-bargaining rights of transit workers, by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities." *Id.* at 27–28. Because a right may discontinue both by degree and abruptly, this context suggests Congress expected collective bargaining rights would neither diminish gradually nor vanish immediately.

On the other hand, the legislative history also includes hints that Congress was not concerned with small changes over time, but with a sudden end to

collective bargaining in the mass transportation industry. In April 1963, the Senate considered a draft of section 13(c), which provided that the Secretary of Labor would ensure workers were protected by arrangements that included, "without being limited to, such provisions as may be necessary for . . . (2) the encouragement of the continuation of collective bargaining rights." 2016 AR 618 (reproducing 109 Cong. Rec. 5415 (1963)). A Senator asked whether this language "would mean that the city or the public body taking over [a] shaky transit system would have to continue the collective bargaining agreement." 2016 AR 619 (reproducing 109 Cong. Rec. 5,416). The answer was "Yes." *Id.* The same Senator then explained his understanding that the Labor Secretary had recommended different language, "prevention of the curtailment of collective bargaining rights," which had not been adopted. *Id.* "Obviously the committee did not go that far on that subject," he said. *Id.* The answering Senator agreed: the Senate committee had "wisely" declined the Labor Secretary's suggestion, although he noted the language "without being limited to" may serve a similar purpose. *Id.* Nevertheless, the language "without being limited to" also escaped the final version of section 13(c).

This exchange counterbalances Senator Morse's statement, excerpted above. It suggests that at least some senators understood the Secretary of Labor would not be permitted to withhold certification of an arrangement simply because it allowed the "curtailment" of collective bargaining rights. The word "curtailment" communicates an intent to avoid diminutions more obviously than the phrase "necessary for . . . the continuation." *See, e.g.*, Oxford American Dictionary Online (defining "curtailment" as "[t]he action or fact of reducing or restricting something").[10] Had Congress's intent been to prevent even modest changes, as the DOL contends, Senators would not have summarily rejected the word "curtailment."

SacRT and MST also cite the hearing testimony of a labor representative regarding UMTA's provisions. *See* S.6 and S. 917, Bills to Authorize the Housing and Home Finance Agency to Provide Additional Assistance for the Development of Mass Transportation Systems, and for Other Purposes: Hearing Before the Subcomm. on Banking and the Currency, 88th Cong. 319 (Mar. 8, 1963) (Testimony of Andrew J. Biemiller, Director, Dep't of Legislation, AFL-CIO), ECF No. 21-2. This representative explained to Senators his worry that "not only the right to strike but the right to bargain [could] go down the drain" if mass

---

[10] At the time this order issued, the definition above was accessible at http://www.oxforddictionaries.com/us/definition/american_english/curtailment.

transportation were managed publicly. *See id.* He agreed with a Senator who asked whether transportation workers worried that "all that been gained from collective bargaining and, indeed, collective bargaining will be lost." *Id.* at 320. "[I]t is also conceivable that pension rights, and so on, that have been won, could be wiped out," he explained. *Id.* The labor representative's words—"going down the drain," "lost," and "wiped out"—communicate a fear not of gradual change, but of a complete end. *See also* Pls.' Br. at 13 (citing additional, similar elements of the legislative history). This concern fits the historical context: a general shift away from the private, unionized operation of mass transportation to public, non-union operation. Again this suggests Congress was concerned primarily with the complete termination of collective bargaining, not its curtailment or diminution.

A review of this legislative history shows the DOL on remand relied on legislative history and historical context only to the extent that the history and context supported its conclusions. It did not address the elements of UMTA's legislative history and context that weighed in favor of SacRT's and MST's interpretations. It did not explain why it decided not to rely on that information or why it found SacRT's and MST's citations unpersuasive. The absence of this discussion undermines the persuasiveness of the DOL's decisions and illustrates a long-recognized difficulty in any analysis of legislative history. When a court or agency relies on legislative history, especially the statements of individual Senators and witnesses at hearings, it must somehow forge one alloyed opinion from many minds. The interpreter of legislative history must "act according to the impression [it] think[s] this history should have made" on the many legislators. *United States v. Pub. Utils. Comm'n of Cal.*, 345 U.S. 295, 319 (1953) (Jackson, J., concurring). Needless to say, this can be a "weird endeavor." *Id.* It also risks undue reliance on the statement of a single legislator whose understanding does not fit that of the whole Congress. *See, e.g.*, *Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 506 U.S. 153, 166 (1993); *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979).

In short, the DOL's analysis of the legislative history is not persuasive. At the same time, neither is the plaintiffs'. If UMTA's legislative history shows anything, it is that Congress did not craft section 13(c)(2) with a future law like PEPRA in mind, but rather out of concern attached to the general shift away from private toward public operation of mass transportation services. Moreover, the parties' citations suggest no uniform understanding of the phrase "continuation of collective bargaining rights" among the legislators who wrote it. The word "continuation" may very well have been a classic legislative compromise.

In this situation, the best reading of section 13(c)(2) is an unsatisfying generalization: "the continuation of collective bargaining rights" means that collective bargaining rights will not cease, and they will not diminish to the point that the bargaining relationship substantially clashes with federal policy on collective bargaining. This interpretation marries the notion that "continuation" may reasonably mean both "not end" and "not diminish," as highlighted in the sections above, with the context and history of UMTA's passage. This history and context shows Congress was concerned that the hard-fought bargaining rights of private transit workers would no longer be protected by federal law. As summarized above, it was motivated primarily by larger-scale restrictions on collective bargaining rights, changes proportionate to the national collapse of the private mass transit industry, changes that would be easy to see when overlaid with the fundamentals of federal labor policy. The DOL's motion cannot be granted on the basis of its interpretation of section 13(c)'s legislative history.

### 2.     Contemporary Decisions Interpreting the NLRA

The DOL confirmed its impression of UMTA's legislative history by reviewing several mid-twentieth-century federal appellate decisions interpreting the NLRA. It found that as commonly understood in this context, an employer's "obligation to bargain over pensions was not restricted to changes that completely eliminated or replaced an existing pension or other employee benefit plan." SacRT Decision at 11–12; MST Decision at 11–12. Its analysis on remand does not support this conclusion, and its motion cannot be granted on the basis of this reasoning.

The parties agree, as does this court, that "[s]ection 13(c) evinces no congressional intent to upset the decision in the [NLRA] to permit state law to govern the relationships between local governmental entities and the unions representing their employees." *Jackson Transit*, 457 U.S. at 23–24. All agree as well that Congress imposed no federal definition of "collective bargaining rights" on the states when it passed section 13(c). *Donovan*, 767 F.2d at 949. Nothing suggests Congress intended to invent a new definition of "collective bargaining" for the sole purpose of the UMTA. "Instead, Congress used the phrase generically, incorporating within the statute the commonly understood meaning of 'collective bargaining.'" *Id.* Therefore, the *Donovan* court concluded, Congress intended the following definition, as far as it goes: "good faith negotiations, to a point of impasse, if necessary, over wages, hours and other terms and conditions of employment." *Id.* (emphasis omitted). The parties do not suggest this view is incorrect, and this court sees no reason to disagree with it.

The *Donovan* court's definition of "collective bargaining" resembles the definition in section 8(d) of the NLRA, 29 U.S.C. § 158(d): "[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." It also resembles the definition embodied by California law. *See, e.g.*, Cal. Gov't Code § 3512 ("It is the purpose of [the Ralph C. Dills Act, Government Code sections 3512–3523.5,] to promote full communication between the state and its employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between the state and public employee organizations."). In light of the consistency of these definitions, the DOL's decision to consult federal decisions interpreting section 8(d) of the NLRA was not unreasonable. Its interpretations of these sections, however, is. Some additional background information is necessary to explain why.

Federal courts interpreting the NLRA have understood employee pensions to be a mandatory subject of collective bargaining under that statute. *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 159 (1971); *Pac. Coast Ass'n of Pulp & Paper Mfrs. v. Nat'l Labor Relations Bd.*, 304 F.2d 760, 761 (9th Cir. 1962). Many federal decisions rely on the Seventh Circuit's thorough discussion in *Inland Steel Company v. National Labor Relations Board*, where the court reasoned that pension benefits are "conditions of employment." *See, e.g.*, *Allied Chem.*, 404 U.S. at 159 n.1 (citing, *inter alia*, *Inland Steel Co. v. Nat'l Labor Relations Bd.*, 170 F.2d 247, 255 (7th Cir. 1948), *cert. denied on this issue*, 336 U.S. 960 (1949), *aff'd on other grounds sub nom. Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382 (1950)); *Pac. Coast*, 304 F.2d at 761 (same). On a similar note, compulsory retirement ages are a mandatory subject of collective bargaining under the NLRA. *See, e.g.*, *Fibreboard Paper Prods. Corp. v. Nat'l Labor Relations Bd.*, 379 U.S. 203, 222 & n.10 (1964) (citing *Inland Steel*, 170 F.2d 247).

This much is uncontroversial. So is the general rule that under the NLRA, an employer must not act unilaterally in areas of mandatory bargaining. Even minimal unilateral changes to terms and conditions of employment may violate the NLRA. *See, e.g.*, *Leeds & Northrup Co. v. Nat'l Labor Relations Bd.*, 391 F.2d 874, 876 (3d Cir. 1968) ("[t]he only change made was to reduce the employees' share of company profits in excess of a level which it had attained only twice in its history[,]" but this change nonetheless violated the NLRA).

Citing these rules, the DOL's decisions on remand relied on the following premises: (1) The definition of "collective bargaining" in section 13(c) is a term of art, and Congress meant to use the established meaning when it enacted section 13(c); (2) one way to learn the established meaning of "collective bargaining" at the time UMTA was enacted is to consider the meaning of that term under the NLRA; (3) under the NLRA, employers must bargain collectively about pensions and retirement ages; (4) if an employer makes unilateral changes to pension plans and retirement ages, it violates the NLRA; and (5) even minimal unilateral changes violate the NLRA. *See* SacRT Decision at 11–13; MST Decision at 11–13.

From these premises the DOL concluded (a) Congress intended, by using the phrase "collective bargaining," to require good faith negotiation over every change a state makes to pension plans or retirement provisions, however minimal; (b) if a state law makes minimal, unilateral changes to public pension and retirement provisions, there has been no "continuation of collective bargaining rights" under section 13(c)(2); and (c) because PEPRA made unilateral changes to the law governing public pensions and retirement ages, SacRT's and MSTs grants cannot be certified.

These conclusions do not necessarily follow from the DOL's premises. First, section 13(c)(2) "substantially preserv[es]"—not completely preserves— "collective bargaining rights that had been established by federal labor policy," *Donovan*, 767 F.2d at 948. Congress understood "federal labor policy would dictate the substantive meaning"—not the total meaning—"of collective bargaining for purposes of section 13(c)." *Id.* at 950. "Congress did not intend to subject local government employers to the precise strictures of the NLRA." *Id.* at 949. Nor did it "impose[] upon the states the precise definition of 'collective bargaining' established by the NLRA." *Id.* The federal elements of "collective bargaining" are necessary to prevent section 13(c)(2) from becoming a "meaningless tautology"; that is, "if state law defines the 'collective bargaining rights' that must be continued under the federal statute, then a public transit authority's labor relations always will be in compliance with section 13(c), because by definition a state transit authority will be in conformity with state law." *Id.* at 948. But wholesale adoption of federal labor law also is not necessary to avoid this nonsensical result.

The DOL's decisions cite this caveat, *see* SacRT Decision at 13; MST Decision at 13, but do not persuasively consider its effect. The DOL's reasoning reads the totality of mid-twentieth-century federal decisional law into the words

"collective bargaining rights." This was not Congress's intent in passing UMTA. If Congress had intended for the Labor Secretary to approve federal funding only when a state's collective bargaining laws would not have violated the NLRA if adopted by a private employer, Congress could have cited section 8(d) of that Act. Instead, Congress referred only generally to "collective bargaining rights."

Similarly, as the plaintiffs point out, some states do not require NLRA-level collective bargaining between transit employees and public mass transit agencies, yet the DOL has not denied certification under section 13(c) to those states. *See* Pls.' Br. at 14 (citing Mo. Ann. Stat. § 105.520; Kan. Stat. Ann. § 75-4321).

Second, the DOL did not explain why the decisions it cited would apply just as well in the public-employment context. The NLRA does not apply to state and local employers. *See Jackson Transit*, 457 U.S. at 23 (citing 29 U.S.C. § 152(2)). A similar concern motivated this court's previous order, and thus flagged the issue for the DOL's consideration. *See* Remand Order, 76 F. Supp. 3d at 1143 ("[T]here is nothing in federal labor policy which expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining." (citation and quotation marks omitted)).

Third, this court previously concluded that California did not give local agencies, including SacRT and MST, unilateral control over pensions. *Id.* PEPRA does not allow "one party control over collective bargaining but rather made across-the-board changes in public employee pension law." *Id.* That is the law of this case, as discussed above. The DOL's decision on remand impliedly assumes this conclusion was incorrect.[11]

For these reasons the DOL's post-remand discussion of NLRA cases contemporary to UMTA's passage is unpersuasive. As discussed above, those cases can reasonably be interpreted to suggest Congress understood the words "collective bargaining rights" to encompass bargaining over pensions and retirement ages. *See, e.g., Allied Chem.*, 404 U.S. at 159 & n.1. These cases are also strong evidence that if a state forbade its transit agencies from bargaining over "wages,

---

[11] The court did not consider this contradiction in its enforcement order. *See* Enforcement Order at *4 ("The DOL considered the text of UMTA section 13(c) and that statute's legislative history, then concluded the plaintiffs' application of PEPRA did not preserve employees' rights or provide for the continuation of collective bargaining. This analysis was not inconsistent with the court's order as it pertained to *Donovan*." (citations omitted)). Because the DOL's current motion is largely denied, however, the court declines to reconsider its conclusions in the Enforcement Order.

hours [or] other terms and conditions of employment," as in *Donovan*, 767 F.2d at 943, Congress would have intended the Secretary to deny certification. But these decisions do not show that any unilateral action by a state, however modest, precludes certification under section 13(c)(2). They do not fit this case because PEPRA does not grant SacRT and MST unilateral authority over pension rights. The DOL's motion cannot be granted on this basis.

### 3.   Collective Bargaining in the Public Sector

This court's previous order also remanded the matter for the DOL to consider the realities of bargaining in the public sector. On remand, the DOL acknowledged (1) that in some cases, "modifications to state pension plans must be ratified by the state legislature," SacRT Decision at 17; MST Decision at 17; and (2) that generally, "in the public sector, terms and conditions of employment are public decisions shaped by political processes and realities outside the direct control of a particular public sector employer and must operate within legislatively imposed budget constraints and be consistent with the legislature's policy direction." *Id.* It did not explain further, except to say both public and private employers face budgetary shortfalls and must negotiate around them. *See* SacRT Decision at 17–18; MST Decision at 17–18.

The DOL considered the differences between private and public employers only superficially. SacRT and MST have not claimed they were frustrated by an inability to obtain ratification from the California legislature. Nor was that the purpose of this court's previous citation of *Robinson v. State of New Jersey*, *supra*, 741 F.2d at 607–08. *See* Remand Order, 76 F. Supp. 3d at 1143–44. In *Robinson*, the Third Circuit referred broadly to "approval by other public authorities" and the difficulty unions face advancing "the collective interests of their members in a number of arenas." 741 F.2d at 607. The *Robinson* court quoted a paragraph from a law review article explaining that it "may not be legally possible or politically sensible" for a public employer to "send someone to the bargaining table with authority to make a binding agreement." *Id.* at 608 (quoting Summers, *Public Sector Bargaining: Problems of Governmental Decisionmaking*, 44 U. Cin. L. Rev. 669, 670–71 (1975)). Public employers must consider taxes, legislative policies, constitutional requirements, civil service principles, municipal codes, and other concerns in addition to the ordinary concerns of private employment, like budgets or competitors' practices. *See id.*

The court recognizes the Remand Order could likely have spelled out these concerns with greater precision. *See* 76 F. Supp. 3d at 1143–44 (referring to legislative ratification, among other difficulties in public bargaining). For this

reason the court does not reconsider its previous conclusion that the DOL's deci-
sions on remand were consistent with the Remand Order. *See* Enforcement Order
at *5. But the DOL's perfunctory discussion in the 2015 letters does not exhibit
the care or insight one might expect from an agency with significant subject-
matter expertise. The DOL says little if anything of the many rocks and hard
places between which SacRT and MST must navigate: they must bargain with
the ATU, comply with California law, and preserve and continue the rights of
their employees under UMTA; they face a statutory and regulatory framework
and a local legal environment foreign to private employers; local and regional
constituencies vie for recognition over the prerogatives of state law; both public
accountability and market forces hang over their heads; and ultimately it is the
local legislative body that decides whether to approve a collective bargaining
agreement. *See* Pls.' Br. at 28–30. The DOL's motion cannot be granted on this
basis; rather, its reasoning on remand supports the plaintiffs' argument that the
DOL's conclusions were foreordained.

### 4.    State-Law Backdrops

This court's previous order noted that "[b]oth employers and employees
come to the bargaining table with rights under state law that form a 'backdrop'
for their negotiations," Remand Order, 76 F. Supp. 3d at 1143 (quoting *Fort Hali-
fax*, 482 U.S. at 21). On remand, the DOL considered whether PEPRA was only
a part of this backdrop and found it was not. SacRT Decision at 13–17; MST
Decision at 13–16. The DOL summarized its conclusion: "PEPRA is not a law
setting background minimum labor standards that is permissible under federal
labor policy. Instead, it more closely resembles the laws that are inconsistent with
federal labor policy because they intrude on collective bargaining." SacRT Deci-
sion at 14; MST Decision at 14. This summary, if read literally, implies the DOL
also concluded that only state laws setting minimum labor standards are permis-
sible under federal labor policy.

As an initial matter, the plaintiffs' briefing improperly dismisses the
DOL's reasoning as an attempt to attribute preemptive effect to section 13(c).
The DOL did not deny certification under a misunderstanding that PEPRA was
preempted by federal law. Rather, it considered the effect of the Supreme Court's
decisions in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), *Malone v. White
Motor Corp.*, 435 U.S. 497 (1978), and *Metropolitan Life Insurance Company v. Mas-
sachusetts*, 471 U.S. 724 (1985), along with several other cases involving potential
federal-state conflicts, as this court's previous order advised. *See* Remand Order,

1  76 F. Supp. 3d at 1143. The court therefore does not address the plaintiffs'
2  preemption-related arguments.

3  The question posed in this court's previous order was whether PEPRA is
4  part of the larger California legal system that would underlie every collective bar-
5  gaining effort, as was true of the pension legislation in *Malone*, the severance-pay
6  law in *Fort Halifax*, the insurance statute in *Metropolitan Life*, or other laws sum-
7  marized in *Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132,
8  136–37 & nn.2–3 (1976). As the Supreme Court has explained, "federal rules de-
9  signed to restore the equality of bargaining power" are compatible with state laws
10  that "impose[] minimal substantive requirements on contract terms negotiated
11  between parties to labor agreements, at least so long as the purpose of the state
12  legislation is not incompatible with [the] general goals" of federal labor policy
13  under the NLRA. *Metro. Life Ins.*, 471 U.S. at 754–55. In theory, if a private ana-
14  log to PEPRA would be preempted by the NLRA, then the DOL's decision not
15  to certify the plaintiffs' grants could be upheld. But this is not the case, as ex-
16  plained below.

17         a.     *Federal Labor Policy Defined*

18  The court begins with the Supreme Court's definition of federal labor pol-
19  icy in the context of the NLRA:

20  [F]ederal labor policy . . . is the promotion of collective bargaining;
21  to encourage the employer and the representative of the employees
22  to establish, through collective negotiation, their own charter for the
23  ordering of industrial relations, and thereby to minimize industrial
24  strife. . . . Congress was not concerned with the substantive terms
25  upon which the parties agreed. The purposes of [federal labor laws]
26  are served by bringing the parties together and establishing condi-
27  tions under which they are to work out their agreement themselves.

28  *Teamsters v. Oliver*, 358 U.S. 283, 295 (1959). This definition and the other deci-
29  sions cited below suggest several questions to help decide whether a state law
30  substantially clashes with federal labor policy.

31         b.     *Identification of Clashes Created by State Law*

32  (i) Does the state law concern state interests "deeply rooted in local feel-
33  ing and responsibility," and are those interests "a merely peripheral concern" of
34  federal policy? *Machinists*, 427 U.S. at 136–37. The *Machinists* Court explained,
35  "the federal law governing labor relations does not withdraw from the States
36  power to regulate where the activity regulated is a merely peripheral concern of
37  [federal labor policy]." *Id.* at 137 (citation, quotation marks, and alterations omit-

ted). The policing of violence is a matter for the states, for example. *Id.* at 136. But states may not subvert federal policy with laws that are facially indifferent to that policy. For example, in *Oliver*, the Supreme Court prevented a state from enforcing an otherwise neutral bar on price fixing because in practical effect, the law's enforcement destroyed a contract provision won by hard-fought collective bargaining. *See* 358 U.S. at 293–97.

(ii) Is the state law generally applicable? Broad statutes of general applicability are more likely to survive preemption than narrow statutes that apply only to a state's own employees or specifically to collective bargaining. *Compare, e.g.*, *Metro. Ins. Co.*, 471 U.S. at 755 ("Minimum state labor standards affect union and nonunion employees equally . . . ."), *with, e.g.*, *Hull v. Dutton*, 935 F.2d 1194, 1198 (11th Cir. 1991) ("[The Alabama statute in question] applies only to its own employees and not to its citizens generally. The statute is an expression of the state's power as an employer to regulate relations with its own employees, rather than the state's authority to regulate in the interest of the health, welfare, and mores of its citizens.").[12] Generally applicable statutes are often consistent with federal policy because they do not primarily regulate the relationship between employees, the union, and the employer. *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 533 (1978) (plurality opinion). But even generally applicable laws may clash with federal policy and so be preempted. *Id.* (citing *Farmer v. United Bhd. of Carpenters and Joiners of Am., Local 25*, 430 U.S. 290, 300 (1977)). The price-fixing law at issue in *Oliver* is again an example. *See, e.g.*, 358 U.S. at 297 ("Clearly it is immaterial that the conflict is between federal labor law and the application of what the State characterizes as an antitrust law.").

(iii) Does the law protect workers' interests, for example, by establishing minimum labor standards? Laws that protect workers' rights and interests are more likely to comport with federal labor policy. In *Metropolitan Life*, the Supreme Court found a Massachusetts law was not preempted because that law pursued a healthcare goal unrelated to the purposes of the NLRA. *See* 471 U.S. at 758. The Court wrote, "Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety." *Id.* at 756; *see also id.* ("It would turn [federal] policy . . . on its head to . . . penalize[] workers who have chosen to

---

[12] The plaintiffs argue unpersuasively that *Hull* is not relevant here. *See* Pls.' Br. at 19–20 & n. 29. The *Hull* court interpreted the Railway Labor Act (RLA). The RLA, like the NLRA, outlines the dimensions of federal labor policy and is relevant.

1   join a union by preventing them from benefiting from state labor regulations im-

2   posing minimal standards on nonunion employers.").

3          Similarly, in *Malone*, the Supreme Court considered a Minnesota law

4   providing that when an employer closes its business, "all employees with 10 or

5   more years of service would receive whatever pension benefits had accrued to

6   them, regardless of whether their rights to those benefits had vested within the

7   terms of the [retirement] Plan." 435 U.S. at 501–02. A plurality of four justices[13]

8   concluded "there is nothing in the NLRA . . . which expressly forecloses all state

9   regulatory power with respect to those issues, such as pension plans, that may be

10  the subject of collective bargaining." *Id.* at 504–05.[14] And in *Fort Halifax*, the Su-

11  preme Court upheld a Maine law that required any employer that closed a plant

12  with one hundred or more employees to provide each worker a specific severance

13  payment. 482 U.S. at 5.

14         At the same time, state laws are not necessarily inconsistent with federal

15  labor policy when they cut against employees' best interests. As explained by the

16  Eleventh Circuit, a state law may be inconsistent with federal labor policy "de-

17  spite the irony" that the inconsistent law benefits the employees rather than the

18  employer. *Hull*, 935 F.2d at 1197. Congress determined that "the collective bar-

19  gaining process is best promoted if negotiated agreements are shielded from any

20  unilateral changes by [an employer]. Thus, as the bitter so often goes with the

21  sweet, this prohibition must readily be enforced . . . ." *Id.*; *accord, e.g.*, *Leeds*, 391

22  F.2d at 877 ("The [NLRA] not only protects the employees from the direct eco-

23  nomic effect of the employer's unilateral action, but also forbids the bypassing of

24  the collective bargaining agent, for this would undermine the union's authority

25  by disregarding its status as the representative of the employees."); *see also Oliver*,

26  358 U.S. at 295 (federal labor policy encourages collective bargaining and is not

27  concerned with the substantive terms of the parties' agreements). In other words,

---

[13] Two justices did not participate, and three dissented.

[14] After reaching this preliminary conclusion, the Court considered in detail the legislative history of the Welfare and Pension Plans Disclosure Act (WPPDA) and concluded that Congress could not have intended to preempt the Minnesota statute by passing the NLRA. *See id.* at 505–15. The WPPDA has since been replaced by the Employee Retirement Income Security Act of 1974 (ERISA). *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981). Unlike ERISA, which preempts state regulation, the WPPDA anticipated state action. *See id.* Nevertheless, government plans are exempt from ERISA, *Standard Oil Co. of Cal. v. Agsalud*, 633 F.2d 760, 764 (9th Cir. 1980), *aff'd*, 454 U.S. 801 (1981) (Mem.), so its passage would seem to have no effect on the Supreme Court's decision in *Malone*, to the extent that decision applies to a state employer's plan.

although it may be true that state laws protecting workers' interests are more like-
ly to be consistent with federal policy, it does not follow that laws serving anoth-
er purpose are more probably inconsistent with federal policy, as long as collec-
tive bargaining rights are preserved.

(iv) Does the state law essentially dictate the substantive result of collec-
tive bargaining? A state law is often preempted if it does. *See Chamber of Commerce
v. Bragdon*, 64 F.3d 497, 501 (9th Cir. 1995) (citing *Barnes v. Stone Container Corp.*,
942 F.2d 689, 693 (9th Cir. 1991), and *Bechtel Constr. v. United Bhd. of Carpenters*,
812 F.2d 1220, 1226 (9th Cir. 1987)). In other words, even unintentional or coin-
cidental state interference with collective bargaining is preempted when the state
law "impos[es] a contract term on the parties and thus alter[s] incentives to nego-
tiate." *Barnes*, 942 F.2d at 693.

(v) Does the law otherwise clash with the federal goal of encouraging
"the employer and the representative of the employees to establish, through col-
lective negotiation, their own charter for the ordering of industrial relations"?
*Oliver*, 358 U.S. at 295. Federal labor policy does not condone a state's "med-
dling at the heart of the employer-employee relationship." *Barnes*, 942 F.2d at
693. Nevertheless, a state law is not necessarily contrary to federal labor policy
even if it entirely removes an issue from the bargaining table. If this were true,
nearly every state law tangential to employment would be preempted, from min-
imum wage laws (no bargaining over lower hourly wages, e.g., in return for pay
in kind) to health and safety standards (no bargaining around regulations burden-
some to both employees and employers, but beneficial to the public).

In summary, federal decisions considering the preemption of state laws
may help trace the boundaries of federal labor policy, and federal labor policy is
the standard against which arrangements are measured under section 13(c)(2). A
variety of state laws may be consistent with federal labor policy and provide a
backdrop to collective bargaining under section 13(c)(2), while at the same time
some laws are not part of this backdrop.

        *c.*      *Analysis*

The questions identified above help divide consistent from the incon-
sistent state laws. When those questions are asked of PEPRA, this court finds no
substantial inconsistency with federal labor policy:

(i) Deeply rooted state interests: On the one hand, PEPRA does not con-
cern the most traditional of California's police powers, such as the general
health, safety, and wellbeing of California citizens. It is not analogous to the "pe-

ripheral" state laws identified by the Supreme Court. *See, e.g.*, *Machinists*, 427 U.S. at 136–37 & nn.2–3; *accord, e.g.*, *N.Y. Tel.*, 440 U.S. at 532–33 (upholding an unemployment benefits law that involved merely "the distribution of benefits to certain members of the public"); *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53 (1966) (upholding a civil remedy for libel despite its labor-law implications). PEPRA does reflect an overarching concern with a broad and tra-ditional state interest: the budget. Governor Brown's announcement signals PEPRA was meant to save "billions of taxpayer dollars," rein in costs, and en-sure that California's public retirement system remained viable. None of the par-ties has cited authority to suggest California targeted the process of collective bargaining or the relationships between unions and public employers specifically. This question resolves in favor of neither the plaintiffs' nor the DOL's position.

(ii) General Applicability: PEPRA applies only to employees of the state and its statutory agencies. This limited scope, on the one hand, makes PEPRA comparable to the unilateral decision of a private employer. Under federal labor policy, private employers must not make unilateral changes to wages and condi-tions of employment. Nevertheless, SacRT and MST are not themselves guilty of unilateral mischief, and they are the entities, not the State of California, who would be the beneficiaries of the  federal grants at issue here. SacRT's and MST's relationships with ATU, not California's, are at issue here. As discussed below, the DOL unreasonably dismissed SacRT's and MST's arguments that they and other agencies have been able to bargain around PEPRA's effects. This question too resolves in equipoise and helps neither the DOL's nor the plaintiffs' case.

(iii) Protection of workers' interests: In general, PEPRA's changes in-crease the share of pension costs borne by employees and are intended to allevi-ate California's financial burdens as employer. But as discussed above, only the most general trend in favor of state laws that benefit employees is discernable in federal appellate decisions. *Compare, e.g.*, *Metro. Life Ins.*, 471 U.S. 724 (minimum insurance policy protections), *and Fort Halifax*, 482 U.S. 1 (severance pay guaran-ties), *with, e.g.*, *Oliver*, 358 U.S. 283 (elimination of price guaranties favorable to employees), *and Machinists*, 427 U.S. 132 (withholding of economic remedies from employees). It is not clear from these cases that a state law conflicts with federal policy simply because its substantive result may tend to favor employers' interests. *See, e.g.*, *Hull*, 935 F.2d at 1197. And here, local transit agencies' ability to negotiate about pension benefits and employees' ability to propose offsets is not cut off. This answer does not support the DOL's motion.

(iv) Dictating the substantive results of bargaining: PEPRA does not dictate the results of collective bargaining. It does impose specific, prospective limitations on defined benefits plans. But as the plaintiffs point out, they and the Bay Area Rapid Transit District (BART) have continued collective bargaining over other complementary pension strategies in the wake of PEPRA's enactment. *See* Pls.' Br. at 23–24. The record before the court supports the conclusion that PEPRA leaves local agencies free to negotiate around its effects and within PEPRA's restrictions. *See id.*; *see also* BART Amicus Curiae Br. 4–7, ECF No. 26-1. Federal NLRA decisions recognize an employer's obligation to bargain with employee unions about the effects of management's decisions. *See First Nat'l Maint. Corp. v. Nat'l Labor Relations Bd.*, 452 U.S. 666, 681 (1981) ("There is no dispute that the union must be given a significant opportunity to bargain about . . . matters of job security as part of the effects bargaining mandated by § 8(a)(5) [of the NLRA])."). For example, in *NLRB v. Royal Plating and Polishing Co.*, 350 F.2d 191 (3d Cir. 1965), a decision the Supreme Court cited with approval in *First National Maintenance*, the Third Circuit held that the NLRA does not prohibit a failing business from deciding unilaterally to relocate or close, provided first it notifies the union and allows it "an opportunity to bargain over the rights of the employees whose employment status will be altered by the managerial decision." *Id.* at 196. That is, federal law allows private employers to follow the dictates of economic necessity, so long as they bargain over the effects of management's decisions. *See id.* at 196–97. The answer to this question therefore favors the plaintiffs.

(v) Clash with goal of encouraging collective negotiation: Finally, although ATU, SacRT, and MST dispute how extensively PEPRA limits their ability to bargain over pension plans and retirement ages, no one suggests the change works to expand the parameters of collective bargaining with respect to defined benefit plans at least. For example, it is undisputed that in the future, local agencies cannot both comply with PEPRA and fund defined benefits plans with certain characteristics. This favors the DOL's motion.

In summary, of these five questions, one favors the plaintiffs, one favors the DOL, and three are neutral or uncertain. It cannot be said that PEPRA substantially conflicts with federal labor policy such that its private analog would be preempted under the NLRA.

For an example of a state law that does conflict with federal policy, consider the Georgia statute at issue in *Donovan*:

[I]n April 1982, the Georgia legislature . . . pass[ed] Act 1506, which amended [a previous enactment] so as to limit [the Metropolitan At-

37

1        lanta Rapid Transit Authority's (MARTA's)] authority to bargain
2        collectively with ATU. Specifically, Act 1506 prohibited MARTA
3        from bargaining over five subjects that are at issue here: the assign-
4        ment of employees, discharge and termination of employees for
5        cause, subcontracting of work, fringe benefits for part-time employ-
6        ees, and assignment and calculation of overtime. It also changed the
7        procedures to be followed for interest arbitration such that, where
8        the parties could not agree on wages, the matter could be submitted
9        to arbitration only upon the consent of both parties.

10  767 F.2d at 942–43. Each of the five questions listed above shows how Act 1506

11  conflicted with federal labor policy: (i) it concerned the relationship between em-

12  ployees and MARTA directly, rather than traditional state interests; (ii) it was

13  not generally applicable, but specifically prohibited MARTA from negotiating

14  with the ATU about five topics; (iii) it did not protect workers' interests; (iv) it

15  dictated the result of collective bargaining by forbidding collective bargaining

16  altogether in a number of respects; and (v) in sum, it was "obvious" to the D.C.

17  Circuit "that several of these provisions [were] completely antithetical to the con-

18  cept of collective bargaining embodied in section 13(c)." *Id.* at 952–53. The

19  DOL's analysis of state-law backdrops does not allow the court to grant its mo-

20  tion.

21      **E.**      **Arbitrary Process**

22      As noted above, the plaintiffs independently challenge the DOL's process

23  as arbitrary and capricious in violation of the APA. The path an agency takes to

24  arrive at a decision is subject to review just as well as the decision itself. The

25  APA "establishes a scheme of reasoned decisionmaking." *Allentown Mack Sales &*

26  *Serv., Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359, 374 (1998) (citation and quo-

27  tation marks omitted). This court must "hold unlawful and set aside agency ac-

28  tion, findings, and conclusions found to be . . . arbitrary, capricious, and abuse of

29  discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. 706(2).

30  "Courts enforce this principle with regularity when they set aside agency regula-

31  tions which, though well within the agencies' scope of authority, are not support-

32  ed by the reasons that the agencies adduce." *Allentown*, 522 U.S. at 374; *accord*

33  *CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001) ("'[A]rbitrary and

34  capricious' review under the APA focuses on the reasonableness of an agency's

35  decision-making processes."). An agency's process was arbitrary if it relied on

36  facts Congress never intended it to, ignored an important aspect of the problem,

37  explained its decision in a way that does not fit the evidence before it, or if its

38  decision is "so implausible that it could not be ascribed to a difference in view or

1  the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*
2  *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

3      An agency's obligations to use a rational process and to interpret statutes
4  correctly are distinct. *See, e.g.*, *CHW W. Bay*, 246 F.3d at 1223. In other words, an
5  agency might interpret a statute correctly and the court defer to its interpretation,
6  but the agency still could apply that interpretation arbitrarily in violation of the
7  APA. Or the agency might use a perfectly rational process but interpret a law
8  incorrectly.

9      Here, SacRT and MST claim (1) the DOL confused the requirements of
10  sections 13(c)(1) and (c)(2) by focusing on the substance of their collective bar-
11  gaining agreements rather than the parties' ability to bargain; and (2) the DOL
12  reached an arbitrarily different result in this case than it did in a comparable case
13  from Massachusetts.

14      **1.      Confusion Between Sections 13(c)(1) and (c)(2)**

15      Sections 13(c)(1) and (c)(2) impose different requirements on a transit
16  agency's arrangements with its employees. Section 13(c)(1) prevents certification
17  if a transit agency's arrangements do not include provisions necessary for "the
18  preservation of rights, privileges, and benefits (including continuation of pension
19  rights and benefits) under existing collective bargaining agreements or other-
20  wise." 49 U.S.C. § 5333(b)(2)(A). Section 13(c)(2) is concerned with another kind
21  of right, "collective bargaining rights." *Id.* § 5333(b)(2)(B).

22      SacRT and MST argue that PEPRA applies restrictions to only one type
23  of pension plan, defined benefits plans, and does not restrict their ability to bar-
24  gain with the ATU about defined contribution plans. For this reason they claim
25  the DOL arbitrarily and incorrectly considered the subject of collective bargain-
26  ing agreements (the topic of section 13(c)(1)) rather than the plaintiffs' ability to
27  bargain under section 13(c)(2). On remand, the DOL was not persuaded by this
28  argument. It found that defined contribution plans shift the risk of market down-
29  turns from the employer to the employees and retirees and are in practice no
30  more than a mandatory savings account. For this reason, the DOL explained, it
31  could not certify the plaintiffs' applications. PEPRA may allow bargaining over a
32  less desirable form of pension plan, but the parties had traditionally bargained
33  over defined benefits plans. Therefore, in the DOL's view, PERPA removed an
34  important topic from the bargaining table and did not allow a continuation of
35  collective bargaining rights.

The DOL did not give much weight to the possibility that ATU, SacRT, and MST could find ways to increase pay, bonuses, or other benefits to compensate employees for the increased risks they shouldered in a defined contribution plan, or to offset contributions to a defined benefits plan. This is one of the plaintiffs' greatest frustrations: they argue the DOL refuses to recognize their ability to collectively bargain around PEPRA's restrictions. *See* Pls.' Br. at 23 (explaining the point by citation to *First National Maintenance Corp.*, *supra*, 452 U.S. at 681–82, discussing effects bargaining). The Secretary's designee explained his reasoning regarding SacRT:

> PEPRA's effect on collective bargaining rights is much less now than when I issued my September 4, 2013 decision. Nevertheless, the developments are insufficient for me to certify that protective arrangements exist for the continuation of collective bargaining rights. SacRTD states that it will not "fully" apply PEPRA until the current collective bargaining agreement expires or is amended. The term "fully" suggests that SacRTD may partially implement PEPRA. . . .
>
> SacRTD is therefore in a different position than transit agencies that could provide assurances either directly or through the state Attorney General that state laws restricting collective bargaining would not result in a diminution of collective bargaining rights or failure to preserve terms of an existing collective bargaining agreement. [Citing the DOL's decisions in other cases] In those cases, the transit agencies committed to complying with section 13(c)'s requirements and not applying a state law that the Department viewed as potentially precluding such compliance. SacRTD has not made that commitment and asserts a right to apply PEPRA.

SacRT Decision at 18–19. And as for MST, the DOL explained, "It is immaterial that Monterey Salinas and ATU negotiated a new collective bargaining agreement effective October 1, 2013 because the agreement was bargained within the parameters established by PEPRA." MST Decision at 18 (citation and quotation marks omitted).

In other words, because SacRT was unable to promise it would not be subject to PEPRA's restrictions, given that PEPRA is state law, and because MST's post-PEPRA bargaining was affected by PEPRA, the DOL denied certification. Similarly, BART's experience was unpersuasive to the DOL in this respect:

> The BART unions reportedly bargained over pensions within the constraints of PEPRA while PEPRA was in effect. Such bargaining does not provide for the continuation of collective bargaining rights required by section 13(c)(2) because the continuation of collective bargaining rights means, as discussed above, that a transit agency

generally cannot change pension terms during the term of or after
the expiration of a collective bargaining agreement without bargain-
ing to impasse. In some instances, a union may waive its right to
bargain. Whether or not the unions in BART waived their right to
bargain over PEPRA, the unilateral changes required by PEPRA
prevent the continuation of unions' right to bargain over the chang-
es. Moreover, the BART unions eventually reached an agreement
that did not comply with PEPRA after California passed legislation
suspending PEPRA's applicability to employees protected by section
13(c).

SacRT Decision at 19–20 (citations omitted); *accord* MST Decision at 19. That is,
"the results of bargaining [were] different when PEPRA [was] in effect than
when it [was] not in effect," which "confirms the impact that PEPRA has on col-
lective bargaining." *Id.*

 In summary, the DOL's reasoning appears to be that because SacRT,
MST, and BART could only bargain within the confines of PEPRA's limitations
on defined benefits plans, PEPRA did not allow a continuation of collective bar-
gaining over pensions. It was concerned about what SacRT and MST might do
in the future if they received certification. Bargaining results before PEPRA were
"different" than bargaining results after PEPRA.

 But the DOL did not explore how the bargaining process was different in
practice. It explained only in general that bargaining "diminished." It remains
unclear what practical impact the DOL believed PEPRA's restrictions had on the
bargaining process itself, rather than the result of that process. If PEPRA shifted
power from ATU to SacRT and MST, for example, how exactly did it do that?
What negotiation disadvantages did ATU confront because of PEPRA? Did
ATU begin from a position of weakness in pension negotiations? How was ATU
unable, if it was unable, to demand concessions in return for the transit agencies'
inability to bargain about certain aspects of defined benefits plans? Does experi-
ence in other cases show this is true? PEPRA's practical effect on bargaining is a
subject the DOL could have persuasively developed and framed with its exper-
tise. Starkly, it did not.

 It cannot be that bargaining discontinued simply because the results of
the bargaining process were "different." As the DOL recognizes, section 13(c)(2)
protects collective bargaining rights, not bargaining results. *See* SacRT Decision
at 9; MST Decision at 9. The DOL does not address why SacRT, MST, and
ATU could not make up for PEPRA's restrictions on defined benefits plans with
negotiations over offsets for required contributions to those plans, more generous
defined contribution plans, healthcare benefits, insurance packages, wages, bo-

1   nuses, and any number of other benefits. The DOL focused instead only on why

2   defined contribution plans are substantively inferior to defined benefits plans and

3   what changes SacRT and MST might make in the future, rather than on their

4   current agreements. This cursory analysis shows it was concerned by the likely

5   substantive results of bargaining, not with the continuation of collective bargain-

6   ing rights. Its decision not to certify was arbitrary.

7                    **2.      Inconsistency with a Previous Decision**

8          The plaintiffs' second argument focuses on a 2009 change to the health

9   benefits of Massachusetts transit employees and the DOL's 2011 certification of

10  federal grants to the Massachusetts Bay Transit Authority (MBTA). In 2009,

11  Massachusetts passed a law transferring the MBTA's group insurance plan to a

12  state insurance commission. *MBTA v. Local 589, ATU, AFL-CIO, CLC*, No. 13-

13  3409, 32 Mass. L. Rep. 82, 2013 WL 7863572, at *1 (Mass. Super. Ct. Dec. 19,

14  2013) (citing 2009 Mass. Acts Ch. 25 § 140). Previously, insurance coverage had

15  been determined by collective bargaining, but under the new law, collective bar-

16  gaining was prohibited. *See id.*; 2009 Mass. Acts Ch. 25 § 140.[15]

17         The ATU and other unions representing MBTA employees objected, and

18  the DOL found in June 2011 that the Massachusetts law "appear[ed] to have re-

19  moved mandatory and/or traditional subjects of collective bargaining from the

20  consideration of the parties and may prevent the MBTA from continuing the col-

21  lective bargaining rights," as required by section 13(c)(2). 2013 AR 1556–59.

22  MBTA saw its federal funding was in jeopardy and asked the state legislature for

23  an exemption. *MBTA*, 2013 WL 7863572, at *2. The MBTA and ATU began

24  negotiations to establish a healthcare plan to supplement the coverage offered

25  under the state commission. The MBTA assured the DOL it would be able to

26  collectively bargain with the unions over this supplemental plan. *See* Letter from

27  Richard Davey, Sec'y, Mass. Dep't of Transp., to John Lund, Deputy Assistant

28  Sec'y, Off. Labor-Mgmt. Standards, U.S. Dep't of Labor (Sept. 2, 2011), ECF

29  No. 18-30.[16] In reliance on these developments, the DOL certified MBTA's

---

[15] The statute was specific on this point: "Upon transfer . . . [beneficiaries] shall receive group insurance benefits determined exclusively by the commission, the coverage shall not be subject to collective bargaining, and no other reimbursements or other contractual obligations shall be paid by the [MBTA] for health care benefits not provided through the group insurance commission." 2009 Mass. Acts Ch. 25 § 140.

[16] The court previously granted the plaintiffs' request to supplement the administrative record with this document. *See* Order Apr. 24, 2014, at 17, ECF No. 41.

grant. Letter from Ann Comer, Chief, Div. of Statutory Programs, U.S. Dep't of Labor, to Marybeth Mello, Reg. Admin., Fed. Transp. Admin. (Sept. 9, 2011), ECF No. 18-30.[17]

The Massachusetts Legislature later formalized this exception in an amendment to the statutory provisions cited above. *See MBTA*, 2013 WL 78663572, at *2 (citing 2011 Mass. Acts Ch. 189).[18] This amendment also provided that any negotiated supplemental coverage should not duplicate the benefits and coverages offered by the state insurance commission. 2011 Mass. Acts Ch. 189.

At the time the DOL certified the MBTA grant, the MBTA and unions had not completed negotiations over a supplemental health plan. *See* Comer Letter, *supra*; MBTA, 2013 WL 7863572, at *2. They did not in fact reach a negotiated solution, but came to a bargaining impasse and submitted the matter to interest arbitration. *Id.* The arbitrator made a decision in August 2013, which the Massachusetts Superior Court confirmed over the MBTA's objections in December 2013. *Id.*

In this case, during the first, pre-remand proceedings before the DOL, SacRT cited the Massachusetts law and the DOL's certification and argued that PEPRA presented an analogous situation. *See* 2013 AR 131. The DOL disagreed:

> The Massachusetts Act did not place hard caps on health care benefits or impose restrictions on negotiated supplemental plans. The language of the Act specifically provided an exemption for all current collective bargaining agreements, preserving employees' existing rights and benefits. As a result, after extensive negotiations, MBTA and the union (ATU) were able to agree to a health welfare trust plan that provided benefits and coverage supplementary to those provided by the mandated [state commission] coverage. In sum, contrary to the situation here, the Massachusetts Act fully preserved rights and benefits under existing collective bargaining agreements, and the parties were able to negotiate a supplemental health plan, thus continuing collective bargaining rights.

---

[17] *See supra* note 16.

[18] The amendment provided in part as follows: "Nothing in [section 140] shall restrict the authority of the [MBTA] to bargain collectively . . . over the establishment of a Health and Welfare Trust Plan or to pay the cost, in whole or in part, as determined by collective bargaining, of any supplementary benefits or coverages provided under such a trust plan."

*Id.* SacRT raised this argument again during its initial challenge in this court to the DOL's decision, but this court did not reach it. *See* Remand Order, 76 F. Supp. 3d at 1144.

On remand, the parties revisited the MBTA case, and the Secretary's designee again found the analogy unpersuasive:

> As I explained in my September 4, 2013 decision, PEPRA . . . differs from a Massachusetts law that transferred group health insurance coverage from a transit agency to an insurance commission because the Massachusetts law placed no hard caps on health care benefits and no restrictions on negotiating supplemental plans. AR 131. PEPRA puts hard caps on defined benefit plans and restricts parties' ability to negotiate supplemental defined benefit plans, even if such plans do no more than supplement (such as by establishing a guarantee of minimum benefit) a defined contribution retirement plan such as those envisioned by PEPRA.

SacRT Decision at 20–21; MST Decision at 20.

Here, the plaintiffs ask the court to find that the DOL's decisions are arbitrarily inconsistent with its decisions in the MBTA case. As noted above, under the APA, administrative agencies must "treat like cases alike" and explain inconsistencies. *Westar Energy*, 473 F.3d at 1241. SacRT's and MST's motion cannot be granted on this basis.

Both in 2013 and 2015 the DOL explained its belief that the Massachusetts law differed from PEPRA because it allowed the MBTA and its unions to continue negotiations over health insurance coverage and imposed no "hard caps" on the substance of their agreements. Although SacRT and MST are correct that under PEPRA they may negotiate a defined contribution plan with the ATU, PEPRA prohibits the adoption of a defined benefit plan with characteristics outside its boundaries. *See* Cal. Gov't Code § 7522.02(e). The plaintiffs have not drawn the court's attention to a PEPRA provision or part of the administrative record showing the DOL understood that law erroneously as imposing a kind of "hard cap" on defined benefit retirement plans. Rather, it seems a result analogous to that adopted by the Massachusetts Legislature in the MBTA case has been achieved: the California legislature created an exemption that could limit PEPRA's reach in response to the DOL's and this court's decisions. *See id.* § 7522.02(a)(3); *see also supra* notes 15, 18.

The court does agree with the plaintiffs that the DOL wrote incorrectly in 2013 that the MBTA and its unions had successfully negotiated a supplemental health plan in 2011. Nevertheless, the DOL's 2015 decisions do not rely on this

misunderstanding. Nor would a correction have much effect, if any: "collective bargaining rights" means negotiation in good faith to impasse, if necessary, which describes what the MBTA and its unions did. *See MBTA*, 2013 WL 7863572, at *2.

### F.   Conclusion—Section 13(c)(2)

The DOL's decisions on remand cannot be upheld on the basis of its interpretation of section 13(c)'s language or legislative history. The same is true of the DOL's review of federal appellate decisions contemporary to UMTA's passage, its consideration of the differences between public and private bargaining, and its review of what state laws may form a permissible backdrop to collective bargaining. At most the authorities on which DOL relies show that section 13(c)(2) prevents certification if a state passes laws that substantially clash with federal labor policy. It is not possible to conclude on this record that PEPRA substantially clashes with federal labor policy.

In addition, the DOL's decisions to deny certification under section 13(c)(2) cannot be upheld because the DOL focused on the results of collective bargaining under PEPRA rather than on whether protective arrangements ensured a continuation of the process through which collective bargaining rights are exercised. Similarly, the DOL unjustifiably rejected evidence that California transit agencies had bargained over pensions notwithstanding PEPRA's limitations on defined benefits plans. By contrast, the DOL's analysis of a previous case in Massachusetts was not arbitrary or capricious and cannot support the plaintiffs' motion.

For these reasons, to the extent the DOL's decisions on remand rejected certification under section 13(c)(2), it acted arbitrarily, and its decisions must be set aside under 5 U.S.C. § 706(2)(A). But because the DOL also denied certification under section 13(c)(1), the plaintiffs cannot obtain relief unless they also prevail on their second claim, which concerns that section. The court now turns to it.

## V.   THE PRESERVATION OF RIGHTS, PRIVILEGES AND BENEFITS

### A.   SacRT

In the Remand Order, this court found the DOL had exceeded its authority by redefining the scope of a collective bargaining agreement to protect the rights of future employees. *See* 76 F. Supp. 3d at 1145. The DOL believed this conclusion was erroneous, but rather than requesting reconsideration or a modi-

fication of the judgment, for example under Federal Rule of Civil Procedure 59(e) or 60(b), and instead of obtaining relief from the Ninth Circuit Court of Appeals, the DOL dismissed its appeal voluntarily and again denied certification to SacRT for the same reason. *See* SacRT Decision at 21. Therefore, in the Enforcement Order, the court set aside the DOL's decision to deny certification to SacRT on the basis of section 13(c)(1). *See* Enforcement Order at *5.

This court has no desire to persist in any error it committed. It may well be that SacRT's collective bargaining agreement offers some protections to future employees. *See, e.g.*, 2013 AR 372 ("All new employees [i.e., new hires] shall be on probation for a period of 180 days (six months) from the completion of training."). But the court cannot bless the DOL's strategy here. For this reason the court declines to reconsider its order setting aside the DOL's decision to deny certification to SacRT under section 13(c)(1).

As to SacRT, the plaintiffs' motion is granted, and the DOL's motion is denied.

**B.     MST**

MST's application presents three additional problems.

First, the DOL's decision on remand denied certification to MST because it found the pension rights of neither new nor classic employees were preserved. *See* MST Decision at 20–21. But the plaintiffs' supplemental complaint challenges only the DOL's discussion of new employees' rights. *See* Suppl. Compl. ¶¶ 100–10, ECF No. 88-2. The parties disagree whether the supplemental complaint can nevertheless be read to imply a challenge to both new and classic employees. If it cannot, MST asks for leave to amend its supplemental complaint, and the DOL argues an amendment should not be allowed.

Second, the DOL argues its decision may be upheld on a straightforward reading of section 13(c)(2). *See* DOL Br. at 15; DOL Resp. at 16. However, its current briefing relies on a reading of two phrases it did not present to the parties in issuing the 2015 letters. MST argues the DOL has attempted to justify its decision after the fact by relying on this new material and asks the court to disregard it.

Third is the substance of the DOL's decision on remand. As noted above, it found that MST had not adopted protective arrangements to preserve the rights of its new and classic employees. MST argues the DOL has not identified any specific right that was not preserved. The next three subsections address these issues.

### 1.      Amendment to the Supplemental Complaint

Federal Rule of Civil Procedure 15 governs amendments to the plead-
ings. The policy of Rule 15 heavily favors amendments that allow a case to be
decided on its merits. *See, e.g.*, *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149,
1160 (9th Cir. 1989); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.
1987); *see also* Fed. R. Civ. P. 15(b)(1) (allowing amendment even in trial, "when
doing so will aid in presenting the merits and the objecting party fails to satisfy
the court that the evidence would prejudice that party's action or defense on the
merits"). Leave to amend may be denied if the amendment is sought in bad faith,
if it would prove an exercise in futility, or if it would cause undue delay, among
similar reasons, *see, e.g.*, *Cafasso, U.S.* ex rel. *v. General Dynamics C4 Sys., Inc.*, 637
F.3d 1047, 1058 (9th Cir. 2011), but the focus of Rule 15 is what prejudice the
opposing party will suffer as a result, *Eminence Capital, LLC v. Aspeon, Inc.*, 316
F.3d 1048, 1052 (9th Cir. 2003).

Here, the plaintiffs' supplemental complaint does not clearly allege any
claim about classic employees' rights under section 13(c)(1). It focuses on new
employees and employees who have not yet been hired. *See* Suppl. Compl.
¶¶ 100–10. Nevertheless, the parties have devoted several pages of their existing
briefing to classic employees. *See* DOL Br. at 15–20; Pls.' Br. at 36–38; DOL
Resp. at 18–21; Pls.' Resp. at 7–10. The DOL has not described what specific
prejudice it would suffer if MST is allowed leave to amend. The court therefore
grants MST's request to amend its complaint to allege a claim based on the
DOL's denial of certification under section 13(c)(1) with respect to classic em-
ployees. To alleviate any prejudice this amendment may cause, the court allows
both parties to file short supplemental briefs, as detailed in the conclusion of this
order.

### 2.      Statutory Interpretation and Post-Hoc Rationalizations

In the DOL's current briefing, it argues that its decisions may be upheld
because section 13(c) protects the rights of all employees "affected by the assis-
tance" and because section 13(c)(1) addresses the preservation of rights under
collective bargaining agreements "or otherwise." *See* DOL Br. at 17–18; DOL
Resp. at 21–25. The DOL did not rest its decision to deny certification on these
provisions on remand. "It is well-established that an agency's action must be up-
held, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.
Ass'n*, 463 U.S. at 50.

The DOL argues in response that its citations to these phrases can support its current motion because this court must interpret the entirety of section 13(c). The court agrees that all of section 13(c) is relevant, but disagrees that the parties' motions may be resolved on the basis of unambiguous statutory language, as explained in the next section. The DOL's new arguments cannot support its motion.

### 3.   The Rights of Future Employees

As discussed above, when a federal court is asked to review an administrative agency's interpretation of a statute, the first question is that law's plain meaning. Both the court and the agency are bound by Congress's plain expressions of intent. *Chevron*, 467 U.S. at 842–43. When ambiguities arise, the agency's interpretation is allowed binding deference under *Chevron* if that appears to have been Congress's intent. *See Mead*, 533 U.S. at 227–28. Otherwise, the agency's decisions receive lesser deference under *Skidmore*. *See id.*

Here the DOL argues section 13(c)(1) unambiguously supports its position. *See* DOL Br. at 15; DOL Resp. at 16. MST does not define its position so clearly, but its citations of legislative history suggest it is less certain of the statute's unambiguity. *See* Pls.' Br. at 31–32. The court begins again with the statute itself:

> (1) As a condition of financial assistance . . . the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. . . .

> (2) Arrangements under this subsection shall include provisions that may be necessary for—

> > (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise . . . .

49 U.S.C. § 5333(b)(1)–(2). Like section 13(c)(2), this section requires some reading between the lines.

For one, "preservation" and continuation" also appear in section 13(c)(1). In its decisions on remand, the DOL defined "preservation" by referring to the verb "preserve," which it defined as "to keep from harm, damage, danger, evil; protect; save." SacRT Decision at 8 (quoting *Webster's New World Dictionary of the American Language* 1153 (college ed. 1962)); MST Decision at 8 (same). It also wrote that "preservation of rights" means "an employer cannot change rights." SacRT Decision at 9; MST Decision at 9. In light of the ambiguous meaning of "continuation," described above, the court cannot agree that any

"change" prevents a preservation or continuation of rights. Nothing about section 13(c) suggests Congress meant to use "continuation" differently in sections 13(c)(1) and (c)(2). In both sections its context and apparent purpose are similar: the status of rights during a shift to publicly operated mass transit. *Cf. Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) (the same word used in different parts of the same law is presumed to have the same meaning unless (1) it has "several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing" and (2) the context of its use shows a "variation in the connection in which the words are used" (citation and quotation marks omitted)).

Second, the meaning of the word "existing" is not immediately obvious on the face of section 13(c)(1). At one level the ambiguity is easily addressed. The DOL understood the "existing collective bargaining agreement" to refer to the agreement in force at the time a transit agency applies for federal funds. The plaintiffs do not challenge this definition, and the court finds it is a reasonable reading. Congress could not have meant to preserve only those rights "existing" at the time UMTA was passed, for example. Otherwise the employees of transit agencies created after UMTA's passage would have no "existing" rights to preserve, considering the absence of a sunset provision from section 13(c). *See Donovan*, 767 F.2d at 957 (Ginsburg, J., concurring).

Section 13(c)(1) however requires an additional inference with respect to "existing collective bargaining agreements." At face value, it refers to all "rights, privileges, and benefits . . . under existing collective bargaining agreements," regardless of the expiration of an existing agreement, regardless of renegotiations down the road, and regardless of inevitable employee turnover. That is, section 13(c)(1) could be read to refer to all rights defined in an existing agreement and require a preservation of those rights in all future agreements for all employees, past, present, and future. The plaintiffs, the DOL, and the ATU do not adopt this position, and rightly so. It seems unlikely Congress meant to freeze in place the substantive rights, privileges, and benefits negotiated at the time of each employer's first application for federal funding. Rather, the plaintiffs and the DOL infer different limitations from section 13(c)(1)'s context and history.

The DOL understands section 13(c)(1) to encompass the rights guaranteed to both (a) employees who have already been hired and (b) unknown prospective employees who may be eligible for protection under the same agreement in the future, if they are hired. *See, e.g.*, MST Decision at 20 ("[I]t is axiomatic that when an established bargaining unit expressly encompasses employees in a

specific classification, new employees hired into that classification [i.e., new hires] are included in the suit." (quoting *In re Airway Cleaners, LLC*, 362 NLRB No. 87 (Apr. 15, 2015))). In other words, the DOL interprets section 13(c)(1) to require the unchanging preservation of all rights, privileges, and benefits during the agreement's term. In contrast, the plaintiffs argue, "Congress intended section 13(c)(1) to protect the 'hard earned' pension benefits of already-hired and already-retired transit employees who risked loss of benefits and years of service in the switch from private to public employment." Pls.' Br. at 31. They acknowledge that prospective employees may have 13(c)(1) rights under a bargaining agreement, but "submit that the particular substantive rights protected by 13(c)(1) *cannot* encompass rights and benefits to which the new employee would have no claim under state law." Pls.' Resp. at 10 (emphasis in original).

These competing interpretations each have strengths and weaknesses. For example, the plaintiffs have the benefit of the most poignant dangers identified in section 13(c)'s legislative history. Among other citations, they refer to legislators' disapproval of a transit agency that refused to accept the pension obligations of a private transit company's retired employees. Pls.' Br. at 31–32. In response, the DOL argues that Congress meant for federal funding to encourage transit agencies to hire more employees. DOL Resp. at 23. It points out that Congress probably did not mean for new hires to be exempted from the protections required by section 13(c)(1). *See id.* at 23–24.

Had the DOL supported its current legal arguments with citations to specific rights, privileges, and benefits for MST's employees and then identified which PEPRA provisions eliminated MST's ability to make arrangements that protected those rights, this order might have resolved differently. Instead, on remand the DOL found (1) that this court misperceived the definition of a collective bargaining unit under MST's collective bargaining agreement; (2) that MST's bargaining agreement applied to "new employees," as defined in PEPRA; and (3) that PEPRA changed the way benefits are calculated under defined benefits plans. *See* MST Decision at 20–21.

The DOL did not explain why PEPRA prevented MST from negotiating its way around PEPRA's limitations such that past, present, and future employees' rights would be preserved, even if only in an alternative form. Section 13(c)(1) cannot be interpreted to prohibit every "change" to a collective bargaining agreement, even changes without any meaningful effect. The DOL did not explain why it made no difference that MST did not even have "new employees" covered by the existing agreement, who would be affected by PEPRA. *See* 2013

50

AR 912 ("Pension benefits under [MST's collective bargaining agreement] will not be affected by PEPRA as MST has no 'new' employees. MST has not hired any [such employee] and shall not hire any such employee [before the expiration of the collective bargaining agreement]."). To the extent the DOL's decision rests on its conclusion that PEPRA is an impermissible state-law backdrop, the court cannot uphold its reasoning, as discussed above and in the Remand Order.

The DOL's decision on remand leaves too many basic questions unanswered to be persuasive, or accorded deference. This court cannot fill in the blanks on the DOL's behalf. *See Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Neither can its attorneys after the fact. *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010).

As for MST's "new employees," the DOL's motion is denied, and the plaintiffs' motion is granted.

## VI.   CONCLUSION

The parties' cross motions are **granted in part and denied in part**:

(1)   With respect to SacRT, the DOL's motion is denied, and the plaintiffs' motion is granted.

(2)   With respect to MST's "new employees," the DOL's motion is denied, and the plaintiffs' motion is granted.

(3)   This order does not resolve the pending motions to the extent they concern MST's "classic employees"; nevertheless, with respect to these employees, the DOL's motion cannot be granted on the basis of its analysis of section 13(c)(2). Its motion is denied in that respect.

The court grants plaintiffs' request to amend the supplemental complaint to allege a claim based on the DOL's denial of certification under section 13(c)(1) with regard to MST's classic employees. An amended supplemental complaint shall be filed **within seven days**. The parties' current motions will be construed to apply to that amended supplemental pleading. To alleviate any prejudice this amendment may cause the DOL, it is granted leave to file a five-page supplemental brief in support of its motion. MST is likewise allowed a five-page supplement. Both parties' supplemental briefs shall be filed **within fourteen days** of the date this order is filed.

*/////*

1        The court does not at this point reach the question of any appropriate

2  remedy.

3        IT IS SO ORDERED.

4  DATED:  August 19, 2016.

_____
UNITED STATES DISTRICT JUDGE