UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | No. 2:13-cv-02069-KJM-DB |
| Plaintiffs, | |
| v. | ORDER |
| UNITED STATES THE DEPARTMENT OF LABOR, et al., | |
| Defendants. | |

The State of California ("State") has sought a federal grant for two state transit projects. The United States Department of Labor ("DOL") has refused to certify the State to receive the grant funds. The State argues this refusal of certification was arbitrary and capricious under the Administrative Procedure Act ("APA"). Although the court previously resolved the parties' cross motions for summary judgment, largely in the State's favor, one question remains: Whether DOL can properly base its refusal to certify the State to receive grant funds based on an intervening state law's changes to pension benefit provisions affecting certain employees that work for Monterey-Salinas Transit ("MST"). As explained below, the court grants judgment for the State on this remaining issue.

/////

/////

1

I. BACKGROUND

The parties dispute the adequacy of the statutory interpretation in which the DOL engaged to deny the State's request for funding under § 13(c)(1) of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 5301(a) ("UMTA"). The court has provided an extensive background section in its summary judgment order, *see* Order Aug. 22, 2016, ECF No. 121 ("SJ Order"), at 2-10, and so summarizes only relevant background information here.

A. UMTA

Congress enacted UMTA in 1964 to revamp deteriorating transit systems throughout the nation. 49 U.S.C. § 5301(a). UMTA created a federal agency, now called the Federal Transit Administration ("FTA"), to disburse funds for large-scale urban rail projects: Transit systems apply for funds related to specific transit projects and the FTA grants funds, subject to certain conditions. *Id.* § 5301(b)(1)-(8). UMTA sparked a national shift towards public operation of mass transportation systems. *See Jackson Transit Auth. v. Amalgamated Transit Union*, 457 U.S. 15, 17 (1982); *Kramer v. New Castle Area Transit Auth.*, 677 F.2d 308, 310 (3d Cir. 1982) (UMTA was force behind "[t]he whole move away from private transit systems and into public systems" by providing "the financial support to allow the changeover to public transportation companies").

During the legislative process, transit labor unions raised concerns about UMTA's potential impact on transit employees' rights. The unions feared local governments would use the newfound federal funding to assume operation of transit entities, and states would either restrict or outright prohibit public employers from bargaining collectively with their employees. Indeed, the National Labor Relations Act, intended to safeguard collective bargaining rights, applied (and continues to apply) only to private employees. Against this backdrop, labor unions warned UMTA could eradicate employees' hard-earned and bargained-for labor rights, conditions and benefits.

To address this concern, Congress drafted § 13(c), which frames the dispute here. *See* 49 U.S.C. § 5333(b); *see also Jackson Transit*, 457 U.S. at 17 ("To prevent federal funds from being used to destroy the collective-bargaining rights of organized workers, Congress

included § 13(c) in the Act."). Before a local government agency receives federal funds for a particular transit system, § 13(c) requires that agency to make "arrangements" to protect the rights and employment status of its employees. *Id.* The DOL is charged with certifying that the arrangements between the government agency and the affected transit employees are "fair and equitable" and that they meet the following five statutory conditions: (1) Preserve the rights, benefits, and privileges transit employees have under existing collective bargaining agreements; (2) continue these employees' collective bargaining rights; (3) protect employees' positions from worsening after the federally funded project ends; (4) assure priority reemployment status should the employees lose their jobs; and (5) offer paid training or retraining programs. *Id.* § 5333(b)(1)-(2).

The DOL may refuse to certify a state agency if existing state laws threaten any of the five requirements. A denial of certification blocks the applicant from receiving funds. As relevant here, the DOL denied the State's request for funding for MST based on the first requirement, identified above, finding a particular state law changed, rather than preserved, certain employees' pension rights in violation of § 13(c)(1). *See* MST Decision, ECF No. 88-5, at 8.

B. MST's Collective Bargaining Agreement

MST is the consolidated transportation services agency for Monterey County, California. This order pertains only to MST's "classic employees": Employees hired after January 1, 2013. Since 1983, MST and the Amalgamated Transit Union ("ATU") have entered into collective bargaining agreements that protect MST employees' labor rights. *See* Administrative Record ("AR") 50, ECF No. 100. As relevant here, a particular ATU-MST agreement was in force when, in December 2012, the State applied for UMTA funding. AR 50-51 (listing effective dates of ATU's agreement with MST as October 1, 2010 through September 30, 2013). The existing ATU-MST agreement memorialized certain pension rights for MST's classic employees. As relevant here, the agreement defines how MST will calculate a pension using the employee's final salary and the years the employee worked; it also demarcates a 36-month period during which MST classic employees can purchase "airtime." AR 793-94,

829-31. Airtime is a time credit that adds fictitious years to the true years an employee has worked before retiring; airtime can be used to increase the calculation of an employee's pension. AR 794; *see* 26 U.S.C. § 415(n)(3)(C) (explaining how these "permissive service credits" are calculated); *see also* SJ Order at n.2.

C. <u>California Law</u>

The DOL refused to certify the State's receipt of funds to benefit MST in part because a state law passed in 2012, the California Public Employees Pension Reform Act ("PEPRA"), changed the airtime rights provision applicable to MST classic employees under the bargaining agreement in place at the time. PEPRA was touted as a "sweeping reform" that limited pension benefits for state employees, increased the retirement age for public employees, required state employees to pay for half of their pension costs, and stopped abusive pension practices. Press Release, Office of Gov. Edmund G. Brown, Jr. (Aug. 28, 2012).[1] This court has discussed PEPRA in more detail in three prior orders and incorporates those discussions by reference here. *See* SJ Order at 3; *California v. U.S. Dep't of Labor*, 76 F. Supp. 3d 1125, 1130 (E.D. Cal. 2014) ("Remand Order"), *order enforced sub nom*, *California v. U.S. Dep't of Labor*, 155 F. Supp. 3d 1089 (E.D. Cal. 2016) ("Enforcement Order").

The provisions of PEPRA that matter here shortened the time during which MST classic employees could exercise their bargained-for right to purchase airtime, by nine months. *See* Cal. Gov't Code § 7522.46 (public employees may no longer purchase airtime in calculating their retirement benefits if calculation based on a percentage of his or her pre-retirement compensation). PEPRA defines airtime by reference to the federal Internal Revenue Code. *See id.* § 7522.46(a) (citing 26 U.S.C. § 415(n)(3)(C)). Under PEPRA, applications for airtime credit were no longer accepted after January 1, 2013. The preexisting ATU-MST bargaining agreement, however, gave MST classic employees the right to buy airtime through September 2013. The DOL cites this change as evidence the State did not "preserve" MST classic employees' existing pension rights, as § 13(c)(1) requires.

---

[1] At the time this order was filed, this press release was available at the following link: https://www.gov.ca.gov/news.php?id=17694.

4

D. Procedural History

Soon after PEPRA's passage, the State applied for federal funding under UMTA to benefit MST and one other state transit agency, Sacramento Regional Transit District ("SacRT"). SJ Order at 2. The DOL refused to certify the State's request for funding to benefit either agency, citing as the basis both §§ 13(c)(1) (requiring "preservation" of employees' bargained for rights) and 13(c)(2) (requiring "continuation" of these rights). *See* MST Decision at 8. The State successfully challenged the DOL's decisions under the APA in this court in 2013, and the court remanded the matter to the DOL for reconsideration. *See* Remand Order at 1089; Enforcement Order at 30. In 2015, the DOL on remand again refused to certify either agency. Again the State sought relief in this court.

In early 2016, the DOL and the State cross-moved for summary judgment on the DOL's § 13(c)(1) and 13(c)(2) certification denials as to both transit agencies. ECF No. 99; ECF No. 104. The court resolved the parties' dispute in favor of the State except with respect to the issue now before the court: The DOL's § 13(c)(1) analysis as to MST classic employees. SJ Order at 51. This issue has now been joined by the State's supplementation of its complaint to clarify that it also challenges the DOL's § 13(c)(1) certification denial as to MST's classic employees. *See* First Am. Supp. Compl. *Id.* ¶¶ 81, 109-111, ECF No. 122 (filed Aug. 29, 2016). The parties have briefed the issue, disputing the standard § 13(c)(1) imposes and whether PEPRA's airtime provision precludes satisfaction of that standard. *See* ECF Nos. 123, 124, 128, 129.

II. SUMMARY JUDGMENT: ADMINISTRATIVE REVIEW

When a plaintiff challenges a federal agency's actions under the APA, the district court does not identify and resolve factual disputes; the court instead determines whether the administrative record supported the agency's decision as a matter of law. *Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). The court examines the information the agency had before it and determines whether the agency's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *See George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009).

5

The court reviews both the path an agency took to arrive at a decision and the decision itself. *Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359, 374 (1998) (the APA "establishes a scheme of reasoned decisionmaking") (citation and quotation marks omitted); *CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001) ("[review under the APA] focuses on the reasonableness of an agency's decision-making processes."). Courts may set aside agency decisions that, although legally sound, "are not supported by the reasons that the agencies adduce." *Allentown*, 522 U.S. at 374; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Here, the State challenges the DOL's interpretation of § 13(c)(1) and the DOL's process and reasoning as arbitrary and capricious.

## III. DISCUSSION

The parties dispute what § 13(c)(1) requires. The DOL based its certification denial, in part, on its interpretation of § 13(c)(1) as prohibiting "any change" to MST classic employees' existing pension benefits. *See* ECF No. 128 at 3 (arguing PEPRA's airtime provision changed MST classic employees' benefits, warranting §13(c)(1) certification denial). The State maintains that § 13(c)(1) prohibits certification only if the State "substantially reduces" MST employees' pension rights. ECF No. 124 at 3. The DOL contends the State's position contradicts § 13(c)(1)'s plain language.

When a court reviews an agency's legal interpretation, the first step involves assessing the statute's plain meaning, which binds both the court and the agency. *United States v. Mead Corp.*, 533 U.S. 218, 227–28 & n.6 (2001); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). If a statute is ambiguous, the court must decide what level of deference to afford the agency's interpretation. *See Mead*, 533 U.S. at 227-28.

This court previously deemed ambiguous § 13(c)(1)'s terms "preserve" and "existing." *See* SJ Order at 48-49. The court also previously explained why it did not extend *Chevron* deference to the DOL's interpretation of these ambiguous terms. *Id.* at 18; Remand Order, 76 F. Supp. 3d at 1137. The court finds no basis to reconsider either determination. *See United States v. Lummi Nation*, 763 F.3d 1180, 1185 (9th Cir. 2014) (explaining when a court makes a decision in a final order, the court must generally avoid revisiting that decision later on

in the same case); *cf. United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) (district court may depart from law of case if first decision was clearly erroneous; if law, evidence, or other circumstances changed in meantime; or if applying law of case would work manifest injustice). If deference is warranted, it is under the lesser *Skidmore* standard, under which the court can review the DOL's assessment "with anything from great respect to indifference" depending on how well-reasoned it is. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The court next construes § 13(c)(1)'s ambiguities as relevant here.

> A.  Section 13(c)(1) Test

Section 13(c)(1) requires the agency applying for a federal grant to establish provisions necessary for the "preservation" of rights, privileges, and benefits under existing collective bargaining agreements. 49 U.S.C. § 5333(b)(2)(A). What constitutes an "existing agreement" and what it means to "preserve" that right are not obvious from the face of the statute. *See* SJ Order at 48-49. This court previously has resolved the ambiguity concerning what constitutes "existing agreements," concluding the term refers to agreements existing when a transit agency applies for federal funds. *Id.* at 49. The court must now determine what it means to "preserve" rights under those existing agreements.

The statute's words are always the starting point. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012). Section 13(c) provides, in relevant part:

> (1) As a condition of financial assistance . . . the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. . . .
>
> (2) Arrangements under this subsection shall include provisions that may be necessary for—
>
> (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;
>
> (B) the continuation of collective bargaining rights;
>
> (C) the protection of individual employees against a worsening of their positions related to employment;
>
> (D) assurances of employment to employees of acquired public transportation systems;

7

(E) assurances of priority of reemployment of employees whose employment is ended or who are laid off; and

(F) paid training or retraining programs.

49 U.S.C. § 5333(b)(1)-(2).

Unless Congress says otherwise, statutory terms carry their ordinary meanings. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012). At the time the UMTA was enacted, "preserve," as used in subsection (2)(A) above, could have had multiple "ordinary" meanings. "Preserve" could plausibly have meant "to keep from harm, damage, danger, evil; protect; save," *Webster's New World Dictionary of the American Language* 1153 (college ed. 1962); but it also could have meant "to "maintain" or "retain" as in to "preserve silence," *Webster's New Collegiate Dictionary* 668 (2d. ed. 1955); or it could have meant to "keep in existence or intact; as in to preserve records," *Webster's International Dictionary of the English Language* 1956 (2d ed. 1955). In other words, the term is ambiguous.

The State and the DOL interpret this ambiguous term differently. The DOL subscribes to a rigid definition, explaining that "preservation of rights" means "an employer cannot change rights." MST Decision at 9; *see also* ECF No. 128 at 4-5 (standing by its position; rejecting the State's argument that certain changes are permissible). Interpreted as the DOL would have it, the provision would effectively bar improving those rights as well. The State argues instead that changing an employee's existing bargained-for rights violates § 13(c)(1) only if the change "substantially reduces" those rights. ECF No. 124 at 2.

Contextually, neither reading holds up. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (explaining context matters, both "the specific context in which that language is used and the broader context of the statute as a whole"). The State's proposed "substantially reduced" language is statutorily indefensible: The text does not support a construction using the verb "reduced" or the strength of the adjective "substantially." The State's reading counters § 13(c)(1)'s purpose to preserve and protect existing agreements.

The DOL's interpretation on the other hand is too rigid. To construe § 13(c)(1)'s obligation to "preserve" rights as completely prohibiting an employer's "changing" rights at all

goes too far.  As noted, Congress intended to financially support mass transportation, but worried that public ownership of transit agencies would threaten rights private employees had previously won.  *Jackson*, 457 U.S. at 23-24.  Congress included § 13(c) in UMTA to "prevent federal funds from being used to destroy the collective-bargaining rights of organized workers[.]"  *Id.* at 17.  Section 13(c) was meant as a "tool to protect [transit workers'] collective-bargaining rights . . . by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities."  *Id.* at 27-28 (citing Sen. Morse's remarks, 109 Cong.Rec. 5673 (1963)).  This context suggests Congress expected collective-bargaining rights could be lost, and possibly vanish immediately, during the private-to-public shift.  This context reveals the purpose of using the word "preserve" in § 13(c)(1) was to prevent eradication of transit employees' rights or worsening of transit employees' positions; there is no indication the goal was to freeze the employees' rights indefinitely.  The DOL's rigid interpretation thus clashes with Congress's intent, a result the rules of statutory interpretation disfavor.  *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2442 (2014).

Contextually then, the "preservation" language appears to prohibit only those changes that harm or diminish bargained-for rights.  This reading, in turn, allows for changes that are either neutral or positive.  *See* SJ Order at 50 (explaining why "Section 13(c)(1) cannot be interpreted to prohibit every "change" to a collective bargaining agreement, even changes without any meaningful effect.").  One may argue if Congress meant to prohibit only negative changes, it would have said so.  Congress did use "worsening" in a later provision.  49 U.S.C. § 5333(b)(2)(C) (requiring that individual employees be protected against "worsening of their positions . . .").  Using "worsening" in one provision and "preserving" in another could suggest the latter term prohibits any changes, not just changes that harm existing rights.

Scrutinizing each word in isolation, however, can lead a reader astray.  *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69-70 (1994).  What matters under § 13(c)(1), as adopted by Congress, is the nature and degree of changes employers make to their employees' existing rights.  Hence, a contextually sound statutory reading is that changing an employee's existing bargained-for rights violates § 13(c)(1) only if the change is negative,

9

meaning it eliminates, reduces, or limits those rights, as well as meaningful, as in a change that is neither trivial nor purely semantic.

In sum, the court interprets § 13(c)(1) to provide that the DOL may deny certification where a state entity seeks funding for a transit project, but has not protected the affected transit entity's employees against meaningful negative changes to rights and benefits conferred by their then-existing collective-bargaining agreements. *Id.* Applying this standard, the court assesses whether PEPRA's airtime provision has a meaningfully negative effect on MST's classic employees. If it does, then the DOL's refusal to certify the State under § 13(c)(1) was proper.

B.  PEPRA's Airtime Changes

The State, on MST's behalf, applied for grant funding in December 2012. ECF No. 9-2 at 105-07, AR 157-59. So, the existing agreement at the time was the ATU-MST collective bargaining agreement in effect from October 1, 2010 through September 30, 2013. *See* AR 50-51. The parties agree the existing bargaining agreement allowed MST classic employees to purchase airtime through September 2013. ECF No. 124 at 2 nn.5-6. The parties also agree PEPRA's reduction of that period by nine months is the only change relevant to the court's current narrow inquiry. H'rg Tr., ECF No. 134, at 16:19-25 (DOL's counsel's effective concession that only provision directly relevant here is PEPRA's airtime provision); *see also* Cal. Gov't Code § 7522.46 (airtime provision). While DOL still argues the impact of PEPRA's airtime provision on MST classic employees should be examined in aggregation with other changes PEPRA's enactment caused, *see* Tr. at 17:5-17, the court is not persuaded. Given that only the airtime provision directly impacts MST classic employees' bargained-for rights, and the absence of authority to support DOL's position regarding its aggregation argument, the court examines the airtime provision by itself. More narrowly, then, did the nine-month reduction in time meaningfully and negatively impact MST classic employees' existing bargained-for pension rights or benefits? To answer this question, the court first determines how much deference to give the DOL's exercise of discretion to subject PEPRA's airtime provision to § 13(c)(1)'s preservation of benefits requirement.

10

1. Deference to the DOL

The DOL contends PEPRA's elimination of MST classic employees' airtime purchasing power for a nine month period warranted a § 13(c)(1) certification denial. Because the DOL's decision reflects a discretionary application of law, the court reviews the decision under *Skidmore* "with anything from great respect to indifference" depending on how well-reasoned it is. *Skidmore*, 323 U.S. at 140. As explained below, the DOL applied the incorrect legal standard, based its denial on several irrelevant PEPRA provisions, and did not rationally connect PEPRA's alleged impact to the DOL's conclusion. *See* AR 68-69.

First, the DOL's inaccurate interpretation of § 13(c)(1) colors its analysis. Instead of examining the nature and meaningfulness of PEPRA's effect on MST employees' pension rights, the DOL broadly relied on the basic fact that PEPRA "changed" government employee pension rights as proof that the State has not "preserved" existing rights. AR 69. As discussed above, however, a § 13(c)(1) analysis properly focuses on the nature and degree of change. The DOL's decision recites various PEPRA provisions, including those reviewed below; the DOL labels these as barriers to § 13(c)(1) compliance, but does not explain how the changes in state law negatively and meaningfully impact MST classic employees' rights. *Id*. Mere recitation of provisions is not reasoned decision making. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52 (it is not enough for an "agency to merely recite [ ] terms . . . as a justification for its actions; rather, the "agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made'") (internal citation omitted). The DOL also still has not addressed whether PEPRA bars MST from negotiating over the airtime changes to preserve employees' rights during the term of the collective bargaining agreement by, for example, making offsetting contributions to a defined benefits plan. *See* SJ Order at 40 (noting DOL refuses to recognize MST's ability to collectively bargain around PEPRA's restrictions).

Second, the DOL partially bases its decision on PEPRA provisions that DOL now effectively concedes do not apply to MST classic employees, as explained below. H'rg Tr. at 16:19-25 (DOL's counsel's argument only that PEPRA's airtime provision changed MST classic employees' benefits); *see also* ECF No. 128 (briefing focused only on the airtime provision). For

example, the DOL cites PEPRA's change to the definition of pensionable compensation. AR 69. But this change does not apply to MST. *See* Cal. Gov't Code § 31461 (enacting pension spiking ban on 1937 Act systems, a type of system that does not apply to any CalPERS participants, including MST employees); *see also* ECF No. 9-5 at 414 (administrative record defining Cal. Gov't Code § 31461's applicability). The DOL also condemned PEPRA's cap on pensionable compensation. AR 69 (citing Cal. Gov't Code § 7522.10(c)). But that too does not apply to classic employees at all, let alone MST's classic employees. *See* Cal. Gov't Code § 7522.10 (impacts on retired annuitants; ban on double-dipping); *id*. §§ 7522.57(a)-(d) (ban on double-dipping); *id*. § 7522.72 (pension forfeiture due to felony conviction).

Finally, the DOL offers new reasons for its decision on remand. For instance, the DOL cites the flood of government employees' December 2012 applications to purchase airtime credits as evidence of PEPRA's impact. ECF No. 128 at 5. But this finding does not appear anywhere in the DOL's initial denial decision. *See* AR 68-69. The court cannot affirm the DOL's decision based on *post hoc* rationalizations: The DOL must support its decision based on reasons articulated at the time of the first denial order. SJ Order at 51 (noting this concern); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (noting the Court has "viewed critically" an agency's "post hoc rationalization."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Food Mktg. Inst. v. Interstate Commerce Comm'n*, 587 F.2d 1285, 1290 (D.C. Cir. 1978) ("The agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result.").

In sum, the court does not defer to the DOL's decision because it is not well reasoned.

          2.     <u>Independent Review</u>

Independently analyzing PEPRA's airtime change leads to the conclusion it does not meaningfully and negatively impact MST classic employees' existing pension rights. Airtime, and the ability to purchase it, is a significant pension benefit. The court thus rejects the State's argument that § 13(c)(1) does not apply because PEPRA's airtime provision effected only a *de minimis* change. ECF No. 124 at 2. Section 13(c)(1) protects a classic employee's "rights,

privileges, and benefits." Even if airtime is considered a "benefit enhancement option," it is still a benefit: The option to enhance a benefit is a benefit in and of itself.

Completely eliminating one's ability to purchase airtime would have a meaningful and negative impact on one's pension benefits. *See* SJ Order at 3 n.2 (describing how airtime in general has a "significant" effect on retirement benefit calculations); Remand Order, 76 F. Supp. 3d at 1138. But the relevant provision here is not so drastic. PEPRA reduced the timeframe during which MST classic employees could purchase airtime. It shortened the initial 36-month period by nine months. The employees still had 27 months to purchase the airtime to which they were entitled under the bargaining agreement. The change PEPRA effected did not reduce how much airtime employees could buy; it prompted them to buy it sooner. Also, the employees knew about the deadline well before it happened: PEPRA was enacted in September 2012 but went into effect on January 1, 2013, with four months' notice. SJ Order at 3; ECF No. 124 at 4; ECF No. 128 at 5. And, as plaintiffs argue, MST and its employees could potentially offset any effect on benefits through local negotiations. The air time change was not sufficiently meaningful to trigger § 13(c)(1).

In sum, PEPRA did not meaningfully and negatively impact rights the MST classic employees enjoyed under their existing collective bargaining agreements so as to warrant a § 13(c)(1) denial. The DOL misconstrued its statutory mandate to determine that the State had not "preserved" existing bargained-for rights. The court finds the DOL's § 13(c)(1) denial was improper under the APA.

C. Conclusion

The court GRANTS the State's motion for partial summary judgment on the DOL's § 13(c)(1) denial as to MST classic employees. Given this order, the State has prevailed on all issues.

IV. REMEDIES

The State requests "a final declaratory judgment and permanent injunction preventing [the DOL] from using PEPRA to deny [§] 13(c) certification to any California transit agency grantee." ECF No. 129 at 6. The "Supreme Court has cautioned that 'injunctive relief

should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the court." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano*, 442 U.S. at 702). "This rule applies with special force where there is no class certification." *Id.*

Here, the State challenges the DOL's denials of certification as to only two transit agencies: MST and SacRT. This is not a class action. The parties have made arguments particularized to the two agencies about the relevant collective bargaining agreements, on which the court has relied to reach its decision. The court finds no basis for awarding remedies extending beyond the two state transit agencies here.

The court enjoins the DOL from relying on PEPRA, as currently enacted, to deny the State's application for funding under either § 13(c)(1) or § 13(c)(2) to the extent the State intends those funds to benefit MST or SacRT.

IT IS SO ORDERED.

This resolves ECF No. 99.

DATED: January 24, 2018.

_____
UNITED STATES DISTRICT JUDGE